**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FERNANDO FRAIZ TRAPOTE, and<br>MARIA CLARA VALLEJO TASCON,<br><br>    4600 S.W. 152 Avenue<br>    Miramar, Florida 33027<br><br>        Plaintiffs,<br><br>v.<br><br>THE BOLIVARIAN REPUBLIC OF<br>VENEZUELA,<br><br>    c/o The Head of the Ministry of Foreign<br>    Affairs<br>    Ministerio del Poder Popular para<br>    Relaciones Exteriores<br>    Dirección del Servicio Consular<br>    Extranjero, Oficina de Relaciones<br>    Consulares<br>    Edificio Anexo a la Torre MRE, piso 1<br>    Avenida Urdaneta- Esquina Carmelitas a<br>    Puente Llaguno<br>    Caracas 1010, Venezuela<br><br>    c/o President of the National Assembly of<br>    Venezuela<br>    Dinorah Figuera<br>    Embassy of the Bolivarian Republic of<br>    Venezuela<br>    1099 30th St. NW<br>    Washington, DC 20007<br><br>        Defendant. | CIVIL ACTION NO.: _____ |

**PLAINTIFFS FERNANDO FRAIZ TRAPOTE'S AND MARIA CLARA VALLEJO
TASCON'S VERIFIED COMPLAINT AGAINST DEFENDANT THE BOLIVARIAN
REPUBLIC OF VENEZUELA**

        Plaintiffs Fernando Fraiz Trapote ("Mr. Fraiz") and Maria Clara Vallejo Tascon ("Ms.

Vallejo") (collectively, "Plaintiffs") bring this action against Defendant the Bolivarian Republic

of Venezuela ("Venezuela," "Venezuelan Government," or "Defendant") and allege as follows:

**INTRODUCTION**

        1.    This action seeks compensation for Venezuela's wrongful expropriation of

Plaintiffs' property in the United States and abroad.

2.      As part of a campaign to nationalize all the means of telecommunication and publicity in the country, the Venezuelan Government, through a sham judicial proceeding, expropriated Plaintiffs' assets, including Plaintiffs' popular television station, their outdoor advertisement company, their private residence, and other private companies and investments in Venezuela and the United States.  The expropriation of Plaintiffs' assets violated international law, as the expropriation did not serve a public purpose, was motivated by political animus, and was not accompanied by just compensation.

3.      In furtherance of this wrongful expropriation, the *Junta Interventora* or Expropriation Board (the "Expropriation Board") was appointed in the sham judicial action to take and seize Plaintiffs' assets.

4.      Members of the illegitimate Expropriation Board came to the United States to seize Plaintiffs' assets in the United States pursuant to the illegitimate expropriation orders.  To this end, the Expropriation Board sought to intervene and take over Plaintiffs' interest in an action for infringement of intellectual property (*LaTele Television, C.A. v. Telemundo Communications Group, LLC*, *et al.,* Case No. 1:12-cv-22539 (the "Telemundo Action")) and in an action for the fraudulent conversion of U.S. $72,000,000 in United States Treasury Bills (*Publicidad Vepaco, C.A. and LaTele Television, C.A. v. Nelson Mezerhane and Rogelio Trujillo*, Case No. 11-4271CA04 (the "Mezerhane/ Trujillo Action")).   In these actions, the Expropriation Board substituted Plaintiffs' interests as the owner by expropriation of the underlying United States property, to wit: (i) the intellectual property rights at issue in the Telemundo Action and (ii) the U.S. $72,000,000 in Treasury Bills in the Mezerhane/ Trujillo Action.

5.      Further, because of the expropriation, Plaintiffs were also deprived of their interest

in Urban Advertising of America, Inc. which had, *inter alia*, a contract with Miami-Dade County, Florida, to commercialize outdoor advertisements in transportation facilities, with a value of more than U.S. $100,000,000.

6.      Plaintiffs are entitled to sue for compensation for the expropriation of their property in the United States pursuant to 28 U.S.C. § 1605(a)(3), which makes clear that a foreign state is not immune in an action "in which  rights in property taken in violation of international law  are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."  28 U.S.C. § 1605(a)(3).

7.      In total, the Government of Venezuela has expropriated Plaintiffs' assets in excess of U.S. $200,000,000 in the United States and in excess of U.S. $1,000,000,000 in Venezuela, which Plaintiffs are entitled to recover pursuant to 28 U.S.C. § 1605(a)(3).

## **THE PARTIES**

8.      Plaintiff Fernando Fraiz Trapote is an individual who is a permanent resident of the United States and is otherwise *sui juris*.

9.       Fraiz is a citizen of the Kingdom of Spain and the Bolivarian Republic of Venezuela.  Mr. Fraiz was born in Caracas, Venezuela, to Spanish parents.  Mr. Fraiz's birth was duly registered with the Spanish Consulate in Caracas, Venezuela, immediately upon birth.  At all relevant times, Mr. Fraiz has had a legal identification, social security number, and passport from Spain*,* and has been registered to vote in Spain.  Mr. Fraiz has a legal residence in Spain, and, together with his family, owns a number of real estate properties in Spain.  Most of his family resides in Spain.  Since 2014, Mr. Fraiz has resided in Miami, Florida.

10.     Plaintiff Maria Clara Vallejo Tascon is an individual who is a permanent resident and citizen of the United States and is otherwise *sui juris*.  Ms. Vallejo is also a citizen of the United Mexican States and the Republic of Colombia.

11.     Defendant the Bolivarian Republic of Venezuela is a "foreign state" within the meaning of 28 U.S.C. § 1603(a)-(b).  Nicolas Maduro purports to be the president of the Bolivarian Republic of Venezuela and its head of state, however, the United States does not recognize the Government of Mr. Maduro.[1]

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1330(a), which provides that "[t]he district courts shall have original jurisdiction without regard to the amount in controversy of any nonjury civil action against a foreign state . . ." within the meaning of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603(a).

13.     Accordingly, this Court has jurisdiction over Venezuela pursuant to 28 U.S.C. §1330(a) and 28 U.S.C. § 1603(a).

14.     Venezuela is not immune from suit under the so-called "expropriation exception" of 28 U.S.C. § 1605(a)(3) because this is an action in which "rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United

---

[1] Mr. Maduro has been in power since 2013, and the United States government has imposed sanctions in response to activities of the Venezuelan government for over 15 years. *See* CONGRESSIONAL RESEARCH SERVICE, VENEZUELA: OVERVIEW OF U.S. SANCTIONS (Nov. 30, 2022),  https://crsreports.congress.gov/product/pdf/IF/IF10715.  The Trump administration expanded economic sanctions against Venezuela in response to the increasing authoritarianism of Maduro. *See id.* The Biden administration has maintained sanctions on the Maduro government and its enablers. *See id.* Canada, the United Kingdom, and the European Union have also all leveraged sanctions against the Maduro government. *See id.* The sanctions the U.S. has imposed against the Maduro government include terrorism-related sanctions, drug-trafficking sanctions, and sanctions related to antidemocratic actions, human rights violations, and corruption. *See id.*

States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."

15.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(f)(4) because this is a civil action against a foreign state.

16.     Plaintiffs have retained the undersigned attorneys to represent them in the prosecution of this action and are obligated to pay such attorneys their reasonable fees and expenses.

17.     All conditions precedent to the bringing of this action have occurred, have been performed, or have been waived.

## FACTUAL BACKGROUND

18.     Since the late 1980s, Mr. Fraiz dedicated himself to acquiring, managing, and developing businesses and investments in Venezuela, significantly contributing to the development of the country.

19.      On December 8, 2001, Mr. Fraiz and Ms. Vallejo married, and their assets and investments became marital assets under Venezuelan law. Though Ms. Vallejo did not participate in business decisions or the day-to-day operations of Mr. Fraiz's businesses, Ms. Vallejo was a co-owner of these businesses with Mr. Fraiz under Venezuelan law at all relevant times.

20.     By 2014, Mr. Fraiz and Ms. Vallejo were the owners of a conglomerate of over seventeen companies with operations throughout Venezuela and with auspicious expansion plans.

21.     Four main groups of enterprises comprised their businesses and investments in Venezuela: (i) outdoor advertising; (ii) telecommunication investments, including a television network and subscription services; (iii) investments in the education sector; and (iv) investments in the real estate sector.  All four enterprise areas were mature, profitable, and with a clean track-

record before gubernatorial agencies at all levels.  Additionally, Mr. Fraiz and Ms. Vallejo had other investments in the areas of radio, digital printing, and construction.

A.    **Plaintiffs' investments in Venezuela and the United States**

1.    *Plaintiffs' investments in outdoor advertising*

22.    In 1988, Mr. Fraiz founded the company Imagen Publicidad C.A. ("Imagen Publicidad") with his father, who had emigrated from Spain, for the purpose of undertaking business in the advertising sector on public roads, streets, and highways in Venezuela.  After a decade of hard work, capital investment, and dedication, Imagen Publicidad was ranked third amongst the other companies in the Venezuelan national market for billboards and publicity.  The leading company in the late 1990s was VEPACO, which was founded in 1929 and was a pioneer in the publicity sector through public advertisements on roads.  Mr. Fraiz was the chairman of the board and president of Imagen Publicidad.

23.    In April 1998, Mr. Fraiz, his father, and another business associate acquired VEPACO with the purpose of further expanding their billboard business on public roads.  Mr. Fraiz was the chairman of the board and president of VEPACO.  At the time, VEPACO was considered one of the largest advertising companies in Latin America based on its gross revenue and far-reaching impact on roads and highways.  In order to create added value and economic efficiency, the VEPACO and Imagen Publicidad operations were consolidated during the years of approximately 1998 to 2001.

24.    VEPACO had a controlling share (85%) in Urban Advertising of America, Inc. ("Urban"), a Florida corporation that was founded in 2001 in Miami.  Urban was in the business of outdoor advertising in Florida.  Mr. Fraiz was the President of Urban.

25.    On July 18, 2011, Urban submitted a proposal in response to a Request for Proposal No. 784 from the Department of Procurement Management for the Miami-Dade County Transit

Department for the commercialization of outdoor advertisement spots in the County's transportation facilities and buses (i.e., the "Passenger Bus Shelter Program").

26.     As part of its proposal, Urban included a Statement of Financial Condition explaining that Urban was "a single purpose entity" formed by VEPACO, its "parent," and including VEPACO's audited financial statements from 2010.

27.     On November 8, 2012, VEPACO was awarded the contract by authorization of the Board of County Commissioners, who approved Resolution R-925-12.

28.     By 2014, VEPACO had thousands of advertising structures distributed throughout Venezuela, including eleven production workshops, digital printing facilities, metal production facilities, fiberglass facilities, paint facilities, fleet of cranes, trucks, SUVs, and sedan cars. VEPACO's client portfolio included well-known companies, including The Procter & Gamble Co., McDonald's Corp, American Airlines, United Airlines Holdings, Inc., Renault SA, Samsung Electronics Co. Ltd., Revlon, Inc., The Coca-Cola Co, British American Tobacco, Polar Companies, Apple, Pepsi-Cola, Seagrams Venezuela, Pernoricard, and Pizza Hut.

   **2.     *Plaintiffs' investments in the telecommunications sector***

      **(i)     Cablevision Group**

29.     On June 26, 1998, with the aim of undertaking new business through the provision of subscription television and wireless internet services, Mr. Fraiz acquired, along with his father and other investors, Cablevision Group to expand into the telecommunication sector.

30.     On July 31, 2001, Mr. Fraiz, through another company, made a capital contribution to the Cablevision Group.

31.     In 2001, after obtaining a general administrative authorization to establish and operate a telecommunications network from the Comisión Nacional de Telecomunicaciones ("Commission of National Telecommunications" or "CONATEL" by its initials in Spanish),

Cablevision Group, through its subsidiary Aire Telecommunications, began to offer online internet content and services and the continued provision of subscription television services by Cablevision Group based on licenses of 2.5 GB.

32.     In 2006, the Cablevision Group began providing internet content as well as point-to-point protocol ("PPP") / broadband service, while also maintaining its subscription television services.  After the Cablevision Group received its official grant, its internet services were widely successful and helped the Cablevision Group establish itself as one of the leading television and internet providers in the main cities of Venezuela.

33.     In 2007, Mr. Fraiz acquired all the remaining shares of Cablevision Group.

**(ii)   LaTele Venezuela**

34.     Mr. Fraiz also had investments in the business of open television production and national broadcasting.  Specifically, in 2001, Mr. Fraiz acquired, through their company Imagen Television C.A., 70% of Inversiones Vistana 333 C.A., which in turn owned Marte CVT Producciones de Televisión S.A.  ("Marte CVT").  This purchase made Imagen Television C.A. the majority shareholder of Marte CVT.

35.     Marte CVT was mainly dedicated to: (i) the production of television content, including telenovelas,[2] miniseries, and movies, which were sold to various networks in Venezuela and abroad; and (ii) the operation of a nationwide television channel that it owned called "Marte TV" through which it broadcast films, television series, and programming produced by the company itself and third parties.

---

[2] A telenovela is often thought of as a Spanish soap opera.  A telenovela is a limited-run serial dramatic television program.  However, telenovelas are distinguishable from soap operas because telenovelas have a finite ending and conclude after a defined run, generally within less than one year, with an average of approximately 120 episodes.  Unlike soap operas, which attract day-time audiences, telenovelas typically air during prime-time viewing hours.

36.     In October 2002, Marte CVT was renamed LaTele Televisión C.A. ("LaTele Venezuela").

37.     By 2014, LaTele Venezuela owned the LaTele Studios, located in Caracas, as well as two transmission towers in the National Park of Waraira Repano (known as El Ávila / El Cuño), and twelve transmitters with national coverage.  LaTele Venezuela was broadcasting its national, open television every day of the week, and all 24 hours of the day.  Its broadcast consisted of various Venezuelan movies, telenovelas, multi-episode television series and miniseries, and programming.

38.     At that time, Mr. Fraiz was the Chairman of the Board, President, and Chairman of Shareholders of LaTele Venezuela.

### (iii)   Plaintiffs' investments in the education and real estate sectors

39.     From 1988 through 2014, in addition to the business ventures mentioned above, Mr. Fraiz engaged in other business investments across different business sectors in Venezuela.

40.      Mr. Fraiz and Ms. Vallejo owned the American Academy, a well-known and notable post-secondary school in Venezuela, originally founded by Mr. Fraiz's parents in the late 1950s.

41.     Several of Plaintiffs' businesses and investments mentioned above operated out of Plaintiffs' real estate business, which encompassed at least eleven companies that were intended to own property and manage various properties and other assets.  In total, these companies owned more than 20 properties located in the Caracas Metropolitan Area and the Venezuelan States of Anzoátegui, Aragua, Carabobo, Miranda, Nueva Esparta, Táchira, and Zulia.

42.     Among these properties was the Image Tower, a building owned by Imagen Real Estate C.A. that housed, among others, the administrative and commercial headquarters of Cablevision Group, Imagen Publicidad, and VEPACO (collectively, the "Companies").  The

building had a total of more than 5,000 m², distributed over eight floors of modern offices, and was located in the Las Mercedes neighborhood, one of the most exclusive areas of Caracas, surrounded by luxury hotels, retail stores, and restaurants.  Mr. Fraiz acquired the different floors of the Image Tower building between 1992 and 1996 and promoted its complete structural remodeling in order to modernize it and adapt it to the commercial needs of his Companies.

**B.**   **Venezuela's Expropriations of Plaintiffs' investments in Venezuela**

    **1.**   ***The Measures against Cablevision Group***

43.   In 2013, Henrique Capriles Radonski contested the 2013 elections where President Nicolás Maduro declared himself president of Venezuela.  This action generated a great political crisis and unrest in Venezuela; and as a result, the Venezuelan Government began to exert greater control and pressure on the telecommunications sector.  The Venezuelan Government targeted the telecommunication companies of Mr. Fraiz and Ms. Vallejo as part of this massive campaign to control the means of communication in Venezuela.

44.   The campaign against Plaintiffs' telecommunication companies began on May 20, 2013, when the Government of Venezuela, through CONATEL, revoked the permits that had authorized Cablevision Group to operate on the spectrum frequencies for the provision of its internet and subscription television services.

45.   On June 27, 2013, representatives of the Government of Venezuela appeared at Cablevision Group's facilities and disconnected and seized the equipment, forcing Cablevision Group to discontinue service to all its clients.

46.   Cablevision Group expressly opposed such measures, arguing, *inter alia*, that the interim measures were imposed without foundation, and requesting that the order be lifted.

47.   On July 19, 2013, Cablevision Group presented its defense brief in a sanctions procedure initiated as a result of the ruling against Cablevision Group, where it exposed the various

irregularities of said ruling and the sanctioning procedure.

48.     A few days later, on July 26, 2013, CONATEL revoked the preliminary measure concerning the seizure of the equipment and ordered the return of the seized equipment to Cablevision Group and confirmed the preliminary measure of suspension of the use of the spectrum frequencies (imposed by CONATEL) in Caracas.  Regarding the sanction procedure, once Cablevision Group presented its defense, CONATEL never conducted the purported investigations, and the process was abandoned without proving any of the accusations against Cablevision Group.  However, by then, the situation was irreversible.  Cablevision Group had lost its clientele by disconnecting it from services for more than a month.  This was further compounded when on December 16, 2014 CONATEL awarded the spectrum frequencies, which Cablevision Group previously had, to other Venezuelan entities – Telefónica in Venezuela and Galaxy Entertainment of Venezuela C.A. ("Direct TV") for the rest of Cablevision Group's concession term, the value of which was more than $500 million.

**2.     *The Sixth Court and the Expropriation Board take control of the rest of Plaintiffs' investments***

**(i)     The arbitrary measures taken by the Sixth Court**

49.   In May 2014, the expropriation campaign was extended to VEPACO, including all the outdoor advertisement facilities.  To this end, on May 7, 2014, the Sixth Circuit Control Court of First Instance Criminal Judicial Court of the Metropolitan Area of Caracas (the "Sixth Court") concocted and published, without any legal basis, in a sham and arbitrary judicial proceeding, a decision that ordered the expropriation of the Imagen companies, including LaTele, and appointed an oversight board called La Junta Interventora or the Expropriation Board. The Court's May 7, 2014 order stated in part:

> "DECREE[D] THE PRECAUTIONARY MEASURE PROHIBITING THE DISPOSITION AND ENCUMBRANCE of the real and personal assets and the

takeover of the firms that guarantee the results of the investigation that be under or list the names of . . . FERNANDO FRAIZ TRAPOTE

[. . .]

DECREE[D] THE FREEZING AND IMMOBILIZATION of each and every bank account that includes as natural and legal persons . . . FERNANDO FRAIZ TRAPOTE [. . .]

DECREE[D] THE PRECAUTIONARY MEASURE appointing an OVERSIGHT BOARD [JUNTA INTERVENTORA] . . . for the purpose of protecting the continued provision of the universal public service, [and] the use of the frequency assigned for open television . . ."

*See* Order dated May 7, 2014, attached hereto as **Exhibit A.**

50.     Acting with the consent of the Sixth Court in the sham judicial proceeding, on May 9, 2014, the Expropriation Board raided the companies of Mr. Fraiz and Ms. Vallejo, without prior notice, threatening the companies' employees and taking control of all of the companies' personal property, real estate, bank accounts, documentary files, servers and computer systems without accountability or compensation of any kind.  The Expropriation Board then arbitrarily, improperly, and unjustifiably disposed of all the expropriated assets.

**(ii)   The Expropriation Board's expropriation of VEPACO, Cablevision Group, and LaTele Venezuela**

51.     On May 9, 2014, the Expropriation Board took over and occupied the offices located in Tower Imagen, among them those of VEPACO and Cablevision Group, destroying their records and files and stealing documentation and computer hardware.  The Expropriation Board replicated these same actions at the headquarters of LaTele Venezuela and, just days later, at the American Academy.  From that moment on, the Expropriation Board, with the support of the Sixth Court and Venezuelan security forces, maintained absolute control over VEPACO, Cablevision Group, and LaTele Venezuela, preventing Mr. Fraiz, and all the other directors and managers, from entering their premises. On May 19, 2014, the Sixth Court issued another order expanding

the capability and oversight role of the Expropriation Board, thereby granting it the power to manage LaTele's affairs.  *See* Order dated May 19, 2014, attached hereto as **Exhibit B.**  The May 19th order further provided that "the president, as well as the members of the current Board of Directors shall be discharged of their duties upon the installation of the [Expropriation] Board." On the basis of this expansion, the Expropriation Board entered into "contracts" with the unrelated company Asociación Civil Valbuena & Makarem S.C. ("V&M") (whose owners were friends with Maduro and/or with the ruling political powers), allowed the Expropriation Board to dispose of the assets of American Academy, VEPACO, and LaTele Venezuela.

52.    In reality, the great majority of all the VEPACO billboards were used by the official political party and Maduro, as the following pictures confirm:





53.     In addition to the unlawful expropriation of Plaintiffs' business enterprises, Plaintiffs' private residence was unlawfully seized and occupied by the Expropriation Board, which seized Plaintiffs' personal effects, such as jewelry, artwork, furniture, watches, and other goods.

### (iii)   The Expropriation Board's expropriation of the American Academy

54.     On May 21, 2014, the Expropriation Board occupied the American Academy.  In similar fashion, the Expropriation Board sent representatives to the American Academy office and informed executives and employees present that, based on the alleged Preliminary Measures of the Sixth Court, they were taking control of the company.  Thereafter, the Expropriation Board took control of its operations, including its assets, bank accounts, income, and documentary records.

### (iv)   The unauthorized transfer of ownership rights from the Expropriation Board to others

55.     In the following months, the Expropriation Board proceeded to grant ownership

rights to various individual members of the Expropriation Board and/or the Venezuelan Government, using the authorization granted in the May 19, 2014 Sixth Court order, which stated in part that, "the appointed interventionists [Expropriation Board members] shall have unlimited authority of auditing, administration, disposal, control and monitoring, including all the responsibilities that the Law as well as the Corporate Bylaws confer to the Assembly Shareholders, to the Administrators and to the other administrative bodies of the [Grupo Imagen companies]."

56.     The Expropriation Board subsequently authorized V&M to manage and control all types of operations of the expropriated companies, and to dispose of their assets, including receiving payments made by the customers and users of the various services provided.

**C.     Mr. Fraiz and his Companies Exhaust Local Remedies in Venezuela**

57.     Mr. Fraiz, through his attorneys and the legal representatives of his companies, repeatedly tried to revoke the preliminary measures and regain control of his investments.  To this end, Mr. Fraiz filed numerous challenges before both Venezuelan judicial Courts and other administrative and executive bodies of Venezuela.

58.     From 2013 to 2023, Mr. Fraiz's efforts to regain ownership and control of his companies were unsuccessful or ignored.  Judicial bodies and administrative agencies failed to recognize the impropriety of the Expropriation Board's actions.

59.     On May 16, 2014, the Attorney General of Venezuela filed a motion requesting the complete nullification of the Sixth Court's decision dated May 7, 2014. The Attorney General's motion called for the revocation of the Sixth Court's decision, reasoning that the decision was completely contrary to the laws of Venezuela, was in violation of due process and proper judicial involvement and violated the laws of criminal procedure in Venezuela.

60.     On June 17, 2014, Mr. Fraiz filed a complaint with the independent Attorney General of Venezuela, detailing the unlawful expropriation of the Imagen companies, including

LaTele, based on the Sixth Court's May 7, 2014 order.

61.     Finally, on March 5, 2019, Dr. Zair Mundaray, the General Director of Procedural Action of the Public Ministry of Venezuela based in Bogota, Colombia, declared the illegality of the Expropriation Board and the expropriation of Plaintiffs' Companies by the Government of Venezuela.  Dr. Mundaray declared the actions of the Expropriation Board, and the Sixth Court's decision authorizing such actions, to be illegal and in violation of the laws of Venezuela.

62.     Despite all these efforts, the Expropriation Board maintained control and ownership of Plaintiffs' companies.  The expropriations were in clear violation of Venezuelan law as the Attorney General concluded in its May 7, 2014 decision, but the Government of Venezuela refused to return the expropriated property.

63.     The measures promoted by the Venezuelan Government (via Maduro and his Vice-President), CONATEL, the Sixth Court, and the Expropriation Board resulted in the wrongful seizure and destruction of Plaintiffs' investments and assets in Venezuela, and their ultimate transfer to third parties associated with the Venezuelan Government or to the Venezuelan Government itself.  For example, LaTele Venezuela's facilities and studios have become operated and controlled by the Venezuelan Government called Televisora Venezolana Social ("TVES") and are used to broadcast government content only.  The Expropriation Board still manages the license and the signal for LaTele Venezuela.

**D.     Venezuela's expropriation on U.S. soil of Plaintiffs' property interests in two lawsuits**

**1.     *The Telemundo Action – copyright & trademark violations***

64.     Mr. Fraiz was the President, Chairman of the Board, Chairman of the Shareholders, and ultimately, the sole shareholder of LaTele Venezuela.

65.     LaTele Venezuela claimed to be the rightful owner of the telenovela *Maria Maria*. This telenovela was written in 1989/1990 and consisted of 198 episodes, principally written by

Humberto "Kiko" Olivieri Michelena.   LaTele Venezuela registered *Maria Maria* in Venezuela on December 30, 1991, and registered *Maria Maria* in the U.S. with the U.S. Copyright Act, with an effective date of registration of November 9, 2010.  *Maria Maria* was immensely popular during its initial run in Venezuela and was later re-broadcasted in various countries and locations in: Venezuela, the United States, Spain, Italy, Bolivia, Colombia, Costa Rica, the Dominican Republic, Ecuador, El Salvador, Guatemala, Honduras, Panama, Paraguay, Peru, and Puerto Rico.

66.     Years later, Telemundo Television Studios, LLC, Telemundo Studios Miami, LLC, Telemundo Network Group, LLC, and Telemundo Internacional, LLC (collectively, the "Telemundo Companies") and Telemundo Communications Group, LLC (the parent company of the Telemundo Companies) (collectively, the "Telemundo Defendants") engaged Mr. Olivieri Michelena to write telenovelas for the channel.  From approximately 2008 to 2009, Mr. Olivieri Michelena re-wrote *Maria Maria* as *El Rostro de Analia* ("*El Rostro*"), which, notably, was the original working title of *Maria Maria*.  Mr. Olivieri Michelena copied much, if not all, of *Maria Maria*'s expressions and protected elements resulting in the telling of a virtually identical story. *El Rostro* consisted of near-identical characters to *Maria Maria*, and replicated every key aspect of *Maria Maria,* including the same core plot, same sequence of events, and similar dialogue, paces, mood, and tone.

67.     Around 2008 to 2009, the Telemundo Companies produced *El Rostro,* an Americanized telenovela in Spanish, in Hialeah, Florida, and broadcasted and distributed *El Rostro* to 40 countries.  *El Rostro* was one of the most successful telenovelas in Spanish for the Telemundo Defendants.  All of this was done in violation of LaTele's intellectual property and ownership rights through LaTele Venezuela.

68.     On July 10, 2012, LaTele Venezuela, controlled and directed by Mr. Fraiz, filed a

– 17 –

lawsuit in the U.S. District Court for the Southern District of Florida (Miami Division) against the Telemundo Defendants for: (i) copyright infringement, (ii) contributory copyright infringement, and (iii) vicarious copyright infringement under 17 U.S.C. §101 *et seq.  See* Telemundo Action. LaTele Venezuela sought declaratory judgment and monetary damages in this lawsuit.

69.     LaTele Venezuela (owned and controlled by Plaintiffs) and the Telemundo Defendants engaged in a lengthy discovery phase and made progress in resolving the matter.

70.     However, on November 19, 2014, over two years after the filing of the Telemundo Action, to Plaintiffs' surprise, Manuel Arthur Mesa, a Miami-based attorney with the Law Offices of Mesa & Associates, P.A., who the Expropriation Board retained, unlawfully intervened in the litigation by filing a Notice of Appearance as "Co-Counsel" for LaTele Venezuela.  *See* Telemundo Action, D.E. 371.

71.     After his appearance, Mr. Mesa made a series of filings that put into question whether the Expropriation Board or LaTele Venezuela (and indirectly, Plaintiffs) had the right to litigate the action over the ownership rights of LaTele Venezuela and the telenovelas against the Telemundo Defendants. *See, e.g.,* Telemundo Action, D.E. 516

72.     On November 6, 2018, the Court ruled that LaTele Venezuela had, in fact, been expropriated and that the ownership of the company belonged to the Expropriation Board pursuant to the expropriation order.  *See* Telemundo Action, D.E. 606 at pp. 4-6.

73.     Mr. Fraiz appealed the Court's decision on who the proper representative of LaTele Venezuela was, arguing that it was he and not the Expropriation Board.  *See* Telemundo Action, D.E. 617.

74.     In the meantime, the Expropriation Board continued the litigation of LaTele Venezuela against the Telemundo Defendants, and ultimately settled the Telemundo Action.  *See*

Telemundo Action, D.E. 624, 625

75.     However, because of Plaintiff's pending appeal, the Court entered a stay and ordered preventing the distribution of any settlement proceeds pending the resolution of Plaintiff's appeal.  *See* Telemundo Action, D.E. 639.

76.     Ultimately, the appeal was dismissed on August 20, 2021, with the United States Court of Appeals for the Eleventh Circuit noting that "[w]hen an appeal is taken on behalf of an artificial entity by someone without legal authority to do so, the appeal should be dismissed." *See* Telemundo Action, D.E. 669; *Latele TV, C.A. v. Telemundo Communs. Grp., LLC*, 9 F.4th 1349 (11th Cir. 2021) (quoting *J.J. Rissell, Allentown, PA Tr. v. Marchelos*, 976 F.3d 1233, 1235-26 (11th Cir. 1985)).

77.     In essence, Plaintiffs' property rights in the Telemundo Action were expropriated in the United States through the Expropriation Board's actions.  Venezuela's appropriation of the Telemundo Action and subsequent settlement was an expropriation in the United States in violation of international law.

**2.     *The Mezerhane/ Trujillo Action – fraud, conversion, and theft of U.S. Treasury Bills***

78.     Prior to 2009, Banco Federal ("Federal Bank") was one of the largest banks in Venezuela.

79.     Nelson Mezerhane ("Mr. Mezerhane"), a well-known businessman in Venezuela, was the owner of Federal Bank, the Chairman of its board of directors, and its chief director.

80.     Rogelio Trujillo ("Mr. Trujillo") was Federal Bank's CEO, a member of its board of directors, and one of its principal directors.

81.     In October 2009, Mr. Fraiz met with Mr. Trujillo to secure necessary financing for: (i) VEPACO to fund mergers and expansion (such as for Urban), as well as to fund the acquisition of specialized equipment, and (ii) LaTele Venezuela to fund various television programs

(including telenovelas) produced outside of Venezuela.  Pursuant to common Venezuelan practice, Mr. Fraiz sought financing loans to purchase Venezuelan bonds that could be easily converted into U.S. Treasury Bills, which could later easily be liquidated into U.S. dollars.

82.     On October 15, 2009, Federal Bank advised Mr. Fraiz that the loans were approved. One loan was for VEF 105,000,000.00 Bolivars to VEPACO, and the other for VEF 50,000,000.00 Bolivars to LaTele Venezuela.  Federal Bank fully funded the two loans that it had agreed to provide to Mr. Fraiz and deposited VEF 104,895,00.00 into VEPACO's bank account and VEF 49,950,00.00 into LaTele Venezuela's bank account.

83.     From there, Mr. Fraiz gave the instructions to purchase Venezuelan bonds in U.S. dollars.  Because the Venezuelan Government did not allow financial instruments, such as bonds, denominated in U.S. dollars to be custodied in Venezuela, Mr. Fraiz gave the instructions that the custody of the Venezuelan bonds be transferred to bank accounts in Curaçao in the names of LaTele Venezuela and VEPACO.  These instructions were carried out by Mr. Merzerhane and/or Federal Bank.

84.     From there, Mr. Fraiz gave the instructions for the Venezuelan bonds denominated in U.S. dollars to be used to purchase and/or exchanged for U.S. Treasury Bills.  The Venezuelan bonds in U.S. dollars were then exchanged and/or purchased for U.S. Treasury Bills in the U.S. (Treasury Bill dated 11.19.2009, CUSIP No. 912795S51, amount of U.S. $23,233,000; Treasury Bill dated 11.19.2009, CUSIP No. 912795S51, amount of U.S. $39,767,000; and Treasury Bill dated 12.17.2009, CUSIP No. 912795S69, amount of U.S. $9,070,500).  However, immediately thereafter, the Treasury Bills were illegitimately and fraudulently transferred to an account(s) controlled by Mr. Merzerhane without authorization or consent of Mr. Fraiz.

85.     Once it was clear to Mr. Fraiz that he had been defrauded by Mr. Merzerhane, Mr.

Trujillo, and Federal Bank, Mr. Fraiz began investigating the whereabouts of the Treasury Bills.

86.   In addition to defrauding Mr. Fraiz, VEPACO, and LaTele Venezuela, Federal Bank, through Mr. Mezerhane and Mr. Trujillo, defrauded and stole the assets of many of Federal Bank's clients and customers.

87.   On December 21, 2011, Mr. Fraiz filed suit on behalf of his companies, VEPACO and LaTele Venezuela, against Mr. Mezerhane and Mr. Trujillo, alleging: (1) fraud against Mr. Trujillo; (2) conspiracy to commit fraud against Mr. Mezerhane and Mr. Trujillo; (3) conversion against Mr. Trujillo; (4) conversion against Mr. Mezerhane; (5) conspiracy to commit conversion against Mr. Mezerhane and Mr. Trujillo; (6) civil theft conversion against Mr. Mezerhane and Mr. Trujillo; (7) and unjust enrichment in conjunction with the orchestration of a massive fraudulent banking scheme involving Federal Bank against Mr. Mezerhane and Mr. Trujillo. *See* Mezerhane/ Trujillo Action.

88.   On December 16, 2016, Mr. Mesa and his law firm, Law Offices of Mesa & Associates, P.A., entered a notice of appearance in this case, purportedly on behalf of the Plaintiffs yet without any consent or authorization from Mr. Fraiz. *See* Mezerhane/ Trujillo Action, D.E. 6.

89.   Thereafter, Mr. Fraiz and his counsel filed various motions disputing Mr. Mesa's and the Expropriation Board's authority to intervene and take control of the lawsuit on behalf of VEPACO and LaTele Venezuela.  *See, e.g.,* Mezerhane/Trujillo Action, D.E. 7.

90.   Ultimately, however, the trial court ruled against Mr. Fraiz and held that Mr. Mesa, on behalf of the Expropriation Board, was counsel of record for VEPACO and LaTele Venezuela by virtue of the expropriation of the companies, and not Mr. Fraiz's counsel of choice.  *See* Mezerhane/ Trujillo Action, D.E. 110.  Separately, the trial court granted Mezerhane and Trujillo's motions to dismiss for want of prosecution.  *See* Mezerhane/ Trujillo Action, D.E. 76.

91.     On December 7, 2018, the appellate court confirmed that Mr. Mesa, and not Mr. Fraiz's counsel of choice, represented VEPACO and LaTele Venezuela in the Mezerhane/Trujillo Action.  *See* Mezerhane/ Trujillo Action, D.E. 112.  Then, on November 6, 2019, the appellate court confirmed the trial Court's dismissal of the Mezerhane/ Trujillo due to VEPACO and LaTele Venezuela's failure to prosecute the action.  *See* Mezerhane/ Trujillo Action, D.E. 117.

92.     The Expropriation Board's actions in the Mezerhane/ Trujillo Action deprived Plaintiffs of their property rights and constituted an expropriation by Venezuela of Plaintiffs' property rights on U.S. soil in violation of international law.

93.     This expropriation caused Mr. Fraiz to suffer damages over U.S. $72,000,000 – the value of the Treasury Bills belonging to VEPACO and LaTele Venezuela that were stolen.

**3.     *Plaintiffs are deprived of Contract with Miami-Dade County in the United States***

94.     On November 8, 2012, in Miami-Dade County, Florida, the Board of County Commission authorized the execution of a contract with Urban by approving Resolution R-925-12 (the "Contract").

95.     The Contract granted Urban the right to manage and commercialize the County's "Bus Shelter Program."  Specifically, Urban had the right to "sell advertising, install, and maintain high quality, expertly designed commercial advertising displays on bus passenger shelters that produce the greatest revenue for the County."  Contract at p. 9.  The Contract included a detailed appendix describing Urban's obligations concerning the Bus Passenger Shelter Program that included maintaining and repairing the shelters, securing appropriate advertising for the shelters, and installing and/or upgrading LED lighting for the shelters.  Contract at pp. 43-54.

96.     In exchange for the right to manage and commercialize the Bus Shelter Program, the Contract required Urban to make minimum rental payments of U.S. $140,000 per month to the County.  Contract at pp. 14-15.  To secure Urban's financial obligation, the County required Urban

to maintain an U.S. $840,000 letter of credit.

97.     As a result of the Expropriation Board's expropriation of VEPACO, between 2013 and 2014, Urban (which was controlled and majority owned by VEPACO) was also expropriated and brought under the control of the Expropriation Board. Following that, the Expropriation Board neglected to make the payments due by Urban to the County under the Contract. As a result, the County sent Urban a default notice.

98.     Mr. Fraiz explained to the County that the Government of Venezuela had expropriated the assets of VEPACO – the parent company of Urban – and that Plaintiffs could no longer make the contractually required payments because Urban's funds came from VEPACO in Venezuela. Ultimately, the County sued Urban. *See Miami-Dade County v. Urban Advertising of America, Inc*., Case No. 15-001106-CA-01, filed on January 15, 20105, in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.

99.     Thereafter, Plaintiffs had no option other than to enter into a settlement agreement under which Urban reassigned the multi-million-dollar contract to another party which resulted in Urban losing its investments.

**4.    *Plaintiffs are deprived of other intellectual property in the United States***

100.    After its appointment, the Expropriation Board took control of Plaintiffs' other intellectual property rights, including but not limited to, the intellectual property rights to various telenovelas that were broadcasted in the United States.

**5.    *Plaintiffs' efforts to exhaust local remedies have been ignored by the judicial system in Venezuela***

101.    The Government of Venezuela is not recognized by the United States.

102.    On June 17, 2014, Mr. Fraiz filed a complaint with the Attorney General of Venezuela seeking a declaration that the actions of the Expropriation Board were null and void.

This complaint detailed the unlawful expropriation of LaTele and the Imagen companies based on the Sixth Court's May 7, 2014 order.

103.    However, these petitions have been ignored and remain in judicial limbo as of this date.

104.    Mr. Fraiz filed a demand for arbitration against Venezuela in the Permanent Court of Arbitration, but this arbitration was dismissed for lack of jurisdiction on January 31, 2022.

105.    All the local remedies available to Plaintiffs in Venezuela or in any other jurisdiction have been satisfied or are otherwise futile.

106.    Consequently, this litigation ensued.

**COUNT FOR EXPROPRIATION IN VIOLATION OF INTERNATIONAL LAW PURSUANT TO 28 U.S.C. § 1605(a)(3)**

107.    Plaintiffs re-allege and incorporate paragraphs 1-106 as if set forth fully in this count.

108.    The Government of Venezuela, through the unlawful actions of the Expropriation Board appointed in a sham judicial proceeding, expropriated Plaintiffs' property interests in various companies and businesses in Venezuela and the United States.

109.    This expropriation was in violation of international law, as Plaintiffs were citizens of other nations.  Specifically, Mr. Fraiz was a citizen of Spain (and Venezuela), and Ms. Vallejo was a citizen of Colombia and Mexico and is now a citizen of the United States.  Ms. Vallejo was never a citizen of Venezuela.  Further, the expropriation extended beyond the borders of Venezuela.  Therefore, this is an action in which rights in property taken in violation of international law are in issue.

110.    The expropriation of Plaintiffs' assets further violated international law, as the expropriation did not serve a public purpose, was motivated by political animus, and was not

accompanied by just compensation.

111.    Part of the expropriated property, including but not limited to Plaintiffs' intellectual property and litigation rights in the Telemundo Action, Plaintiffs' litigation rights in the Mezeranhe/ Trujillo action, Plaintiffs' rights in the Urban Contract, and Plaintiffs' intellectual property rights, is present in the United States in connection with a commercial activity carried on in the United States by the Government of Venezuela.

112.    Further, expropriated property or property exchanged for that property is owned by an agency or instrumentality of the foreign state, and that agency or instrumentality of Venezuela engaged in a commercial activity in the United States.  Specifically, the Expropriation Board is an agency or instrumentality of the Government of Venezuela that owned the property expropriated from the Plaintiffs.  The Expropriation Board is engaged in commercial activity in the United States, including the negotiation and ultimately settlement of the Telemundo Action.

113.    Plaintiffs were directly and proximately damaged as a result of Venezuela's expropriation of Plaintiffs' various companies, business interests, and property in Venezuela.

**WHEREFORE**, Plaintiffs Fernando Fraiz Trapote and Maria Clara Vallejo Tascon demand judgment against Defendant the Bolivarian Republic of Venezuela for compensatory damages in an amount to be proven at trial, lost profits, lost opportunities, lost shareholder value, and any and all other relief the Court deems just and proper.

Dated: July 20, 2023                          Respectfully submitted,

*/s/ Daniel Z. Herbst*
Daniel Z. Herbst
D.C. Bar No. 501161
**REED SMITH LLP**
1301 K Street, N.W.
Suite 1000, East Tower
Washington, DC 20005

Telephone:  202-414-9232
dherbst@reedsmith.com

*and*

Francisco A. Rodriguez (*pro hac vice forthcoming*)
Florida Bar No. 653446
Sandra J. Millor (*pro hac vice forthcoming*)
Florida Bar No. 13742
Ana R. Ulseth (*pro hac vice forthcoming*)
Florida Bar No. 1022151
**REED SMITH LLP**
200 S. Biscayne Blvd
Suite 2600
Miami, FL 33131
Telephone: (786) 747-0200
Francisco.Rodriguez@reedsmith.com
SMillor@reedsmith.com
AUlseth@reedsmith.com

*Attorneys for Plaintiffs*

**<u>VERIFICATION</u>**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, pursuant to 28 U.S. Code § 1746, to the best of my knowledge.

Executed on this 18th day of July, 2023.

_____

Print Name: Fernando Fraiz Trapote

_____

Print Name: Maria Clara Vallejo Tascon