UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| FERNANDO FRAIZ TRAPOTE and MARIA CLARA VALLEJO TASCON, <br><br> *Plaintiffs*, <br><br> v. <br><br> THE BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> *Defendant*. | Case No. 1:23-CV-2118-LLA <br><br> <u>ORAL ARGUMENT REQUESTED</u> |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANT'S MOTION FOR SUBSTITUTION
<u>OF THE REAL PARTY IN INTEREST AND SUBSTITUTION OF COUNSEL</u>**

David P. Riesenberg (D.C. Bar No. 1033269)
Dilmurod Satvaldiev (D.C. Bar No. 90027884)
PINNA GOLDBERG U.S. PLLC
10 G Street NE, Suite 600
Washington, D.C., 20002, U.S.A.
T: +1 (202) 549-2477
E: driesenberg@pinna-goldberg.com

June 5, 2025                               *Counsel for Defendant*

# INTRODUCTION

Defendant, the Bolivarian Republic of Venezuela, submits this Memorandum of Points and Authorities in support of a Motion for Substitution of the Real Party in Interest and Substitution of Counsel under Rules 17 and 25 of the Federal Rules of Civil Procedure. Respectfully, the previously listed counsel for Defendant must be removed as attorneys of record and replaced by the undersigned in accordance with Defendant's instructions.[1]

In summary, Defendant's Motion for Substitution should be granted for the following reasons.

***First***, as detailed below in **Part I**, the undersigned have been appointed to represent the interests of Defendant and the people of Venezuela pursuant to instructions from the Office of the Attorney General ("OAG") in Caracas, Venezuela's capital city.

Under the Venezuelan Constitution and Venezuelan law, it is exclusively the OAG in Caracas—and no other entity—that possesses responsibility and competence to appoint legal counsel on behalf of Defendant for the present litigation. Similarly, relevant U.S. officials within the U.S. Executive Branch have also recognized the Caracas authorities to constitute the government of Venezuela.[2]

---

[1] The undersigned have respectfully conferred with the previously listed counsel, Mr. Gregory A. Paw, who opposes the relief sought. The undersigned also have contacted Counsel for Plaintiffs, who have not yet taken a position on this Motion for Substitution.

[2] *E.g.*, U.S. Department of Homeland Security, Statement (May 14, 2025), https://x.com/dhsgov (Riesenberg Decl., Ex. 66); *see also Venezuela frees 6 Americans after meeting between Maduro, Trump envoy*, Voice of America, reposting from the Associated Press (Jan. 31, 2025) (Riesenberg Decl., Ex. 63); Decl. of Michael G. Kozak ¶¶ 2-3 (Mar. 15, 2025) (Riesenberg Decl., Ex. 65); *Venezuela's Maduro thanks Trump for return of toddler left behind in US,* Reuters (May 14, 2025) (Riesenberg Decl., Ex. 67); *Venezuela Frees U.S. Air Force Veteran in Overture to Trump,* Wall Street Journal (May 20, 2025) (Riesenberg Decl., Ex. 68).

***Second***, as detailed below in **Part II**, the present Motion does **not** require this Court to scrutinize every complex dimension of the United States' political relationship with Caracas. *See, e.g.*, *Nat'l Petrochemical Co. v. M/T Stolt Sheaf*, 860 F.2d 551, 554 (2d Cir. 1988) ("[C]ourts are hardly competent to assess how friendly or unfriendly our relationship with a foreign government is at any given moment . . . .").

To the contrary, the single, narrow question facing this Court is whether "the courts should be closed" to a foreign government seeking to raise meritorious defenses in good faith. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410, 412 (1964). As the U.S. Supreme Court has explained, "access to the federal courts" should be preserved irrespective of the political "animosity" or "unfriendliness" between the United States and a particular foreign government— including even the total "severance of diplomatic relations" (which is not the situation here). *See id.* ("Although the severance of diplomatic relations is an overt act with objective significance in the dealings of sovereign states, we are unwilling to say that it should inevitably result in the withdrawal of the privilege of bringing suit."); *see also Chabad v. Russian Fed'n*, 110 F.4th 242, 254-255 (D.C. Cir. 2024) (recognizing the United States' well-established interest in "'encourag[ing] foreign sovereigns generally to resolve disputes within the United States' legal framework'" (quoting *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 447 F.3d 835, 838-39 (D.C. Cir. 2006)).

Accordingly, as detailed below, the key point for evaluating the present Motion is that the current U.S. officials within the U.S. Executive Branch have not expressed any intention to exclude the OAG in Caracas from either **(1)** raising meritorious jurisdictional defenses under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611, or **(2)** otherwise vigorously defending the interests of the Venezuelan people with factual evidence <u>accessible exclusively in</u>

2

<u>Venezuela</u>.  Indeed, from multiple perspectives, it would impose an impossible burden on this Court to proceed with adjudicating this fact-intensive dispute without meaningful participation from Caracas.  Nor would excluding the OAG's participation from the specific case before this Court have any conceivable benefit for the United States or the people of Venezuela.  It is thus highly implausible that the U.S. Executive Branch actually intends to prevent the Caracas authorities from representing Defendant and the Venezuelan people <u>in this specific U.S. litigation</u>, whatever the broader diplomatic and political situation might be.

To help illustrate these points, Defendant respectfully lodges herewith **<u>Exhibit #1</u>**, which is Defendant's Proposed Motion to Dismiss.  Significantly, at least with respect to the FSIA arguments contained in Defendant's Proposed Motion, this Court must give *sua sponte* consideration to those jurisdictional arguments **(1)** irrespective of whether the OAG formally participates in this case and **(2)** irrespective of whether the FSIA arguments are raised now in the Proposed Motion to Dismiss—or even <u>many years after a final judgment</u>.[3]

As to the non-FSIA arguments and (especially) the potential evidentiary issues, the undersigned and Co-Counsel are presently consulting with other entities and/or individuals in Caracas with a potentially strong interest in this U.S. litigation.

Such entities and/or individuals may ultimately seek to file a Motion (or Motions) to Intervene under Rule 24 of the Federal Rules of Civil Procedure for the purpose of possibly

---

[3] *See, e.g.*, *Chabad*, 110 F.4th at 256 (vacating a default judgment based on FSIA arguments raised by a third-party subpoena recipient <u>after ten years of post-judgment litigation</u>, wherein the Russian Federation had not participated); *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 426 (S.D.N.Y. 2019) (considering FSIA arguments contained in a letter sent to the court's fax machine from the Russian Ministry of Justice (ECF 186), even though the Russian Federation itself "ha[d] not appeared"); *Walters v. People's Republic of China*, 672 F. Supp. 2d 573, 574, 575 n.2 (S.D.N.Y. 2009) (considering and upholding FSIA arguments raised in "a copy of a letter from the embassy" even though the Chinese government had never formally appeared in the litigation).

3

adopting the arguments set forth in **Exhibit #1** and assisting the Court during the possible future stages of this litigation, if necessary.

The undersigned will promptly inform this Court regarding any developments concerning such potential Intervenors.

*Third*, as described below in **Part III**, Defendant agrees with Plaintiffs that an oral hearing is necessary and justified for this Court's assessment of the present case. Defendant therefore respectfully joins Plaintiffs' request for a hearing pursuant to Local Civil Rule 7(f).

## ARGUMENT

**I.      AUTHORITY TO REPRESENT DEFENDANT UNDER VENEZUELAN LAW AND U.S. LAW**

The OAG in Caracas has instructed the undersigned to represent and defend the interests of Defendant and the people of Venezuela in this U.S. litigation. Pursuant to Venezuelan law, the OAG is empowered to grant "power[s] of attorney" to external counsel, including foreign counsel, for the purpose of "representing and defending the rights, property and patrimonial interests of the Republic."[4] Pursuant to this authority, the undersigned have been granted a power of attorney specific to the present litigation.

Significantly, the OAG in Caracas is the sole entity with responsibility and competence to designate external counsel to represent Defendant under the Venezuelan Constitution and Venezuelan law. The OAG was established by the 1999 Constitution of the Bolivarian Republic of Venezuela (as amended in 2009). Under Article 247 of the Venezuelan Constitution, it is the OAG that "advises, defends and represents in and out of court the property interests of the

---

[4] 2016 Decree with the Rank, Value, and Force of the Organic Law of the Office of the Attorney General of the Republic, Article 50 (Riesenberg Decl., Ex. 45).

4

Republic."[5]  No other entity, including the National Assembly, is vested with this responsibility or competence under the Venezuelan Constitution or Venezuelan law.

As confirmation of the foregoing, the status of the Caracas authorities as "the government of Venezuela" has been recognized by the U.S. Executive Branch since approximately the beginning of the current U.S. and Venezuelan Presidential Administrations in January 2025, if not earlier, based on a continuous series of productive negotiations between relevant Venezuelan and U.S. officials regarding U.S. foreign-policy objectives.[6]  *See, e.g.*, *Zivotofsky v. Kerry*, 576 U.S. 1, 2, 11, 21 (2015) (analyzing how the U.S. President exercises the "recognition power" by "sending or receiving diplomatic agents"); *Zivotofsky v. Sec'y of State*, 725 F.3d 197, 205 (D.C. Cir. 2013) (describing the "legal consequences" that obtain with respect to "recognition" where the U.S. Executive Branch "enters into negotiations" with a foreign government (citations and internal quotation marks omitted)).

Accordingly, as regards the United States' relations with foreign governments, it is the federal courts' responsibility "'to support the policy of the executive branch whenever such policy is discernible.'"  *Nat'l Oil Corp. v. Libyan Sun Oil Co.*, 733 F. Supp. 800, 807 (D. Del. 1990) (quoting 65 A.L.R. Fed. 881).

This Court should therefore permit the OAG in Caracas to participate in the present litigation pursuant to the Venezuelan Constitution and the policy of the U.S. Executive Branch.

---

[5]  1999 Constitution of the Bolivarian Republic of Venezuela (as amended in 2009), Article 247 (Riesenberg Decl., Ex. 11).

[6]  *E.g.*, U.S. Department of Homeland Security, Statement (May 14, 2025), https://x.com/dhsgov (Riesenberg Decl., Ex. 66); *see also Venezuela frees 6 Americans after meeting between Maduro, Trump envoy*, Voice of America, reposting from the Associated Press (Jan. 31, 2025) (Riesenberg Decl., Ex. 63); Decl. of Michael G. Kozak ¶¶ 2-3 (Mar. 15, 2025) (Riesenberg Decl., Ex. 65); *Venezuela's Maduro thanks Trump for return of toddler left behind in US*, Reuters (May 14, 2025) (Riesenberg Decl., Ex. 67); *Venezuela Frees U.S. Air Force Veteran in Overture to Trump,* Wall Street Journal (May 20, 2025) (Riesenberg Decl., Ex. 68).

*See, e.g.*, *People's Mojahedin Org. of Iran v. United States Dep't of State*, 182 F.3d 17, 24 (D.C. Cir. 1999) ("'Who is the sovereign, *de jure* or *de facto*, of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens and subjects of that government . . . .'" (quoting *Jones v. United States*, 137 U.S. 202, 212-13 (1890)).

## II.     THE NARROW QUESTION FACING THIS COURT

Significantly, to decide the present Motion for Substitution, this Court is not ultimately required—or, indeed, permitted—to perform any holistic or wide-ranging "'assessments of varying degrees of friendliness or its absence'" between the United States and the Caracas authorities. *See Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424, 440 (S.D.N.Y. 2004) (quoting *Sabbatino*, 376 U.S. at 410); *M/T Stolt Sheaf*, 860 F.2d at 554 ("[C]ourts are hardly competent to assess how friendly or unfriendly our relationship with a foreign government is at any given moment . . . ." (citation omitted)).

To the contrary, even the United States' "severance of diplomatic relations" with a specific foreign government or, indeed, any other political "animosity" does not preclude that same foreign government from "resorting to United States courts." *See Sabbatino*, 376 U.S. at 408, 410; *M/T Stolt Sheaf*, 860 F.2d at 553-55 (explaining that even a "break in diplomatic relations with another government does not automatically signify denial of access to federal courts"). This Court's determination of which lawyers are ultimately permitted to participate in U.S. litigation on behalf of a foreign sovereign defendant, therefore, does not require—or give rise to—any "pronouncements of approval" by the United States. *M/T Stolt Sheaf*, 860 F.2d at 553-55 (citation omitted).

For the present case, it is also important to emphasize the specific purpose of Defendant's Motion for Substitution—which closely aligns with the United States' well-established interest in "'encourag[ing] foreign sovereigns generally to resolve disputes within the United States' legal framework.'" *See Chabad*, 110 F.4th at 254-255 (quoting *FG Hemisphere*, 447 F.3d at 838-39).

That is, pursuant to its mandate under the Venezuelan Constitution, the OAG seeks to accomplish essentially two goals of great significance for Defendant and the people of Venezuela. As detailed below, the U.S. Executive Branch cannot plausibly intend to obstruct the OAG from pursuing either of these two goals and, thereby, assisting this Court to resolve the present litigation fairly, justly, and efficiently.

1.      **<u>Raising Meritorious FSIA Defenses</u>** – The OAG's first goal in this U.S. litigation is to raise defenses based on Defendant's jurisdictional immunity under the FSIA and the inapplicability of the so-called "expropriation" exception at 28 U.S.C. § 1605(a)(3). This includes a number of significant legal and factual points that, respectfully, either were not raised or else were stated incorrectly by the previously listed counsel.[7]

The text, context, and history of § 1605(a)(3) undoubtedly reflect the "willingness" of the U.S. political branches to allow a foreign government to raise immunity defenses in "a federal forum," irrespective of the broader diplomatic and political relationship. *See M/T Stolt Sheaf*, 860 F.2d at 553-55 (identifying evidence reflecting the "willingness" of the U.S. Executive Branch to allow "a wholly-owned entity of the Khomeini government of Iran" to participate in U.S. litigation even though the United States "severed diplomatic relations with Iran in 1980"); *see also Interpamil GmbH v. Collectibles, Inc.*, 97-CV-9076, 1999 U.S. Dist. LEXIS 17681, at *10, 13

---

[7]     To illustrate this point, Defendant lodges herewith the Proposed Motion to Dismiss as **<u>Exhibit #1</u>**.

(S.D.N.Y. Nov. 15, 1999) (analyzing whether a "collection of Executive Orders" issued and maintained by President Bush and President Clinton reflected a "willingness to permit the Federal Republic of Yugoslavia to litigate claims . . . in a United States forum," irrespective of the United States' imposition of sanctions and lack of diplomatic relations with this same foreign government).

In particular, § 1605(a)(3) was enacted against the distinct "legal and historical backdrop" of the *Sabbatino* case, which involved claims against the Cuban authorities resulting from a 1960 nationalization of sugar owned by U.S. investors. *Republic of Hungary v. Simon*, 145 S. Ct. 480, 494, 497 (2025) (acknowledging "the expropriation exception's roots in *Sabbatino*"). In the *Sabbatino* case, the U.S. Supreme Court had specifically allowed "an instrumentality of the Cuban Government" to participate in U.S. litigation in 1964, irrespective of "the existing situation between the United States and Cuba" after the 1952-1959 Cuban Revolution, the 1961 Bay of Pigs Invasion, and the 1962 Cuban Missile Crisis. *Sabbatino*, 376 U.S. at 408, 410. As *Sabbatino* concluded, even the "severance of diplomatic relations, commercial embargo, and freezing of Cuban assets" by the U.S. Executive Branch did not reflect any U.S. policy "aimed at closing the courts of this country to Cuba," which is a logically and legally distinct question. *Id.* at 410-11 (emphasis added).

Indeed, the text of § 1605(a)(3) reflects precisely the opposite intention—that the political branches do intend for U.S. courts to allow foreign governments to plead their immunity "from the jurisdiction of courts of the United States" in the specific cases where these foreign governments are accused of taking "rights in property . . . in violation of international law." *See, e.g.*, *Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 175 (2017). Certainly, as illustrated by the *Sabbatino* case, the types of "expropriation" claims

8

evaluated in § 1605(a)(3) litigation will frequently arise in challenging political and diplomatic situations. *See, e.g.*, *Gabay v. Mostazafan Found. of Iran*, 151 F.R.D. 250, 254 (S.D.N.Y. 1993); *De Sanchez v. Banco Cent. de Nicaragua*, 770 F.2d 1385, 1386 (5th Cir. 1985). It would thus defeat the essential purpose of § 1605(a)(3) to prevent foreign governments from raising their sovereign immunity defenses in this same category of FSIA cases, irrespective of the general diplomatic context.

Moreover, preventing this Court from considering these FSIA arguments now would impose a significant burden on this Court and risk serious inefficiencies at later stages of this litigation. This follows from the settled principle that, even where a foreign sovereign defendant fails to raise specific jurisdictional defenses under the FSIA in whole or in part, "a District Court still must determine" somehow—on its own motion—whether "immunity is unavailable" under the FSIA. *CapitalKeys, LLC v. Democratic Republic of Congo*, No. 21-7070, 2022 U.S. App. LEXIS 20367, at *3 (D.C. Cir. July 22, 2022) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983)).[8]

Accordingly, in one recent case, the D.C. Circuit vacated a default judgment based on FSIA arguments raised by a third-party subpoena recipient <u>after ten years of post-judgment litigation</u>, wherein the foreign sovereign defendant had not participated. *Chabad*, 110 F.4th at 245 ("The

---

[8] Even non-jurisdictional arguments will not necessarily be forfeited in the specific context of the present case. This is because "the size" of Plaintiffs' claims—*i.e.*, purportedly worth more than US$ 1 billion—and this litigation's "possible effects upon international relations" may ultimately establish the type of "exceptional circumstances" that will justify this Court or the D.C. Circuit reviving even non-jurisdictional arguments at a later stage. *Owens v. Republic of Sudan*, 864 F.3d 751, 769 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020) (explaining that such factors qualified as "exceptional circumstances" (citations and internal quotation marks omitted)); *Acree v. Republic of Iraq*, 370 F.3d 41, 58 (D.C. Cir. 2004) ("[W]hile we will ordinarily refrain from reaching non-jurisdictional questions that have not been raised by the parties . . . we may do so on our own motion in 'exceptional circumstances.'" (citation omitted)).

district court thus does not have—and has never had—jurisdiction over Chabad's claims against the Russian Federation."). Needless to say, this resulted in a great waste of judicial resources, which could have been avoided if the foreign government had fully participated and raised the relevant FSIA arguments earlier in the process.

Given those risks, U.S. District Courts have been careful to consider FSIA arguments even where they have been raised outside any formal pleading. *See Democratic Nat'l Comm.*, 392 F. Supp. 3d at 426 (considering FSIA arguments contained in a letter sent to the court's fax machine from the Russian Ministry of Justice (ECF 186), even though the Russian Federation itself "ha[d] not appeared"); *Walters*, 672 F. Supp. 2d at 574, 575 n.2 (considering and upholding FSIA arguments raised in "a copy of a letter from the embassy" even though the Chinese Government had never formally appeared).

Accordingly, in view of these considerations and the unique character of sovereign-immunity defenses under the FSIA, it is highly implausible that the U.S. Executive Branch actually intends for this Court to obstruct the OAG's ability to raise all meritorious FSIA defenses in this U.S. litigation.

    **2.**    **Raising Defenses Based on Competent Evidence** – The OAG's second goal in this U.S. litigation is to defend the interests of Defendant with reference to factual evidence—including particularly factual evidence located in Venezuela.

As reflected in the Proposed Motion to Dismiss, even some of the threshold jurisdictional questions under Rule 12(b)(1) will unavoidably require assessment of documentary evidence.[9] *See*

---

[9] The Proposed Motion to Dismiss raises at least two fact-intensive issues in support of the FSIA defenses: (1) the applicability of the "domestic takings" rule in light of Plaintiffs' dual nationality, and (2) whether the allegedly expropriated "assets" constitute "rights in property" under the FSIA § 1605 (a)(3). *See* **Exhibit #1**. Both these issues require examination of factual evidence.

*Helmerich*, 581 U.S. at 174 (explaining that the FSIA requires resolution of "factual disputes" concerning "jurisdictional facts" at the outset of litigation (citation omitted)).

Of course, if this case does proceed to the merits stage, there is no question that this Court will be faced with an even greater range of complex factual issues. At the heart of this dispute is a series of Venezuelan criminal proceedings and administrative proceedings that are already decades old. For example, Plaintiffs seek to argue that a 2002 criminal proceeding against Plaintiff Fraiz Trapote was not justified.[10] Specifically, Plaintiffs argue that there was no basis for this criminal proceeding, and that the Venezuelan Court acted improperly by issuing a judicial order to appoint an Administrative Oversight Board (the *Junta Interventora*) to assume responsibility over Plaintiffs' property during this criminal proceeding.[11]

For obvious reasons, it would be virtually impossible to litigate these questions fairly and responsibly without access to factual evidence in Venezuela. Preventing the OAG in Caracas from participating in this litigation would thus impose a significant burden on this Court and obstruct the efficient resolution of this case.

Accordingly, in view of these considerations and the potentially fact-intensive nature of the present litigation, it is highly implausible that the U.S. Executive Branch intends for this Court to obstruct the OAG's ability to defend the interests of Defendant and the people of Venezuela based upon competent evidence.

---

[10]   *See* Complaint ¶¶ 49-50 (ECF 1).

[11]   *See id.*

11

## III.   REQUEST FOR ORAL ARGUMENT

Given the significance of the above points for the present litigation, Defendant agrees with Plaintiffs that an oral hearing will be necessary and justified to assist this Court's assessment of the present case. *See* Pls.' Opp'n to Mot. to Dismiss 22 (ECF 24) (explaining "that a hearing will be helpful in assisting the Court in understanding the application of the expropriation exception in this case").

Defendant, therefore, respectfully joins Plaintiffs' request for a hearing pursuant to Local Civil Rule 7(f).

## **CONCLUSION**

For the reasons stated above, Defendant respectfully asks this Court to grant the Motion for Substitution of the Real Party in Interest and Substitution of Counsel under Rules 17 and 25 of the Federal Rules of Civil Procedure.

Date:  June 5, 2025                               Respectfully submitted,

*/s/ David P. Riesenberg*
David P. Riesenberg (D.C. Bar No. 1033269)
Dilmurod Satvaldiev (D.C. Bar No. 90027884)
PINNA GOLDBERG U.S. PLLC
10 G Street NE, Suite 600
Washington, D.C., 20002, U.S.A.
T: +1 (202) 549-2477
E: driesenberg@pinna-goldberg.com

*Counsel for Defendant*