**UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

FERNANDO FRAIZ TRAPOTE and
MARIA CLARA VALLEJO TASCON,

*Plaintiffs*,

v.

THE BOLIVARIAN REPUBLIC OF
VENEZUELA,

*Defendant*.

Case No. 1:23-CV-2118-LLA

**DEFENDANT'S REPLY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUBSTITUTION OF THE
REAL PARTY IN INTEREST AND SUBSTITUTION OF COUNSEL**

Defendant, the Bolivarian Republic of Venezuela, respectfully submits this Reply in

Support of the Motion for Substitution of the Real Party in Interest and Substitution of Counsel

(the "Substitution Motion") (ECF 29, 29-1).[1]

As explained herein, based on the applicable principles of U.S. law concerning the

"recognition" doctrine, the Substitution Motion must be granted in accordance with the explicit

policy of the current U.S. Executive Branch.

**I.     RECOGNITION OF AUTHORITY TO REPRESENT DEFENDANT**

In his Opposition to the Substitution Motion, Mr. Gregory Paw has now clarified that he

was engaged and instructed by an entity that apparently calls itself "the Venezuelan National

---

[1]    In support, Defendant submits herewith the accompanying Second Declaration of David P.
Riesenberg (June 23, 2025) with attached exhibits.

Assembly of <u>2015</u>."  Opp'n 2, 6-11 (ECF 33) ("Mr. Paw and his law firm, Freeh Sporkin & Sullivan LLP, had been retained . . . through a process established by the Venezuelan National Assembly of <u>2015</u>." (emphasis added)).

Respectfully, 2015 was ten years ago.  It is now <u>2025</u>, and this Court's present task is to determine whether the <u>current</u> U.S. Executive Branch has recognized the Caracas authorities to constitute Venezuela's government <u>as of the present moment</u>.

In particular, since approximately January 31, 2025, the current U.S. Executive Branch has frequently referred to diplomatic agreements or negotiations with "Venezuela"[2] or "the government of Venezuela."[3]  All these statements have consistently and unmistakably contemplated the Caracas authorities—*i.e.*, those who are duly empowered under the Venezuelan Constitution and Venezuelan law—and not Mr. Gregory Paw's client, the purported "Venezuelan National Assembly of 2015."

In the following sections, therefore, Defendant will first address the Opposition's errors with respect to the applicable U.S. legal principles concerning how the "recognition" analysis is to be performed.

Defendant will then address the Opposition's mistakes with respect to the specific evidence that must be assessed in order to decide the Substitution Motion.

---

[2]    *See, e.g.*, Statement of U.S. President Donald J. Trump, Truthsocial.com (Feb. 1, 2025), Second Declaration of David P. Riesenberg ("Riesenberg 2d Decl."), <u>Exhibit 81</u> (describing what "Venezuela has agreed" and what "Venezuela has further agreed" after meetings between the Caracas authorities and U.S. Special Presidential Envoy Richard Grenell).

[3]    *See, e.g.*, Statement of the U.S. Department of Homeland Security, X.com (May 14, 2025) (ECF 32-21) ("ICE defers to the government of Venezuela to advise if the child is with the mother or in government custody . . . .").

## A.    THE OPPOSITION'S ERRORS OF LAW

The Opposition is constructed around several errors of law concerning how this Court may determine the question of "[p]olitical recognition" or, in other words, whether the U.S. Executive Branch has "acknowledge[d] that the government in question speaks as the sovereign authority for the territory it purports to control."  *See Banco Nacional De Cuba v. Sabbatino*, 376 U.S. 398, 410-411 (1964).  These errors of law are addressed below.

First, the Opposition needlessly recites the (uncontroversial) principle that "it is the role of the Executive Branch, not the courts, to identify the legitimate political leadership of a foreign country."  Opp'n 5.  This proposition has never been disputed and, indeed, was already acknowledged in the Substitution Motion.[4]

The Opposition, however, then leaps to the unjustifiable conclusion that the U.S. courts are precluded from analyzing any <u>evidence</u> concerning the "recognition" question—*i.e.*, evidence concerning what policy the U.S. Executive Branch has actually adopted at the relevant moment of assessment.  Specifically, the Opposition contends that "read[ing]" any so-called "tea leaves" with respect to the United States' "recent interactions" with Caracas would purportedly qualify as a "judicial intrusion" upon the prerogative of the U.S. Executive Branch.  Opp'n 7.  Supposedly, any and all judicial evaluation of "tea leaves" has been "prohibited" by the Supreme Court's decision in *Baker v. Carr*, 369 U.S. 186 (1962).

To be sure, this point is ultimately academic for the purposes of the Substitution Motion.  As further described below in **Part I-B**, Defendant is <u>not</u> relying upon mere "tea leaves" in the

---

[4]    *E.g.*, Substitution Mot. 6 ("'Who is the sovereign, *de jure* or *de facto*, of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges . . . of that government . . . .'") (quoting, *e.g., Jones v. United States*, 137 U.S. 202, 212-13 (1890)).

present case.  On the contrary, the current U.S. Executive Branch has <u>explicitly</u> described the Caracas authorities as representing "Venezuela" and constituting "the government of Venezuela." For the moment, however, it is worth carefully explaining the degree to which the Opposition has misunderstood and mischaracterized the applicable legal standard.

Respectfully, *Baker v. Carr* did not "prohibit[]" the judicial analysis of so-called "tea leaves" or, in other words, the available evidence concerning the adoption of a tacit or implicit U.S. foreign policy by the U.S. Executive Branch.  *See* Opp'n 7.  On the contrary, the Supreme Court reached <u>precisely the opposite holding</u>.  As explained in *Baker v. Carr*, recognition is unquestionably "an executive responsibility."  *Baker*, 369 U.S. at 212.  But this does not relieve the Article III courts of their responsibility to "construe" the evidence concerning how, or if, or to what extent the U.S. Executive Branch may have <u>exercised</u> that responsibility: "[I]f the executive proclamations fall short of an explicit answer, <u>a court may construe them</u> seeking, for example . . . to determine . . . the situation . . . . [T]hough it is the executive that determines [U.S. foreign policy] . . . , the <u>executive statements will be construed</u> where necessary" by the Article III courts. *Id.* (emphasis added).

The relevant question, therefore, is not <u>who</u> decides which foreign government is the "recognized" authority with respect to a foreign State—which is unquestionably a responsibility committed to the U.S. Executive Branch.

The question is <u>how</u> this Court is to determine <u>what choice has been made</u> by the U.S. Executive Branch at a particular time.

For this purpose, judicial analysis of so-called "tea leaves" is entirely appropriate:  "A government typically recognizes a foreign state by 'written or oral declaration.' . . . Recognition <u>may also be implied</u> as 'when a [recognizing] state enters into negotiations" with a foreign

government or "sends it diplomatic agents." *Zivotofsky v. Sec'y of State*, 725 F.3d 197, 205 (D.C. Cir. 2013) (emphasis added), upheld by *Zivotofsky v. Kerry*, 576 U.S. 1, 11, 21 (2015) ("Recognition . . . may also be <u>implied</u>—for example, by concluding a bilateral treaty or by sending or receiving diplomatic agents." (emphasis added)). *See also DKT Mem'l Fund v. Agency for Int'l Dev.*, 887 F.2d 275, 291 (D.C. Cir. 1989) ("[A] nation speaks in foreign affairs <u>not only by the</u> <u>express messages</u> that it sends, but by its choice of foreign entities with whom it will associate. . . ." (emphasis added)).

The main legal premise at the heart of the Opposition, therefore, is foreclosed by well-established precedent—which has never disfavored or precluded analysis of all relevant evidence (*i.e.*, the so-called tea leaves) in this context, including where no "formal statement of recognition" can be identified.[5]

Indeed, one of the best-known examples of "recognition" in U.S. constitutional history involved an <u>implicit</u> act of recognition—which was ultimately found to have superseded an earlier <u>explicit</u> recognition. In 1793, President George Washington tacitly "recognized [a] new government <u>by implication</u>" upon receiving "the minister from France's post-revolutionary government," despite having given <u>explicit</u> recognition to France's pre-revolutionary government fifteen years earlier in a 1778 Treaty of Amity. *Zivotofsky*, 725 F.3d at 207-08 (emphasis added),

---

[5]    *See, e.g., Nat'l Petrochemical Co. v. M/T Stolt Sheaf*, 860 F.2d 551, 554 (2d Cir. 1988) (analyzing the available evidence concerning the policy of the U.S. Executive Branch even in "the absence of formal recognition"); *see also Interpamil GmbH v. Collectibles, Inc.*, 97-CV-9076, 1999 U.S. Dist. LEXIS 17681, at *10, 13 S.D.N.Y. Nov. 15, 1999) (analyzing whether a "collection of Executive Orders" issued and maintained by President Bush and President Clinton reflected a "willingness to permit the Federal Republic of Yugoslavia to litigate claims . . . in a United States forum," irrespective of the United States' imposition of sanctions and lack of diplomatic relations with this same foreign government); *Nat'l Oil Corp. v. Libyan Sun Oil Co.*, 733 F. Supp. 800, 807 (D. Del. 1990) (quoting 65 A.L.R. Fed. 881) (explaining that it is the federal courts' responsibility "'to support the policy of the executive branch <u>whenever such policy is discernible</u>'" (emphasis added)).

upheld by *Zivotofsky*, 576 U.S. at 13 (agreeing, based upon the 1793 example, that "[i]f the executive receives an ambassador, or other minister, as the representative of a new nation . . . it is an acknowledgment of the sovereign authority" of the foreign government even without any formal declaration (citation omitted)).

As the applicable precedents emphasize, recognition of a foreign government may necessarily be implicit or tacit because "the Executive Branch must have the latitude" to choose whether to recognize a foreign government by "formal" means or otherwise. *M/T Stolt Sheaf*, 860 F.2d at 554-55 (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318-20 (1936)). In other words, the "recognition" power of the U.S. Executive Branch is "'not limited to a determination of the government to be recognized,'" but also gives the U.S. Executive Branch the flexibility "'to determine the policy which is to govern the question of recognition.'" *Zivotofsky*, 725 F.3d at 216 (quoting *United States v. Pink*, 315 U.S. 203, 229 (1942)); *see also United States v. Cty. of Arlington*, 669 F.2d 925, 929-30 (4th Cir. 1982) ("'[r]ecognition is not always absolute,'" and that "'[n]o such obstacle can be placed in the way of rehabilitation of relations between this country and another nation'" pursuant to the policy of the U.S. Executive Branch) (quoting *Pink*, 315 U.S. at 229-30).

Fundamentally, an explicit recognition may be superseded by an implicit recognition, and *vice versa*, in accordance with the latitude of the U.S. Executive Branch "'to speak as the sole organ'" of the United States with respect to foreign relations. *Zivotofsky*, 576 U.S. at 18 (quoting *United States v. Belmont*, 301 U.S. 324, 330 (1937)). There is thus no support for the Opposition's attempt to impose an artificially high threshold—let alone a "clear-statement" rule—upon the exercise of the "recognition" power by the U.S. Executive Branch. The Opposition's analysis of this point, therefore, must be rejected.

Finally, the Opposition invokes the "Act of State Doctrine" for the proposition that the "selection of Mr. Paw and Freeh Sporkin & Sullivan LLP" by "the National Assembly of 2015" supposedly cannot be questioned by this Court.  Opp'n 10-11.  This assertion is unnecessary and redundant.

That is, the applicability of the "Act of State Doctrine" in this context is dependent and inseparable from the "recognition" analysis, because this doctrine specifically entails "deference in domestic courts" only with respect to the "actions of a <u>recognized</u> sovereign."  *Zivotofsky*, 576 U.S. at 11 (emphasis added); *Republic of Aus. v. Altmann*, 541 U.S. 677, 700-01 (2004) ("The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a <u>recognized</u> foreign sovereign power committed within its own territory." (emphasis added, citation and quotation marks omitted)).  The applicability or inapplicability of the "Act of State Doctrine," therefore, is merely a consequence of the "recognition" doctrine and does not add anything to that analysis.

Indeed, from the opposite perspective, if Defendant is correct that the U.S. Executive Branch has recognized the Caracas authorities (as further described below in **Part I-B**), then it is the appointment of the undersigned Counsel that is entitled to this Court's deference under the "Act of State Doctrine" in accordance with the exclusive authority of the Office of the Attorney General ("OAG") under the Venezuelan Constitution and Venezuelan law.  *See, e.g.*, Substitution Mot. 4-5.

B.    ANALYSIS OF THE 2025 EVIDENCE

Based on the legal principles described above, the 2025 evidence shows unequivocally that the current U.S. Executive Branch has recognized that the Caracas authorities—and only the

Caracas authorities—can "speak[] as the sovereign authority for the territory" of Venezuela. *Sabbatino*, 376 U.S. at 410-411.

By contrast, there are apparently no instances since January 29, 2025, where the current U.S. Executive Branch has suggested that Mr. Paw's client (the so-called "National Assembly of 2015") exercises any comparable authority. The relevant aspects of the 2025 evidence are discussed below.

***First***, as the Opposition explicitly concedes, the U.S. Executive Branch and the Caracas authorities have recently concluded an "<u>agreement</u> to accept the return of Venezuelan citizens <u>to their home nation</u>." Opp'n 7 (emphasis added). The negotiation and implementation of this "agreement" by U.S. Special Presidential Envoy Richard Grenell have been publicly and repeatedly acknowledged by the White House,[6] U.S. Department of State,[7] and U.S. Department of Homeland Security.[8]

Under settled law, all such instances where the U.S. Executive Branch "[e]nters into negotiations," "sends . . . diplomatic agents," and concludes "agreements with respect thereto" must necessarily qualify as recognition of the Caracas authorities. *Zivotofsky*, 725 F.3d at 205-206, 211 (citation omitted). No more is ultimately required.

In the present case, however, the 2025 evidence provides an even clearer picture. Specifically, when describing Mr. Grenell's negotiations with the Caracas authorities at the end of January 2025, U.S. President Donald J. Trump stated explicitly that "<u>Venezuela</u> has agreed" to

---

[6]    Statement of White House, X.com (Feb. 10, 2024), Riesenberg 2d Decl., <u>Exhibit 82</u> ("Repatriation flights to Venezuela have resumed with Ambassador @Richard Grenell overseeing the first two flights.").

[7]    Decl. of Michael G. Kozak (Mar. 15, 2025) (ECF 32-20).

[8]    Statement of U.S. Department of Homeland Security, X.com (May 14, 2025) (ECF 32-21).

receive the repatriated Venezuelan nationals and that "Venezuela has further agreed to supply the transportation back."[9]  Similarly, after a Venezuelan minor "was repatriated to Venezuela" to be reunited with her Venezuelan mother, the U.S. Department of Homeland Security issued a statement that expressly identified the Caracas authorities—who had facilitated this repatriation—as "the government of Venezuela."[10]

This is not, therefore, a situation where the U.S. Executive Branch has merely "recognized [a] new government by implication," as with President Washington's receiving the French minister in 1793.  *Zivotofsky*, 725 F.3d at 207-08.  On the contrary, the 2025 evidence reveals an "express" acknowledgement that the Caracas authorities are "the effective government" of Venezuela. *Zivotofsky*, 576 U.S. at 11.

***Second***, it is worth contrasting the 2025 evidence with each of the specific categories of (irrelevant) factual materials cited by the Opposition.

In particular, the Opposition cites only two documents that actually address the "recognition" question, which include a 2019 "Statement" and a 2019 "Fact Sheet" issued during President Trump's first term.[11]  Both these 2019 documents reflected the now-discontinued policy

---

[9]    Statement of U.S. President Donald J. Trump, Truthsocial.com (Feb. 1, 2025), Riesenberg 2d Decl., Exhibit 81.

[10]   Statement of the U.S. Department of Homeland Security, X.com (May 14, 2025) (ECF 32-21).

[11]   Statement from U.S. President Donald J. Trump Recognizing Venezuelan National Assembly President as the Interim President of Venezuela (Jan. 23, 2019), Riesenberg 2d Decl., Exhibit 74; Fact Sheet, President Donald J. Trump is Cutting Off the Financial Resources of Maduro and His Cronies, published by the White House (Aug. 6, 2019), Riesenberg 2d Decl., Exhibit 75.

of "maximum pressure,"[12] which had been promoted in 2019 by former U.S. National Security Advisor John Bolton during his short time in office.  Accordingly, in his 2020 memoir and in subsequent media interviews, Ambassador Bolton has acknowledged: (1) that the 2019 "decision on political recognition" had been his policy; and (2) that the "maximum pressure" policy was abandoned after his departure from the Trump Administration.[13]  Finally, the opposition cites to a carefully worded 2023 Press Statement issued during former President Biden's term.  This document does not explicitly take any position on the recognition of <u>any</u> Venezuelan government or suggest that Ambassador Bolton's campaign of "maximum pressure" was maintained during former President Biden's term.[14]

As of 2025, however, it is unmistakable that the U.S. Executive Branch has now rejected the 2019 policy of  "maximum pressure" and explicitly adopted a different U.S. foreign policy concerning the Caracas authorities.  Specifically, as U.S. Special Envoy Richard Grenell has

---

[12]  Venezuela frees 6 Americans after meeting between Maduro, Trump envoy, Voice of America, reposting from the Associated Press (Jan. 31, 2025) (ECF 32-18) (describing reactions to the abandonment of "the 'maximum pressure' campaign" pursued during President Trump's "first term").

[13]  *See, e.g.*, JOHN BOLTON, THE ROOM WHERE IT HAPPENED: A WHITE HOUSE MEMOIR (2020), Riesenberg 2d Decl., <u>Exhibit 78</u>; Interview with John Bolton, Riesenberg 2d Decl., <u>Exhibit 76</u>.  The Opposition also cites two judicial decisions concerning the "recognition" of the Venezuelan government, which both appear to originate with this 2019 policy.  See Opp'n 4, 9 (citing *Jiménez v. Palacios*, 250 A.3d 814, 831 (Del. Ch. 2019) and *PDVSA United States Litig. Tr. v. Lukoil Pan Ams. LLC*, 65 F.4th 556, 562-63 (11th Cir. 2023).

[14]  Contrary to the Opposition's suggestion, the 2023 Press Statement never uses the word "government" or any similar terminology to describe the 2015 National Assembly.  Rather, the 2023 Press Statement only makes the carefully worded assertion that "[t]he United States continues to recognize the democratically elected 2015 National Assembly as the last remaining <u>democratic institution</u> in Venezuela."  *See* Press Statement (Riesenberg 2d Decl., <u>Exhibit 79</u>).  This is not the same as recognizing a "government."

recently explained in relation to his negotiations with the Caracas authorities: "Under Donald Trump, we don't do regime change."[15]

It is therefore untenable for the Opposition to suggest that the current U.S. Executive Branch is somehow bound by statements concerning recognition made six years ago, when the current U.S. policy explicitly reflects a new direction.

***Third***, with respect to the affidavit (ECF 32-20) of a senior U.S. diplomat, Mr. Michael G. Kovak, the Opposition incorrectly suggests that the affidavit "acknowledges that the Maduro regime is not recognized as a legitimate government." Opp'n 7 & n.4. With this characterization, the Opposition appears to be implying that the affidavit's terminology regarding "the Maduro regime" is somehow legally distinguishable from a reference to a "Government." *Compare id. with* Decl. of Michael G. Kozak (Mar. 15, 2025) (ECF 32-20) (emphasis added). This novel assertion of a "magic words" requirement, however, is not supported by any case law or by diplomatic practice.

Indeed, the U.S. Supreme Court has explicitly acknowledged that a "'particular regime'" may be recognized as constituting "'the effective government of a state.'" *Zivotofsky*, 576 U.S. at 11 (quoting Restatement (3d) of U.S. Foreign Relations Law § 203, Comment a) (emphasis added).

***Fourth***, and finally, the Opposition also cites a series of other legally and factually irrelevant documents issued between 2017 and January 10, 2025, concerning the purportedly "illegitimate" nature of the Caracas authorities. Opp'n 8. All these documents relate to federal criminal indictments, sanctions, and financial rewards concerning arrests.

---

[15] Interview with U.S. Special Presidential Envoy Richard Grenell, Conservative Political Action Conference (February 21, 2025), Exhibit 86.

Defendant does not accept these measures, which are themselves contrary to the Venezuelan Constitution and Venezuelan law, and which are contrary to the principles of international law concerning the sovereign immunity of Defendant and Defendant's public officials.

In any event, for the narrow purposes of the Substitution Motion, these documents are all legally and factually immaterial for the following simple reasons: **(1)** None of these documents makes even a single reference to "recognition" or any similar concept. **(2)** The U.S. Supreme Court and many other the U.S. courts have held repeatedly that the United States' imposition of economic sanctions and other similar policy tools are legally irrelevant to the narrow question of "recognition."[16] **(3)** All these documents all predate the commencement of President Trump's second term and the implementation of the new policy toward the Caracas.[17]

## II.    THE UNDISPUTED POINTS REGARDING THE CONTEXT OF THIS CASE

Finally, in view of the evidence and legal principles analyzed above, it is also worth briefly revisiting and summarizing several undisputed points regarding the context of this case and this Court's narrow task in evaluating the Substitution Motion.

---

[16] *Sabbatino*, 376 U.S. at 408, 410 (finding "recognition" of the Cuban Government irrespective of sanctions); *M/T Stolt Sheaf*, 860 F.2d at 553-55 (finding "recognition" of the Iranian Government irrespective of sanctions); *Interpamil*, 97-CV-9076, 1999 U.S. Dist. LEXIS 17681, at *10, 13 (finding "recognition" of the Serbian Government irrespective of sanctions).

[17] In this same regard, the Opposition contains the following ipse dixit statement with no citation: "The United States continues to recognize the legitimacy of . . . the Commissioner appointed by the National Assembly as Venezuela's diplomatic representative. The U.S. State Department has forwarded notifications issued by this and other U.S. courts to the Commissioner as part of this recognition." Opp'n 6. Respectfully, this statement is unsupported and cannot be verified. The purported service of process in the present litigation occurred during the term of former U.S. President Biden. There is no evidence that this policy has been maintained in 2025.

Significantly, neither the Opposition nor the Plaintiffs have expressed any disagreement with the following two propositions: **(1)** this Court must give *sua sponte* consideration to the arguments and defenses contained in the Proposed Motion to Dismiss lodged as **<u>Exhibit #1</u>** (ECF 29-4, 29-5); and **(2)** it will be virtually impossible to adjudicate this fact-intensive case fairly and efficiently if the Caracas authorities are excluded from participating.

It is highly implausible, therefore, that the current U.S. Executive Branch actually intends to block the Caracas authorities from raising these meritorious defenses on behalf of Defendant and the Venezuelan people—including based upon the <u>factual evidence</u> that is located <u>exclusively in Venezuela</u>. This point is particularly apparent in view of the demonstrated willingness of the current U.S. Executive Branch to work productively with the Caracas authorities on a wide range of other foreign-policy question. *See, e.g.*, Opp'n 7 (acknowledging that the Caracas authorities and the U.S. Executive Branch concluded an "agreement to accept the return of Venezuelan citizens to their home nation").

Finally, as described previously in the Substitution Motion (ECF 29-1 at 3-4), the undersigned confirms that consultations are ongoing in Caracas with other entities and/or individuals with a potentially strong interest in this U.S. litigation. Such entities and/or individuals may ultimately seek to file a Motion (or Motions) to Intervene under Rule 24 of the Federal Rules of Civil Procedure with a view to adopting the specific arguments set forth in the Proposed Motion to Dismiss (ECF 29-4, 29-5). The undersigned will promptly inform this Court regarding any developments in Caracas concerning such potential Intervenors under Rule 24.

*       *       *       *       *

For the reasons set forth above, this Court should grant the Substitution Motion in accordance with the explicit policy of the U.S. Executive Branch to recognize the Caracas authorities as the government of Venezuela.

Date:  June 23, 2025                         Respectfully submitted,

                                            */s/ David P. Riesenberg*
                                            David P. Riesenberg (D.C. Bar No. 1033269)
                                            Dilmurod Satvaldiev (D.C. Bar No. 90027884)
                                            PINNA GOLDBERG U.S. PLLC
                                            10 G Street NE, Suite 600
                                            Washington, D.C., 20002, U.S.A.
                                            T: +1 (202) 549-2477
                                            E: driesenberg@pinna-goldberg.com


                                            *Counsel for Defendant*