UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FERNANDO FRAIZ TRAPOTE and MARIA CLARA VALLEJO TASCON,<br><br>Plaintiffs,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>Defendant. | Case No. 1:23-cv-02118-LLA |

**DEFENDANT'S STATEMENT OF POINTS AND AUTHORITIES SUPPORTING THE MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

COMES NOW Defendant the Bolivarian Republic of Venezuela ("Venezuela," or the "Republic") seeking to dismiss the Complaint filed by plaintiffs Fernando Fraiz Trapote and Maria Clara Vallejo Tascon. In support thereof, the Republic states as follows:

## INTRODUCTION

The Foreign Sovereign Immunities Act ("FSIA") is a cornerstone of America's foreign policy. It codifies and clarifies a variety of common-law rules and provides a uniform "set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983). Among those legal standards is presumptive immunity for foreign sovereigns, including Defendant the Bolivarian Republic of Venezuela (the "Republic"). 28 U.S.C. § 1604. To bring a claim in U.S. courts against a foreign state, a plaintiff must come within the FSIA's

enumerated exceptions. *Verlinden*, 461 U.S. at 489. If none of the exceptions apply, the courts lack jurisdiction to hear the case.

Plaintiffs' sprawling Complaint pleads a single, nondescript count for "expropriation in violation of international law" arising from the Republic's alleged seizure—more than ten years ago—of business and intellectual property that Plaintiff Fraiz Trapote claims to have amassed decades earlier in Venezuela. For multiple, independent reasons, this Court lacks jurisdiction over the lawsuit, and, in any event, the Complaint fails to state a claim.

First, the lone FSIA exception that Plaintiffs cite—section 1605(a)(3)'s so-called "expropriation exception"—reaches only property "present in the United States in connection with a commercial activity" that the foreign state carries on in the United States. The D.C. Circuit reads this "physical presence" requirement strictly and applies it on a claim-by-claim basis. Yet, Plaintiffs concede that the overwhelming majority of this suit concerns "businesses and investments ***in Venezuela***." Compl. ¶ 21 (emphasis added). Plaintiffs may not salvage their claims to that foreign-held property by pointing to isolated, unrelated assets allegedly carrying some nexus to the United States.

Second, Plaintiff Fraiz Trapote's Venezuelan citizenship is independently fatal to his lawsuit. Under the domestic takings rule, foreign citizens suing their own nations have no recourse in U.S. courts. In fact, a foreign tribunal already rejected his effort to sue Venezuela on this basis once before. That adjudication was not only

correct but also has preclusive effect in the current suit. His wife and co-plaintiff may not stand in his shoes to pursue property to which she has no legal claim.

Third, Plaintiffs' claims are time barred under the applicable three-year statute of limitations because every alleged expropriation was known and sustained no later than 2014. And fourth, international comity principles counsel against Plaintiffs' effort to relitigate their grievances in this Court.

**PARTIES**

Plaintiff Fraiz Trapote is a businessman who was born in Caracas, Venezuela, who also claims Spanish citizenship. Compl. ¶ 9. In a case he brought to vindicate many of the same rights at stake here, an international arbitral panel found that his "dominant" citizenship is Venezuelan.

Fraiz Trapote allegedly married Plaintiff Maria Clara Vallejo Tascon on December 8, 2001. *Id.* ¶ 19. She purports to be a citizen of the United States, as well as Mexico and Colombia. *Id.* ¶ 10. By the time the Plaintiffs married in 2001, Plaintiff Fraiz Trapote had already amassed the majority of the assets he and Plaintiff Vallejo Tascon seek to vindicate by and through this suit.

**BACKGROUND**

Despite its length, Plaintiffs Complaint tells a simple story. Plaintiffs allege that beginning in 2008, the Republic supposedly took steps to expropriate Fraiz Trapote's property rights, and that in 2014 the Republic allegedly utilized a "sham" judicial proceeding abroad to legitimize that effort. Compl. ¶ 2. The assets in question include a television station in Venezuela, "other private companies and investments" (also in Venezuela), and a contract for billboard advertisements in Miami-Dade

County. Compl. ¶¶ 2, 5. For the most part, Plaintiff Fraiz Trapote secured those assets in the 1980s and 1990s, prior to his December 2001 marriage to Plaintiff Vallejo Tascon. Compl. ¶¶ 18, 22-23, 29, 39.

The Complaint superimposes several legal proceedings on this narrative. In one proceeding, Plaintiff Fraiz Trapote allegedly brought a copyright claim in the United States District Court for the Southern District of Florida on behalf of the Venezuelan television network LaTele Venezuela relating to a Venezuelan soap opera. Compl. ¶ 68. His effort failed, however, when the court found that the Oversight Board[1]—not Fraiz Trapote—was the rightful owner of LaTele Venezuela and allowed the Oversight Board to litigate that suit on the network's behalf. Compl. ¶ 72.

A second U.S. lawsuit met a similar fate. In that suit, Plaintiff Fraiz Trapote brought an assortment of claims on behalf of LaTele Venezuela to recover Venezuelan bonds held in Curacao. Compl. ¶¶ 83-87. Again, the court found that the Republic was the correct party in interest as owner of LaTele Venezuela. Compl. ¶ 90. A third suit involved a contract for bus stop advertisements between Miami-Dade County and Fraiz Trapote's Venezuelan advertising company, Urban. *Id.* ¶¶ 98-99. Because the Republic had expropriated Urban's parent company and decided not to pursue the bus stop advertisements, Miami-Dade County brought a lawsuit that concluded with the contract being assigned to another party. *Id.* ¶ 99.

---

[1] The Complaint refers to this entity as the "Expropriation Board." The Republic disputes that characterization as false and misleading and refers to the entity hereinafter as the "Oversight Board."

Plaintiffs omit a fourth proceeding, and for good reason. In 2018 Plaintiff Fraiz Trapote commenced an international arbitration against the Republic for alleged violations of an investment treaty between Spain and Venezuela. Compl. ¶ 104; *see* Final Report of the Arbitral Tribunal, attached hereto as Exhibit 1). That panel considered and evaluated many of the issues presented to this Court, summarizing them as follows:

> The present controversy arises as a result of the measures allegedly adopted by the Defendant against the investments made by the Plaintiff in Venezuela in the television, advertising and educational sectors…According to the Claimant, Venezuela's measures resulted in the expropriation of its holdings in the Companies, as well as its operating permits, concessions, qualifications and assets in general without the payment of prompt, adequate compensation.

After full briefing and a hearing, the panel held that it lacked jurisdiction "to hear and resolve the claims of the Plaintiff" on account of his Venezuelan citizenship." Ex. 1 ¶ 432. The arbitral panel concluded that, although Plaintiff claims both Spanish and Venezuelan citizenship, the latter was his "dominant and effective" nationality. *Id.* ¶ 415. That award is final and has not been vacated or annulled. That has devastating—indeed fatal—implications for the present suit.

## ARGUMENT

### I. Plaintiffs' Vague "Expropriation" Complaint is Time-Barred

Because the "timeliness [of a claim] is a non-jurisdictional, threshold requirement," the Court may dismiss it on this basis, alone, and need not bother with this case's FSIA-related issues. *See Matar v. TSA*, 910 F.3d 538, 541 (D.C. Cir. 2018); *Sheikh v. Repub. of Sudan*, 172 F. Supp. 3d 124, 127 (D.D.C. 2016) (in FSIA cases a

court may "properly move[ ] the timeliness issue to the head of the line" where doing so represents a "sensible course").

Courts apply "the forum state's choice of law principles" to cases implicating the FSIA. *See Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009); *accord de Csepel v. Republic of Hungary*, 714 F.3d 591, 603 (D.C. Cir. 2013). Pursuant to those principles, "District of Columbia law governs the issue of the proper statute of limitations." *Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 146 F.3d 983, 991-92 (D.C. Cir. 1998). The District of Columbia imposes a catch-all three-year statute of limitations for actions "for which a limitation is not otherwise specifically prescribed," D.C. Code 12-301(8), including actions like the one at bar. *See Friedman v. Gov't of Abu Dhabi,* 464 F. Supp. 3d 52, 71 (D.D.C. 2020) (applying section 301(8)'s three-year statute of limitations to equitable claims against a foreign sovereign where the claims were "self-evidently time-barred" on their face); *Sea Search Armada v. Republic of Colom.*, 821 F. Supp. 2d 268, 273 (D.D.C. 2011) (applying a three-year statute of limitations to FSIA claims that were analyzed as either "breach of contract" or "conversion").

Plaintiffs' solitary count, a claim for "expropriation in violation of international law," is too vague to state a cause of action. Compl. ¶¶ 107-13. *See Pyne v. District of Columbia*, 298 F. Supp. 2d 7, 12 (D.D.C. 2002) (dismissing claimed violations of "District of Columbia Law" because "such pleading does not satisfy notice pleading requirements under Federal Rule 8(a)"); *see also* Section III, *infra* (explaining that "expropriation" is not a recognized cause of action). For limitations purposes,

however, each of the eleven potential instances of alleged "expropriation" that Plaintiffs may have in mind occurred more than three years before Plaintiffs filed the Complaint. Those are when:

- the Government of Venezuela, through CONATEL, revoked the permits that had authorized Cablevision Group to operate (May 20, 2013), *id.* ¶ 45;

- representatives of the Government of Venezuela appeared at Cablevision Group's facilities and disconnected and seized the equipment (June 27, 2013), *id.* ¶ 46;

- the Six Circuit Control Court of First Instance Criminal Judicial Court of the Metropolitan Area of Caracas concocted and published a decision that ordered the expropriation of the Imagin Companies (May 7, 2014), *id.* ¶ 49;

- the Oversight Board raided the companies of Mr. Fraiz and Ms. Valllejo and took over and occupied the offices, destroying their records and files and stealing documentation and computer hardware, (May 9, 2014), *id.* ¶¶ 50-51;

- the Oversight Board disposed of the assets of American Academy, VEPACO, and LaTele Venezuela (May 19, 2014), id. ¶ 51;

- the Oversight Board occupied the American Academy…and informed executives and employees present that they were taking control of the company (May 21, 2014), *id.* ¶¶ 54;

- the Oversight Board subsequently authorized V&M to manage and control all types of operations of the expropriated companies, and to dispose of their assets (in the months "following" May 21, 2014), *id.* ¶¶ 56;

- Mr. Olivieri Mechelena re-wrote *Maria Maria* as *El Rostro de Analia* (approximately 2008 to 2009), *id.* ¶ 66;

- treasury Bills were illegitimately and fraudulently transferred to an account(s) controlled by Mr. Mezerhane without authorization or consent (prior to December 2011), *id.* ¶¶ 84-87;

- Urban was expropriated and brought under the control of the Oversight Board and entered into a settlement agreement under which it reassigned its multi-million-dollar contract to another party (between 2013 and 2014), *id.* ¶¶ 97-99; and

- the Oversight Board took control of Plaintiffs' other intellectual property rights including the intellectual property rights to various telenovelas ("after its appointment" in 2014). *Id.* ¶ 100.

Each of these alleged harms is subject to its own statute of limitations. *See De Csepel*, 859 F.3d 1094, 1109-10 (applying distinct statutes of limitations to each alleged act of expropriation); *Kennedy-Jarvis v. Wells*, 195 F. Supp. 3d 230, 240 (D.D.C. 2016) (same for claims of misappropriation). And each was known and sustained no later than 2014. The Complaint admits, for example, that "[o]n June 17, 2014, Mr. Fraiz filed a complaint with the independent [Public Prosecutor] of Venezuela, detailing the unlawful expropriation" central to the present suit. Compl. ¶ 60. Any causes of action derived from these alleged torts were therefore time-barred years ago. D.C. Code 12-301(8); *Colbert v. Georgetown Univ.*, 641 A.2d 469 (D.C. 1994) ("Where the act of an injury can be readily determined, a claim accrues for purposes of the statute of limitations at the time the injury actually occurs") (quotation omitted); *see also Sea Search Armada v. Repub. of Columbia*, 821 F. Supp. 2d 269, 273 (D.D.C. 2011) (rejecting equitable tolling based on the discovery rule where "pending litigation in a foreign country simply showed that plaintiffs could have pursued their claim in the U.S. earlier").

Plaintiffs' emphasis on "exhaust[ing] local remedies" with "judicial courts and other administrative and executive bodies in Venezuela," Compl. ¶ 57, is a distraction. In *Simon v. Republic of Hung.*, 911 F.3d 1172, 1180 (D.C. Cir. 2018) the D.C. Circuit held that an expropriation plaintiff need not pursue and exhaust proceedings in the sovereign's domestic forum prior to filing suit here. That rule

makes sense because "there is a substantial risk that the [plaintiffs'] exhaustion of any Hungarian remedy could preclude them by operation of res judicata from ever bringing their claims in the United States." *Id.* at 1181 (overturned on unrelated grounds). If permitted, such an exhaustion requirement "would in actuality amount to a judicial grant of immunity from jurisdiction in United States courts." *Id.* "But the FSIA admits of no such bar." *Id.* Thus even if "judicial bodies and administrative agencies" in Venezuela did "fail to recognize" Plaintiffs' rights abroad, Compl. ¶¶ 57-59, those decisions have nothing to do with the District of Columbia's 3-year statute of limitations. Besides, many of those foreign rulings themselves predate this suit by more than three years. *See e.g.*, Compl. ¶ 61 ("Finally, on March 5, 2019, Dr. Zair Mundaray…declared the illegality of the Oversight Board and the expropriation of Plaintiffs' Companies by the Government of Venezuela"); *id.* at ¶ 49; *see also id.* ¶ 63 (blaming these foreign tribunals for "the wrongful seizure and destruction of Plaintiffs' investments and assets in Venezuela").

The foreign proceedings also have no tolling effect in the United States. "District of Columbia law does not recognize an equitable tolling exception to the statute of limitations." *Pappas v. D.C.*, 513 F. Supp. 3d 64, 85 (D.D.C. 2021). "Rejection of the application of equitable tolling…rests on the belief that where the legislature has provided no savings statute, courts would exceed their prescribed role by providing a remedy." *East v. Graphic Arts Indus. Joint Pension Tr.*, 718 A.2d 153, 156 (D.C. 1998) (limiting equitable tolling to "two limited exceptions" of "the lulling doctrine and the discovery rule").

Nor may Plaintiffs rely on a continuing-violation theory. The alleged "expropriations" were all discrete acts that occurred and imparted their harm, if any, no later than 2014. *See De Csepel*, 859 F.3d at 1102-03; *Kennedy-Jarvis v. Wells*, 195 F. Supp. 3d 230, 240 (D.D. C. 2016) (same for claims of misappropriation, which involved "a series of discrete torts, each of which…is independently actionable"). Those acts' latent consequences—ongoing management of "the license and the signal for LaTele Venezuela" or the "ultimate transfer" of assets to unnamed third-parties, for instance (Compl. ¶ 63)—do not restart the clock. Besides, the doctrine requires at least one injurious act (not merely an injurious effect) to have occurred within the limitations period. *See Felter v. Norton*, 412 F. Supp. 2d 118, 125 (D.D.C. 2006) (citing *Guerra v. Cuomo*, 176 F.3d 547, 551 (D.C. Cir. 1999)). Plaintiffs can point to none. The Court's analysis may end here.

## II. This Court Should Dismiss Plaintiffs' Complaint Under Rule 12(b)(1).

"In the United States, there is only one way for a court to obtain jurisdiction over a foreign state and it is not a particularly generous one—the FSIA." *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005). The FSIA's immunity presents a "bright line," and its enumerated exceptions are the "sole basis" for obtaining subject matter jurisdiction over a foreign sovereign. *CC/Devas v. Antrix Corp.*, 605 U.S. 223, 230 (2025); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1983); 28 U.S.C. § 1605-07. "In the absence of an applicable exception, the foreign sovereign's immunity is 'complete.'" *Peterson*, 416 F.3d at 86. Where a foreign sovereign defendant invokes immunity under the FSIA, the court

accepts the plaintiff's allegations as true and determines "whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Phoenix Consulting Inc. v. Repub. of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

Plaintiffs rely exclusively on the "expropriation exception" in 28 U.S.C. § 1605(a)(3). That provision applies to disputes over "property taken in violation of international law." *Id.* It includes two sub-rules—one for foreign sovereigns themselves and one for their instrumentalities. Where, as here, the sovereign is the defendant, the allegedly expropriated property must have been "present in the United States in connection with a commercial activity carried on in the United States by the foreign state." *Id.*; *Chabad v. Russian Fed.*, 110 F.4th 242, 250-51 (D.C. Cir. 2024). A "commercial activity" under the FSIA is "either a regular course of commercial conduct or a particular commercial transaction or act," without regard to the purpose underlying the act. 28 U.S.C. § 1603(d).

The provision's "physical presence" feature is inflexible; a defendant is "immune to claims for the expropriation of property not present in the United States." *Schubarth*, 891 F.3d at 395; *De Csepel*, 859 F.3d at 1107. Physical presence is determined "on a claim-by-claim" basis, taking each article of property separately and considering where it was located at the time of the alleged expropriation. *Matos Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 713-14 (D.C. Cir. 2022) (rejecting an argument that the FSIA requires courts "to look at the entire lawsuit to determine the gravamen thereof" in assessing claims of immunity).

Plaintiffs conceded that the overwhelming majority of this suit concerns "businesses and investments in Venezuela." Compl. ¶ 21; *id.* ¶ 20 (describing a "conglomerate of over seventeen companies with operations throughout Venezuela and with auspicious expansion plans"); *id.* ¶ 18 (boasting of Plaintiffs' success in "acquiring, managing, and developing businesses and investments in Venezuela"). In particular, each of the following alleged misdeeds, to the extent that amount to expropriation at all, involved property located outside the United States:

- "the campaign against Plaintiffs' telecommunications companies…the value of which was more than $500 million," Compl. ¶¶ 43-48;
- "the expropriation campaign [that] was extended to VEPACO, including all the outdoor advertisement facilities" including "the companies' personal property, real estate, bank accounts, documentary files, servers and computer systems," *id.* ¶¶ 49-50;
- Bank notes that were "transferred to bank accounts in Curacao in the names of LaTele Venezuela and VEPACO," *id.* ¶¶ 78-85; and
- Property allegedly taken from "Tower Imagen, among them those of VEPACO and Cablevision Group" and taken from "the headquarters of LaTele Venezuela and, just days later, at the American Academy." *Id.* ¶¶ 51-57.

*Repub. of Hungary v. Simon*, 604 U.S. 115, 127 (2025) (holding that "property" in section 1605(a)(3) "refers only to the specific piece of property taken from the plaintiff." And that a complaint "would fail if it instead identified another unrelated" expropriated item "even if that other [property' had the requisite commercial nexus to the United States").

It is no response for Plaintiffs to point to isolated allegations of "expropriation on U.S. soil," Compl. ¶ 64, to save the majority of their suit. Indeed, Plaintiffs fail to

identify which property, if any, is domestic except that "part" of it is. *Id.* ¶ 11. And even if they could point to some property in the United States, that would salvage only the specific claims at issue. *See Matos*, 28 F.4th at 714. A plaintiff may not save claims related to foreign-held property by "identify[ing] another unrelated [property] expropriated by the foreign state, even if that other [property] had the requisite commercial nexus to the United States." *Chabad*, 110 F.4th at 250-51; *see also id.* ("no one disputes that the phrase 'that property' in 1605(a)(3) refers only to the specific piece of property taken from the plaintiff").

The best Plaintiffs can hope for, then, is to sever claims related to property held in the United States. Moreover, there must be recent or ongoing commercial activity in the United States. And, as Plaintiffs own pleading makes plain, each of the domestic actions concerning any claimed domestic property (the bus advertisements, the intellectual property, and the currency) have ended. Ostensibly, there is no recent or ongoing commercial activity surrounding that property.

## III. Plaintiffs' Complaint Fails to State a Claim and Should Be Dismissed Under FRCP 12(b)(6).

### a. "*Expropriation in Violation of International Law" is Not an Actionable Tort*

Plaintiffs announce their suit as "an action in which rights in property taken in violation of international law are in issue." Compl. ¶ 109. What international law? What international statute? Plaintiffs never say. And it is not up to the court, much less the defendant, "to construct a party's legal theories for him." *Chase v. State Farm Fire and Cas. Co.*, 780 A.2d 1123, 1133 n.12 (D.C. 2001).

Insofar as Plaintiffs have some ill-defined concept of international common law in mind, their theory fails. Federal law does not recognize a "private cause of action for violations of customary international law." *Herero People's Reparations Corp. v. Deutsche Bank*, 370 F.3d 1192, 1195 (D.C. Cir. 2004) (collecting cases). Thus, as in any 1605(a)(3) context, Plaintiffs must establish concrete, particularized "common-law or statutory claims for relief." In referencing generally "violation[s] of international law," (Compl. ¶¶ 6, 14, 77, 92, 109-110), they fail to do that. *See id; McKesson*, 672 F.3d 1078 ("customary international law does not provide…a cause of action").

The FSIA does not itself supply any substantive law. Section 1605(a)(3)'s "expropriation exception" refers to "amenability" to suit, but it does not provide "substantive law [for] determining the liability of a foreign state. *Cassirer*, 596 U.S. at 113. Section 1605(a)(3) is "purely jurisdictional in nature, and create[s] no cause of action." *McKesson*, 672 F.3d at 1075. Put another way, Plaintiffs' focus on "expropriation" identifies an (inapplicable) exception to immunity, not a cause of action. Vague references to international law are not sufficient to state a claim in the absence of well plead "common-law or statutory claims for relief." *Helmerich*, 581 U.S. at 186-87.

b. *Plaintiffs Do Not Identify Any Domestic Property that Was Expropriated.*

The expropriation exception covers only concrete interests in property. *See Peterson*, 416 F.3d at 88-89. "Property taken within the meaning of the statute means 'physical property' not the right to receive payment." *Lord Day & Lord v. Socialist*

*Repub. of Vietnam*, 134 F. Supp. 2d 549, 560 (S.D.N.Y. 2001). Plaintiffs do not identify any property in the United States that was expropriated.

Plaintiffs' first attempt to allege a taking of domestic property relates to lawsuits. They assert that they were harmed by "Venezuela's expropriation on US soil of Plaintiffs' property interests in two lawsuits," the "Telemundo Action" and the "Mezerhane/Trujillo Action." Compl. ¶¶ 64-93. In both cases, Plaintiffs purported to litigate on behalf of businesses that they no longer owned. By Plaintiffs' own account, a federal court in Florida held that LaTele Venezuela "belonged to the Oversight Board pursuant to the expropriation order." Compl. ¶ 72.; *see also LaTele Television, C.A. v. Telemundo Communications Group, LLC, et al.*, Case No. 1:12-cv-22539, ECF No. 606 at pp. 4-6. By treating "ownership" of the lawsuits as separate from ownership of the companies involved, Plaintiffs attempt to domesticate the loss of the businesses that occurred in Venezuela. But the two things are not separate. The party that owns a business also controls its litigation.

More generally, a litigant has no "vested" or "guaranteed" property right in his hypothetical recovery. *See Peterson*, 416 F.3d at 88 (no property right in anticipated worker's benefit resembling social security payment because it was "not guaranteed"); *id*. (citing with approval the District Court's finding that "an expectation interest in payments[ ] does not qualify as a right in tangible property and the expropriation exception does not apply here for that reason"); *Rodriguez*, 502 F. Supp. 3d 200, 221 (D.D.C. 2021). Instead, "a party's property right in any cause of action does not vest until a final reviewable judgment is obtained." *Ileto v. Glock, Inc.*, 565 F.3d 1126,

1141 (9th Cir. 2009); *accord D.C. v. Beretta USA Corp.*, 940 A.2d 163, 169, 180-81 (D.C. 2008). A lawsuit that aims to recover property at some point in the future does not satisfy the FSIA's requirement of property in the United States.

Plaintiffs' second attempt at identifying a property interest follows a similar pattern. Attempting to separate Urban, the Venezuelan advertising business, from its contacts, Plaintiffs allege that they lost the possibility to "sell advertising" through Miami-Dade County's "Bus Shelter Program." Compl. ¶¶ 94-99. According to Plaintiffs, the new, governmental owners of their billboard company failed to maintain an $840,000 letter of credit to retain Urban's contract for bus stop advertisements. *Id.* ¶ 97. Once again, Urban's management belonged to Urban's owners; Plaintiffs cannot domesticate the alleged expropriation of Urban by treating its contracts as separate from the business itself. And, as above, an expectation interest in Urban's potentially "multi-million dollar contract" with Miami-Dade County is too conjectural to constitute a property right. At most, it was a hope in "future payment of fees," not a "vested" right in those fees. *See Democratic Cent. Comm of D.C. v. Washington Metro Area Transit Comm'n*, 38 F.3d 603, 604-05 (D.C. Cir. 1994). Plaintiffs lament Urban's decision to abandon the bus stop opportunity, but that action did not harm them.

As applied to foreign sovereigns, the FSIA's expropriation exception applies only to property held in the United States. Plaintiffs cannot circumvent that limitation by focusing on US-based actions by foreign companies that Plaintiffs claim were expropriated from them overseas. A company's owners determine its actions.

Asserting a property interest over corporate actions is just another way of asserting a property interest in the company itself. Here, the FSIA does not permit a lawsuit contesting the companies' ownership, and Plaintiffs cannot use the companies' lawsuits and business opportunities as a backdoor to accomplish what the FSIA disallows.

## IV. Plaintiffs' Claimed Relief is Not Available to Venezuelan Nationals like Plaintiff Fraiz Trapote

Plaintiff Fraiz Trapote concedes that he is a "citizen of the Kingdom of Spain and the Bolivarian Republic of Venezuela." Compl. ¶ 9. That concession extinguishes the rights he has claimed in this suit.

Pursuant to the Domestic Takings Rule, international law does not forbid a state from taking the property of its own citizens. *See Philipp*, 592 U.S. at 176; *Republic of Austria v. Altmann*, 541 U.S. 677, 713 (2004) (Breyer J., concurring) (noting this "consensus view"); *Yang Rong v. Liaoning Provincial Govt.*, 362 F. Supp. 2d 83, 102 (D.D.C. 2005) ("Confiscations by a state of the property of its own nationals, no matter how flagrant and regardless of whether compensation has been provided, do not constitute violations of international law.").

The rule is straightforward and begins with answering whether the plaintiff is a citizen or subject of the defendant foreign sovereign. "Courts generally must identify a plaintiff's nationality for purposes of the domestic takings rule." *Simon*, 77 F.4th 1077, 1095 (D.C. Cir. 2023). "The threshold question is: Was the victim of the alleged taking a national of the foreign-state defendant at the time of the taking? If

yes, the domestic takings rule bars application of the FSIA's expropriation exception." *Id*.

By his own admission, "Mr. Fraiz was born in Caracas, Venezuela" and is a "citizen of the Kingdom of Spain and the Bolivarian Republic of Venezuela." Compl. ¶ 9. His repeated emphasis on his Spanish heritage is immaterial; his status as a Venezuelan citizen at the time of the alleged expropriations is dispositive. *See Csepel*, 695 F. Supp. 3d at 29.

Making this issue even more straightforward, an arbitral tribunal has already held that Fraiz Trapote is Venezuelan. In January 31, 2022, that panel concluded that Fraiz Trapote's nationality is Venezuelan and that his "links with Spain are insufficient to reverse this conclusion." Ex. 1 at ¶ 415. The panel found Fraiz Trapote:

- was born in, studied in, married in, and had children in Venezuela;
- developed a business life in Venezuela;
- resided in Venezuela from the time of his birth until 2014 and "did not prove that he had resided permanently in Spain, at any time in his life";
- participated actively in Venezuelan public life, but not public life in Spain; and
- presented himself to the Government of Venezuela as a Venezuelan businessman, omitting any mention of dual citizenship.

*See id*. ¶ 414. That award is final and has not been vacated or annulled. Collateral estoppel and issue preclusion principles prohibit Fraiz Trapote from relitigating these conclusions, which followed a full and fair adversarial testing. *EDCare Mgmt., v. DeLisi*, 50 A.3d 448, 451 (D.C. 2012) (a foreign arbitral award constitutes a final

judgment on the merits for purposes of res judicata and a losing party "may not then bring the same claims under new labels") (*citing Schattner v. Girard*, 668 F.2d 1366, 1368, 1371 (D.C. Cir. 1981)).

Plaintiffs attempt to avoid the domestic takings rule by alleging that Plaintiff Maria Clara Vallejo Tascon has citizenship in the United States, Mexico, and the Republic of Columbia. Compl. ¶ 10. Taking that allegation as true for present purposes, U.S. citizenship does not establish any property right in assets that Fraiz Trapote brought to the marriage. The Complaint includes the inaccurate legal assertion that, upon their marriage, "their assets and investments became marital assets under Venezuelan law." Compl. ¶ 19. In fact, property acquired before the marriage belongs only to the spouse who obtained it. This includes assets owned prior to marriage as well as inheritances and gifts:

> The spouses own property is that which belongs to the husband and wife at the time of marriage, and that which they acquire during the marriage by donation, inheritance, legacy or by any other lucrative title.

Civil Code of Venezuela Arts. 149, 151; *Diaz v. Reinhard*, AA20-C-2022-000333 (Casacion Civil Nov. 9, 2022) ("it is clear that property belonging to each spouse will be those that are acquired before the marriage and the capital gain (appreciation), unless it is proven that the increase came from assets of the conjugal community"); *see also Arminda Elena Reyes Alvarez v. Hector Francisco Azuaje Francesc*, 2002-000273 (Casacion Civil, March 10, 2004) ("property acquired before the celebration of the marriage is the separate property of the spouse and does not belong to the conjugal community").

Here, virtually all of the alleged property interests the Complaint pursues belonged to Fraiz Trapote prior to the marriage in December 2001. Compl. ¶ 22 ("in 1988 Mr. Fraiz founded the company Imagen Publicidad C.A. with his father"); *id.* ¶ 23 ("in April 1998, Mr. Fraiz, his father, and another business associate acquired VEPACO"); *id.* ¶ 29 ("on June 26, 1998…Mr. Fraiz acquired, along with his father and other investors, Cablevision Group"); *id.* ¶ 30 ("On July 31, 2001, Mr. Fraiz, through another company, made a capital contribution to the Cablevision Group"); *id.* ¶ 34 ("in 2001, Mr. Fraiz acquired, through their company Imagin Television C.A., 70% of Inversiones Vistana 333 C.A., which in turn owned Marte CVT Producciones de Television S.A."). Under Venezuelan marital law, Ms. Vallejo Tascon has no property interest in these businesses and investments. Civil Code of Venezuela Art. 151. As a result, she has no standing in U.S. courts to pursue claims associated with those assets. *Telephone Users Ass'n v. Pub. Serv. Comm'n of District of Columbia*, 304 A.2d 293, 295 (D.C. 1973) ("The federal courts have consistently adhered to one major proposition without exception: one who has no interest of his own at stake always lacks standing"). Thus, even if the Plaintiffs' marriage is legitimate (the Republic does not concede it is), Ms. Vallejo Tascon does not have a right to pursue any property Fraiz Trapote obtained before the two were married.

Because Fraiz Trapote is Venezuelan, the domestic takings rule is an independent bar to this lawsuit. And because the property in question predates his 2001 marriage to Maria Clara Vallejo Tascon, Plaintiffs cannot use Ms. Vallejo Tascon's U.S. citizenship to revive claims that she lacks standing to assert.

## V. Plaintiffs' Claim Should be Dismissed Based on International Comity Principles

Courts recognize international comity as a basis for abstention where, as here, a case poses grave concern to foreign states and where it has a minimal connection to the United States. *See, e.g., U.S. v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 8 (D.C.C. 2013) (describing comity as "a golden rule among nations—that each must live the respect to the laws, policies, and interests of others"). "Permitting the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the court of another would very certainly imperil the amicable relations between governments and vex the peace of nations." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 304 (1918).

As Plaintiffs concede, events leading to many of the grievances the Complaint identifies have been adjudicated at least once before in Venezuela. *See* Compl. ¶ 102 ("On June 17, 2014, Mr. Fraiz filed a complaint with the [Public Prosecutor] of Venezuela seeking a declaration that the actions of the Oversight Board were null and void"); *id.* ¶ 57 ("Mr. Fraiz filed numerous challenges before both Venezuelan judicial Courts and other administrative and executive bodies of Venezuela"); *id.* ¶ 49 (describing the "Sixth Court's May 7, 2014 order").

Without exception, those efforts failed. *See id.* ¶ 104 (Plaintiffs' "demand for arbitration against Venezuela…was dismissed for lack of jurisdiction on January 31, 2022"). In response, Plaintiffs label those proceedings a "sham" and, by implication, ask this Court to do the same. But in accordance with longstanding principles of international comity, those foreign legal proceedings' quality is not for this court to

decide. *See Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 115 (2013) (invoking comity principles to decline jurisdiction over claim brought by foreign plaintiffs against foreign defendants involving conduct abroad); *Casey v. Dep't of State*, 980 F.2d 1472, 1477 (D.C. Cir. 1992) ("Surely, a foreign court's holding…should not lightly be second-guessed by an American court—if it is ever reviewable"). Especially given the improving diplomatic relations between the United States and Venezuela, the Court should decline Plaintiffs' invitation to superintend those foreign proceedings. *See Kiobel,* 569 U.S. at 115 (counseling against "unintended clashes between our laws and those of other nations which could result in international discord:); *see also RJR Nabisco*, 136 S. Ct. at 2100 (the presumption against extraterritoriality "serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries").

**CONCLUSION**

The Court should dismiss this case with prejudice. It relies exclusively on the FSIA's expropriation exception, which is a narrow rule applicable only to property in the United States that a foreign sovereign takes in violation of international law. Plaintiffs do not identify any property meeting that description, nor do they point to the international law that the Republic allegedly violated. On top of that, the statute of limitations, domestic takings rule, lack of standing, and international comity provide additional grounds for dismissal. U.S. courts are not a forum for resolving every dispute arising anywhere in the world at any time. Because none of the defects in this case can be cured by amendment, the Court should dismiss with prejudice.

Dated: October 9, 2026

Respectfully submitted,

GREENBERG TRAURIG, LLP

*s/ Daniel Pulecio-Boek*
Daniel Pulecio-Boek, Bar Number 1500514
Michael A. Pusateri, Bar Number 1005463
Daniela Johnson Restrepo (admitted *Pro Hac Vice*)
D.C. Bar Number 90021025
**GREENBERG TRAURIG, LLP**
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Telephone: (202) 331-3117
Email:
pulecioboekd@gtlaw.com
pusaterim@gtlaw.com
daniela.johnsonrestrepo@gtlaw.com

*And*

Gabriel Aizenberg (admitted *Pro Hac Vice*)
Illinois Bar Number 6236614
**GREENBERG TRAURIG, LLP**
360 N. Green Street, Suite 1300
Chicago, IL 60606
Telephone: (312) 456-8400
Email:
gabriel.aizenberg@gtlaw.com

*Counsel for Defendant*