**CPA Case No. 2019-11**

**IN THE CASE OF AN ARBITRATION IN ACCORDANCE WITH THE AGREEMENT FOR THE PROMOTION AND RECIPROCAL PROTECTION OF INVESTMENTS BETWEEN THE KINGDOM OF SPAIN AND THE REPUBLIC OF VENEZUELA, SIGNED ON 2 NOVEMBER 1995 AND ENTERED INTO FORCE ON 10 SEPTEMBER 1997**

-

**THE ARBITRATION RULES OF THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (1976) (the "UNCITRAL Rules")**

-

**FERNANDO FRAIZ TRAPOTE (Spain/Venezuela)**

**(the "Claimant")**

-

**THE BOLIVARIAN REPUBLIC OF VENEZUELA**

**(the "Respondent", and jointly with the Complainant, the "Parties")**

---

# FINAL REPORT

---

*The Arbitral Tribunal* Dr. Enrique Barros Bourie (Presiding Arbitrator) Mr. Alexis Mourre Prof. Raúl Vinuesa

*Secretary of the Tribunal* Mr. José Luis Aragón Cardiel Permanent Court of Arbitration

*Assistant to the Court* Mr. Andrés Germain Ronco

**January 31, 2022**

*This page has been intentionally left blank*



## INDEX

**I. INTRODUCTION ........ 1**

A. THE ........ PARTIES 1
B. THE DISPUTE ........ 2

**II. PROCEDURAL HISTORY ........ 3**

A. COMMENCEMENT OF ARBITRATION ........ 3
B. CONSTITUTION OF THE ........ COURT 3
C. PROCEDURAL ORDER NO. 2 ........ 3
D. ADOPTION OF THE ACT OF INCORPORATION AND PROCEDURAL ORDER NO. 1 ........ 4
E. TERCERO FINANCISTA ........ 4
F. LAWSUIT MEMORIAL ........ 5
G. BIFURCATION OF THE ........ PROCEDURE 5
H. WRITINGS ON OBJECTION *RATIONE PERSONAE* ........ 6
I. AUDIENCIA ........ 6
J. EVENTS AFTER THE HEARING ........ 9

**III. FACTUAL BACKGROUND ........ 11**

A. THE APPLICANT'S ALLEGED INVESTMENTS ........ 11
*1. Investments in the public street advertising sector ........ 11*
*2. Investments in the telecommunications sector ........ 12*
*3. Investments in the education sector ........ 15*
*4. Real Estate Investments ........ 15*
B. THE MEASURES ........ 16

**IV. THE FORMS OF ORDER SOUGHT BY THE PARTIES ........ 20**

A. THE DEFENDANT 'S REQUEST ........ 20
B. THE PLAINTIFF 'S PETITION ........ 20

**V. JURISDICCIÓN *RATIONE PERSONAE* ........ 22**

A. THE INTERPRETATION OF THE TERM *INVESTORS* IN ACCORDANCE WITH ARTICLE 31 CVDT ........ 22
*1. Rules of interpretation ........ 23*
*2. Textual interpretation of the concept of investor ........ 26*
*3. Context of the ........ Treaty 27*
*4. Object and purpose of the ........ Treaty 36*
*5. Principles of International Law ........ 39*





B. COMPLEMENTARY MEANS OF INTERPRETING ........ 50
*1. Preparatory work for the ........ Treaty 51*
*2. Constitution of Venezuela of 1961 ........ 53*
*3. Preparatory work for the ICSID Convention ........ 54*
C. DOMINANT AND EFFECTIVE NATIONALITY OF MR. FRAIZ ........ 55
D. SUBSIDIARY ARGUMENT: THE EXTENSION OF THE PROTECTION OF THE ........ TREATY 61
*1. The time of fulfilment of the nationality condition of Article I.1(a) of the Treaty ........ 62*
*2. The Applicant's investments protected by the ........ Treaty 64*

**SAW. ANALYSIS OF THE ARBITRAL TRIBUNAL ........ 69**

A. INTERPRETATION OF THE CONCEPT OF *INVESTORS* IN ARTICLE I.1(A) OF THE BIT ........ 69
*1. Rules of interpretation set out in the Vienna Convention on the Law Treaty Treaties (CVDT) ........ 69*
*2. Textual interpretation of the concept of investor ........ 72*
*3. Context of the BIT ........ 83*
*4. Object and purpose of the BIT ........ 89*
*5. Principles of international law ........ 92*
*6. Conclusion on the interpretation of the concept of investor in the ........ BIT 107*
B. COMPLEMENTARY MEANS OF INTERPRETING ........ 108
C. MR. FRAIZ 'S SITUATION UNDER ARTICLE I.1(A) OF THE BIT ........ 108
D. VENEZUELA 'S SUBSIDIARY ARGUMENT ........ 112
E. COASTS........ 113
*1. Plaintiff's Cost Statement ........ 113*
*2. Defendant's Cost Statement ........ 113*
*3. Decision on costs ........ 113*

**VII. DECISION OF THE ARBITRAL TRIBUNAL ........ 116**

**LIST OF ABBREVIATIONS**

| | |
|---|---|
| **Audience** | Hearing on Objection *Ratione Personae,* held on 16 and 17 February 2021 |
| **Cable television** | Cablevision C.A. |
| **ICSID** | International Centre for Settlement of of Investment Disputes |
| **CONATEL** | National Telecommunications Commission |
| **Reply** | Response Brief on Objection to Jurisdiction *Ratione Personae* of October 26, 2020, filed by the Plaintiff |
| **Convention on Nationality** | Hague Convention on Certain Questions Relating to Conflicts of Nationality Laws of 1930 |
| **CVDT** | Vienna Convention on the Law of Treaties of 1969 |
| **Defendant's Statement of Costs** | Defendant's February 26, 2021 Statement on Costs |
| **Plaintiff's Cost Statement** | Plaintiff's Cost Brief of February 26, 2021 |
| **Demanded** | Bolivarian Republic of Venezuela |
| **Plaintiff or Mr. Fraiz** | Fernando Fraiz Trapote, the plaintiff in this arbitration |
| **Rejoinder** | Rejoinder Memorial on the Objection to Jurisdiction *Ratione Personae* of December 15, 2020, filed by Plaintiff of him |
| **Enterprises** | Cablevision, TVS and TMS, Vepaco, LaTele and American Academy |
| **National Treatment Standard** | Article IV.2 of the Treaty |





| | |
|---|---|
| **Spectrum Frequencies** | 20 frequencies in the radio space in the sub-band 2.5-2.7 GHz covered by the Reservation Offices |
| **Cablevision Group** | Cablevision, TVS and TMS |
| **Image Advertising** | Image Advertising C.A. |
| **LaTele** | LaTele Television C.A. |
| **Lileska** | Sociedad de Inversiones Lileska C.A. |
| **Mars CVT** | Marte CVT Producciones de Televisión S.A. |
| **Measurement** | Alleged Measures Taken by Venezuela Against Plaintiff's Investments in Enterprises |
| **Memorial** | Brief on Jurisdictional Objection *Ratione Personae* of September 16, 2020, filed by the Respondent |
| **Complaint Memorial** | May 18, 2020 Complaint Brief, filed by Plaintiff |
| **Objeción *Ratione Personae*** | Objection *ratione personae* of the Respondent to the jurisdiction of the Tribunal, concerning the dual Spanish and Venezuelan nationality of the Applicant |
| **Reserve Offices** | DMS 610 and 611 Letters, obtained by TVS and TMS on April 2, 1990, granting them the exclusive use of the Spectrum Frequencies |
| **Parts** | Plaintiff and Defendant |
| **Installation Permits** | Various equipment installation permits granted to TVS and TMS between 1997 y 1999 |
| **Regular Broadcast Permits** | Regular Broadcast Permissions Granted to TVS and TMS in 1991 and 1992 to provide subscription television service in Caracas |





| | |
|---|---|
| **Draft Articles on Diplomatic Protection** | Draft Articles on Diplomatic Protection of the International Law Commission of 2006 |
| **UNCITRAL Rules** | Arbitration Rules of the United Nations Commission on International Trade Law, 1976 |
| **Replica** | Jurisdictional Rebuttal Brief *Ratione Personae* of the Defendant Objection of November 20, 2020, for the Defendant |
| **Preliminary Request for Discovery of Documents** | Applicant's request of 9 December 2019 for a discovery phase prior to the filing of the Statement of Claim |
| **TMS** | Multisatellite Transmissions C.A. |
| **Image Tower** | Building known as Torre Imagen |
| **The BIT Treaty** | Agreement for the Reciprocal Promotion of Investments between and Protection of the Kingdom of Spain and the Republic of Venezuela, signed on 2 November 1995 and the 10 10, 1997 |
| **Treaty of Friendship** | General Treaty of Cooperation and Friendship between the Kingdom of Spain and the Bolivarian Republic of Venezuela, signed in Madrid on 7 June 1990 |
| **TVS** | Venezolana de Transmisiones y Satélites CA |
| **Venezuela** | Bolivarian Republic of Venezuela |
| **Vepaco** | Vepaco CA Advertising |
| **V&M** | Valbuena & Makarem S.C. |





## I. INTRODUCTION

### To. THE PARTIES

1. The plaintiff in these proceedings is Mr. Fernando Fraiz Trapote (hereinafter, the **"Mr. Fraiz"** or the **"Plaintiff"),** with address at Calle Portugal 01 02 PBJ C, Pozuelo de Alarcón, Madrid, Spain. The Applicant is represented in the present proceedings by:

**Nigel Blackaby QC**
**Noiana Marigo Lluís**
**Paradell Ezequiel**
**Vetulli María Paz**
**Lestido Alexandre**
**Alonso**
Freshfields Bruckhaus Deringer US LLP

**Jean Paul Dechamps Gustavo**
**Topalian Pablo Jaroslavsky**
**Juan Ignacio González Mayer**
**Florencia Wajnman Horacio**
**Risso Julieta Cappelletti**

Dechamps International Law

**José Humberto Frias**
**Daniel Bustos**
D'Empaire

2. The Respondent in these proceedings is the Bolivarian Republic of Venezuela (hereinafter referred to as **"Venezuela"** or the **"Respondent",** and together with the Complainant, the **"Parties").** The Defendant is represented in these proceedings by:

**Reinaldo Muñoz Pedroza**
Attorney General of the Bolivarian Republic of Venezuela

**Henry Rodríguez Facchinetti**
General Manager of Litigation of the Attorney General's Office of the Bolivarian Republic of Venezuela

**Alfredo De Jesús S.**
De Jesús & De Jesús S.A.

**Alfredo De Jesús O.**
**Marie-Thérèse Hervella**
**Eloisa Falcón López**
**Pierre Daureu Erika**
**Fernández Lozada Pablo**
**Parrilla Nicolás Emilio**
**Bianchi**

**Déborah Alessandrini**
Alfredo De Jesús O. - Transnational Arbitration & Litigation

**B. THE DISPUTE**

3. The present controversy arises as a result of the measures allegedly adopted by the Defendant against the investments made by the Plaintiff in Venezuela in the television, advertising and educational sectors. Specifically, the affected investments cover four Venezuelan commercial ventures: the group formed by the companies Cablevisión C.A. **("Cablevisión")**, Venezolana de Transmisiones y Satélites CA **("TVS")** and Transmisiones Multisatélites C.A. **("TMS")** (collectively the **"Cablevision Group")**; Advertising Vepaco C.A. **("Vepaco")**; LaTele Television CA **("LaTele")**; and American Academy (collectively, the **"Companies")**.

4. According to the Claimant, Venezuela's measures resulted in the expropriation of its holdings in the Companies, as well as its operating permits, concessions, qualifications and assets in general (collectively, the **"Measures")** without the payment of prompt, adequate compensation

and in violation of the Agreement for the Promotion and Reciprocal Protection of Investments between the Kingdom of Spain and the Republic of Venezuela, signed on 2 November 1995 and entered into force on

10 September 1997 (the **"Treaty"** or the **"BIT")**.

5. The Respondent has raised a number of objections to the jurisdiction of the Tribunal. In this Award, the Tribunal adopts a decision on the Respondent's objection *ratione personae*, relating to the Claimant's dual Spanish and Venezuelan nationality (the **"Objection *Ratione Personae*")**.





**PROCEDURAL HISTORY**

**To. COMMENCEMENT OF ARBITRATION**

7. By Notice of Arbitration of 16 October 2018, received on the same day by the Respondent, the Claimant commenced arbitration proceedings against the Respondent in accordance with the Treaty and Arbitration Rules of the United Nations Commission on International Trade Law 1976 (the **"UNCITRAL Rules")**.

**B. CONSTITUTION OF THE TRIBUNAL**

8. On January 18, 2019, the Plaintiff notified the appointment of Mr. Óscar M. Garibaldi, a dual Argentine and U.S. citizen, as first arbitrator.

9. On February 4, 2019, the Defendant challenged Mr. Garibaldi.

10. On February 22, 2019, the Respondent notified the appointment of Prof. Raúl E. Vinuesa, of dual Argentine and Spanish nationality, as second arbitrator.

11. On 19 June 2019, the Secretary-General of the Permanent Court of Arbitration (the **"PCA")**, as the appointing authority in the present arbitration, accepted the challenge raised against Mr. Garibaldi.

12. On 22 July 2019, the Applicant appointed Mr Alexis Mourre, a French national, to replace Mr Garibaldi.

13. By Acting on the Appointment of the Presiding Arbitrator, dated November 7, 2019, the Secretary General of the PCA appointed Dr. Enrique Barros Bourie, a Chilean national, as presiding arbitrator.

**C. PROCEDURAL ORDER NO. 2**

14. On 25 November 2019, the Court sent the Parties draft Articles of Incorporation y of Procedural Order No. 1 and invited them to submit any comments they deemed appropriate thereon.

15. On 9 December 2019, as part of his comments on draft Procedural Order No. 1, the Applicant proposed that a discovery phase be carried out prior to the filing of the Statement of Claim.





16. On 17 December 2019, the Court asked the Applicant to submit a letter detailing the full terms of his proposal and explaining the reasons for it, also inviting

a the Defendant to respond to said letter.

17. The Applicant submitted its application in its entirety on 27 December 2019, and on 8 January 2020 the Respondent submitted its observations on it.

18. On 6 February 2020, the Court issued Procedural Order No. 2, rejecting the Applicant's application of 27 December 2019 and ordering the Applicant to file his Statement of Claim on 18 May 2020.

**D. ADOPTION OF THE ACT OF INCORPORATION AND PROCEDURAL ORDER NO. 1**

19. A first procedural meeting was held on 13 February 2020 and was attended by the members of the Tribunal and its Assistant, the representatives of the Parties and the PCA.

20. On 26 March 2020, the Tribunal issued Procedural Order No. 1, establishing the procedural timetable and rules of procedure for arbitration. Pursuant to Section 2.1 of Procedural Order No. 1, the legal seat of arbitration is The Hague, Netherlands. In addition, as provided in section 4 of the same order, the Tribunal, with the consent of the Parties, appointed Mr. Andrés Germain as Assistant to the Tribunal.

21. On 15 May 2020, the Court circulated the Articles of Incorporation signed by the Parties and by the members of the Court. In accordance with the Articles of Incorporation, the language of arbitration is Spanish (section 7) and the PCA acts as the Secretariat in these proceedings (section 8).

**And. THIRD PARTY FINANCIER**

22. On February 6, 2020, the Claimant informed the Tribunal and the Respondent that *"subsequent to the commencement of this Arbitration, and in order to mitigate its damages and diversify its risks, the Claimant entered into an external financing agreement for the Arbitration with A&G Investment Holdings LLC."*

23. On February 12, 2020, the Respondent requested: (i) the Claimant to provide *"useful information to identify the third-party financier, for the purposes of the analysis of possible conflicts of interest"* and to submit *"the financing agreement made in connection with this arbitration"*; and (ii) the Court, to order the Applicant to produce such information in the event that the Applicant did not do so voluntarily.





24. On February 21, 2020, Plaintiff submitted additional information about A&G Investment Holdings LLC and requested that Defendant's request for disclosure of the financing agreement be denied.

25. On 25 February 2020, the Respondent requested the Court's leave to submit comments on the Applicant's communication of 21 February 2020.

26. On 27 February 2020, the Court adopted the following decision:

> *After taking into consideration the Parties' allegations and the information submitted by the Claimant in relation to the Financing Agreement, and having deliberated, the Tribunal finds it unnecessary, at this stage of the proceedings, to submit additional information in relation to the Financing Agreement for the purpose of determining potential conflicts of interest. Nor has the Court been brought to the attention of any exceptional circumstance that could justify an order to disclose the Financing Agreement or to take precedence over the confidential nature of such an agreement,* prima facie, *by its very nature.*
>
> *Consequently, the Court: (i) considers satisfied the Defendant's request that the Plaintiff "provide useful information that allows the identification of the third-party financier, for the purposes of the analysis of possible conflicts of interest"; and (ii) it rejects Respondent's request that the Court order Plaintiff to file the Financing Agreement.*

**F. MEMORANDUM OF CLAIM**

27. On May 18, 2020, the Plaintiff filed its Claim Brief (the **"Claim Brief")**.

**G. BIFURCATION OF THE PROCEDURE**

28. On 17 June 2020, the Respondent filed a Request for Bifurcation of the Proceedings, in which it announced two distinct objections to the jurisdiction of the Tribunal: (i) the Objection *Ratione Personae,* as the main objection; and (ii) an alternative objection *ratione materiae,* based on the argument that the Applicant has not made an investment in the terms required by the Treaty.

29. On 2 July 2020, the Applicant filed his Response to the Request for Forking.

30. By decision of 18 July 2020, the Court decided to bifurcate the Defendant's objection *ratione personae* into a single jurisdiction stage.

**H. WRITINGS ON OBJECTION RATIONE PERSONAE**

31. On 7 September 2020, the Court confirmed the procedural timetable for the phase on the Objection *Ratione Personae.*

32. On September 16, 2020, the Respondent filed its Memorial on Jurisdictional Objection *Ratione Personae* (the **"Brief").**

33. On October 26, 2020, the Applicant filed his Response Brief on the Objection to Jurisdiction *Ratione Personae* (the **"Response").**

34. On November 20, 2020, the Respondent filed its Rebuttal Brief on Jurisdictional Objection *Ratione Personae* (the **"Reply").**

35. On December 15, 2020, the Plaintiff filed his Rejoinder Brief on the Objection to Jurisdiction *Ratione Personae* (the **"Rejoinder").**

**I. AUDIENCE**

36. On August 28, 2020, after taking into consideration the comments and availability of the Parties, the Court reserved February 16 to 19, 2021 for the holding of the Hearing on the Objection *Ratione Personae* (the **"Hearing").**

37. On 29 December 2020, the Court requested the Parties' comments on the possibility of holding the Oral Hearing via videoconference, in view of the existing travel restrictions and the state of the global COVID-19 pandemic.

38. On 5 January 2021, the Parties agreed that the Oral Hearing should be held by videoconference.

39. On 8 January 2021, the Court circulated a draft of Procedural Order No. 3, concerning the holding of the Hearing, and invited the Parties' comments thereon.

40. On 13 January 2021, the Parties submitted their comments on draft Procedural Order No. 3.





41. A pre-Hearing conference was held on 14 January 2021, attended by the Court, the Parties, the Assistant Court and the PCA.

42. On 21 January 2021, the Court issued Procedural Order No. 3.

43. On January 27, 2021, the Respondent indicated that it did not consider it necessary to call Mr. Fraiz to be questioned at the Hearing.

44. On February 8, 2021, the Defendant requested authorization from the Court to incorporate into the file *"five additional documents of an evidentiary nature"*[1].

45. On 11 February 2021, the Applicant submitted its observations on the Respondent's request.

46. On 14 February 2021, the Respondent requested additional authorization from the Tribunal to incorporate the Dissenting Opinion of Prof. Thomas Clay into the award of jurisdiction in the case of *Sergei Viktorovich Pugachev v. Russian Federation,* which is on the record under reference CLA-173.

47. On February 15, 2021, the Court (i) issued Procedural Order No. 4, partially granting the Respondent's request of February 8, 2021; and (ii) granted the Respondent's request of February 14, 2021.

48. The hearing was held between 16 and 17 February 2021.

49. The following persons were present at the hearing:

**The Court**

Dr. Enrique Barros Bourie (Presiding Arbitrator) Mr. Alexis Mourre Prof. Raúl Vinuesa

**Assistant to the Arbitral Tribunal**

Andrés Germain

**The Plaintiff**

Nigel Blackaby
Lluís Paradell
Ezequiel Vetulli

1 Respondent's letter to the Court, 8 February 2021, p. 1.





Joe Arias Tapia *(Freshfields Bruckhaus Deringer)*

Jean Paul Dechamps Pablo Jaroslavsky Florencia Wajnman Horacio Risso Manuela Díaz *(Dechamps International Law)*

José H. Frías
*(D'Empaire)*

**The Defendant**

Reinaldo Muñoz Pedroza Henry Rodríguez Facchinetti *(Office of the Attorney General of the Bolivarian Republic of Venezuela)*

Alfredo De Jesús S.
*(De Jesús & De Jesús, S.A.)*

Alfredo De Jesús O.
Marie-Thérèse Hervella, Pierre Daureu, Erika Fernández Lozada, Pablo Parrilla, Nicolás E. Bianchi, Magdalena Bulit Goñi, Déborah Alessandrini *(Alfredo De Jesús O. - Transnational Arbitration & Litigation)*

**Permanent Court of Arbitration**

José Luis Aragón Cardiel, Legal Counsel and Clerk of the Court
Clara Ruiz Garrido, Deputy Legal Counsel Magdalena Legris, Case Manager

**Stenographers**

Leandro Iezzi Virgilio
Dante Rinaldi *(D-R Esteno)*





**J. POST-HEARING EVENTS**

50. On 18 February 2021, the Court invited the Respondent to submit a brief commenting on certain documents and legal authorities introduced by the Applicant at the Hearing as part of its response to the questions posed by the Tribunal at Hearing[2 itself].

51. On February 26, 2021, the Plaintiff and the Respondent filed their respective statements of costs (the **"Plaintiff's Statement of Costs"** and the **"Defendant's Statement of Costs",** respectively).

52. On the same day, the Parties submitted the agreed corrections to the transcripts of the Oral Hearing.

53. On 15 March 2021, the Respondent submitted a brief comment on the documents and legal authorities introduced by the Applicant at the Hearing.

54. On 24 March 2021, after being authorised by the Court, the Applicant submitted his observations on the Respondent's letter of 15 March 2021.

55. On 19 October 2021, the Applicant requested the Court's permission to submit *"the judgment handed down by the Paris Court of Appeal on 12 October 2021 in the case between the Republic of Senegal and Mr. Ibrahim Aboukhalil entered in the general directory under No. RG 19/21625".*

56. On 26 October 2021, the Respondent submitted comments on the Applicant's 19 October 2021 application.

57. On 28 October 2021, the Court rejected the Applicant's request of 19 October 2021, finding that it was *"in the process of finalising the award on jurisdiction and finds that each party has had sufficient opportunity to present its arguments and evidentiary background".*

58. On December 6, 2021, the Applicant updated the Court on developments in the process of annulment of the Decision on Jurisdiction issued in the case of *Serafín García Armas v. Venezuela,* incorporated into the file as Annex CLA-2. The following day, the Respondent submitted its observations on the Complainant's submission.

2 On 24 February 2021, the Applicant provided an index of these new factual annexes **(C-375 a C-384)** and legal authorities **(CLA-158 bis, CLA-158 ter, CLA-174** to **CLA-176).**

59. On 8 December 2021, the Court acknowledged receipt of the communications from both Parties to the 6 December 2021, reiterating that *it was "close to finalising its award on jurisdiction y did not therefore consider it appropriate to present additional pleadings or legal authorities at that procedural moment."*





## III. FACTUAL BACKGROUND

60. The following factual background has been prepared on the basis of the arguments presented by the Parties to date and is intended solely to put the Tribunal's decision on the *Objection Ratione Personae into context.* In no case do they constitute conclusions of the Court on the facts underlying the present controversy.

### To. THE PLAINTIFF'S ALLEGED INVESTMENTS

61. Between 1988 and 2014, Mr. Fraiz carried out business activities in Venezuela, particularly in the sectors of street advertising, telecommunications, the education sector, and the real estate sector. The following is a description of these activities according to the Complainant's account.

#### 1. Investments in the street advertising sector

62. In 1988, Mr. Fraiz founded with his father the company Imagen Publicidad C.A. **("Advertising Image")** with the purpose of undertaking business in the public street advertising sector[3].

63. In April 1998, with the aim of expanding their street billboard business, Mr. Fraiz, his father and another partner acquired Vepaco, one of the leading advertising companies in Latin America[4]. Since then, the operations of Vepaco and Imagen Publicidad have been unified[5].

64. In 2004, Mr. Fraiz acquired his father's shares in Vepaco and Imagen Publicidad, as well as those of his partner in Vepaco, controlling 100 per cent of both companies[6].

65. By 2014, Vepaco had 3,738 advertising structures distributed in different parts of the Venezuelan territory[7], offices in the building known as Torre Imagen (the **"Image Tower")**[8],

[3] Complaint Brief, § 16.

[4] Notice of Arbitration, § 18; Complaint Brief, § 18; Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis);** "History", Vepaco website **(Annex C-143).**

[5] Complaint Brief § 19; Vepaco "Road Show" presentation, 2013 **(Appendix C-256)** pp. 4-6.

[6] Notice of Arbitration, § 19; Complaint Brief, § 23; Imagen Publicidad Shareholders' Book, April 30, 1990, **(Annex C-20)** p. 9; Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis).**

[7] Complaint Brief, § 26; Inventory of Vepaco fences, 2013 **(Annex C-257).**

[8] Notice of Arbitration, § 20; Complaint Brief, §§ 19, 61.





eleven production workshops and a fleet of vehicles[9]. Its client portfolio included companies such as Procter & Gamble, McDonald's and Coca-Cola[10] and, since 2006, it had lease agreements with telecommunications operators for the installation of telecommunications equipment on its billboards[11].

#### 2. Investments in the telecommunications sector

66. With the aim of undertaking businesses providing subscription television services and wireless internet, Mr. Fraiz acquired in 1998, together with his father and other investors, 100 percent of the companies Cablevisión, TMS and TVS[12].

67. The Cablevisión Group provided subscription television services thanks to the permits obtained by TMS and TVS under the regime of the Regulations for the Operation of the Subscription Television System[13]. These permits granted temporary rights over the assigned frequency until the granting of the definitive concession[14]. In practice, operators were allowed to start commercial exploitation of the allocated frequencies even though the concession process was still ongoing[15].

68. In particular, TMS and TVS had obtained, in 1990, DMS Letters 610 and 611 (the **"Reservation Letters")**[16] which reserved for them 20 frequencies in the radio space in the sub-band 2.5-2.7 GHz (the **"Spectrum Frequencies")**[17]; in 1991 and 1992, regular transmission permits to provide subscription television service in Caracas (the **"Transmission Permits").**

[9] Complaint Brief, § 26; List of vehicles owned (directly or indirectly) by Mr. Fraiz **(Apéndice II).**

[10] Complaint Brief, § 26; Vepaco "Road Show" Presentation, 2013 **(Appendix C-256)** pp. 12-13.

[11] Complaint Brief, § 26.

[12] Notice of Arbitration, § 8; Complaint Brief, § 36; Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis).**

[13] Notice of Arbitration, § 8; Complaint Brief, § 31; Regulations for the Operation of the Subscription Television System, January 11, 1989 **(Annex C-12).**

[14] Notice of Arbitration, § 12; Complaint Brief, § 33; Regulations for the Operation of the Subscription Television System, January 11, 1989 **(Annex C-12)** art. 11.

[15] Notice of Arbitration, § 12; Complaint Brief, § 34.

[16] Notice of Arbitration, § 10; Complaint Brief § 35; Official Letter DMS 610 of the Ministry of Transport and Communications, April 2, 1990 **(Annex C-17);** Official Letter DMS 611 of the Ministry of Transport and Communications, April 2, 1990 **(Annex C-18).**

[17] Notice of Arbitration, § 10.





**Regular")**[18]; and, between 1997 and 1999, various permits for the installation of equipment[19] (the **"Installation Permits").** These permits allowed Cablevisión to provide subscription television service in Caracas and eleven other regions of Venezuela until the definitive concessions were obtained[20].

69. After obtaining in 2001 a general administrative authorization to establish and operate a telecommunications network to offer wireless internet services[21], Cablevisión began to provide internet services in 2006[22], also maintaining its subscription television services.

70. On November 12, 2004, Mr. Fraiz indirectly acquired 100 percent of TMS (by acquiring 100 percent of Imagen Publicidad Corporativa)[23]. In October 2005, Mr. Fraiz indirectly acquired 100 percent of TVS (by acquiring 100 percent of Latinoamerican Media Group)[24]. In turn, in 2007, Mr. Fraiz acquired all of the shares of Invesco, thus passing

a be the sole indirect owner of Cablevisión[25].

71. In addition, in 2001, Mr. Fraiz began activities in the television production and open television business. To this end, it indirectly acquired (through Imagen Televisión C.A.) 59.5 percent of the shares of Marte CVT Producciones de Televisión S.A.

[18] Notice of Arbitration, § 10; Complaint Brief § 35; Order No. PADS-GST-00268, May 20, 2013 **(Annex C-84)** p. 2; Ruling No. PADS-GST-00270, May 20, 2013 **(Annex C-86)** pp. 1-2.

[19] Notice of Arbitration, § 10; Complaint Brief § 35; Installation Permits of the Cablevisión Group held by TMS, various dates **(Annex C-318);** Installation Permits of the Cablevisión Group held by TVS, various dates **(Annex C-319).**

[20] Complaint Brief § 35.

[21] Notice of Arbitration, § 13; Complaint Brief, §§ 36-39; General Authorization, February 7, 2001 **(Annex C-56).**

[22] Complaint Brief, § 40.

[23] Reply, § 227; Shareholders' book of Imagen Publicidad Corporativa, 16 December 1990 **(Appendix C-23)** p. 3; Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis).**

[24] Reply, § 227; Shareholders' Book of Latinoamerican Media Group C.A., June 10, 1998 **(Appendix C-41),** p. 11; Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis).**

[25] Reply, § 227; Minutes of the meeting of Invesco A.V.V., November 12, 2007 **(Exhibit C-71);** Share Certificate No. 4 issued by Invesco A.V.V., November 12, 2007 **(Exhibit C-72);** Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis).**

("Mars CVT")[26]. Marte CVT had several regular transmission permits with national coverage granted in 1999 that authorized it to provide open television services [27]27.

72. In 2005, Mr. Fraiz indirectly acquired an additional 10.5 percent of Marte CVT [28] (which since October 2002 had been renamed LaTele[29]), now holding 70 percent of Marte CVT. The

30 remaining 30 percent continued to be indirectly owned by Sociedad de Inversiones Lileska C.A. **("Lileska")**[30].

73. In 2007, Mr. Fraiz took control of 99.025 per cent of LaTele[31].

74. In order to bring the permits into line with the new regulatory framework of the Organic Law on Telecommunications of June 2000[32], in 2002 Marte CVT submitted the corresponding application for the transformation of its permits into concessions[33]. This transformation was finally granted by the National Telecommunications Commission (the **"CONATEL")** on June 18, 2012[34]. That same year,

[26] Mr. Fraiz acquired, through Imagen Televisión C.A., 70 percent of the shares of Inversiones Vistana 333 C.A., which in turn held 100 percent of the shares of Marte CVT. Notice of Arbitration, § 21; Complaint Brief, § 49; Share purchase agreement between Producciones Agualinda C.A. and Imagen Televisión C.A., September 12, 2001, **(Appendix C-62);** Shareholders' book of Inversiones Vistana, 333 CA, 16 April 2001 **(C-60),** pp. 8-9; Strategic Partnership Agreement between Hernán Pérez Belisario and Julio César Makarem Urdaneta, 22 February 2001 **(Annex C-57);**

Clarification of the Strategic Partnership Agreement of 22 February 2001, 20 March 2001 **(Annex C-58).** See Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis).**

[27] Notice of Arbitration, § 23; Complaint Brief, § 50; Official Letter No. 000405, February 1, 1999, **(C-202);** See Official Letter No. 004441, October 11, 1999 **(Annex C-207);** See Official Letter RD/No. 00116, 11 January 2000 **(Annex C-209);** Official Letter No. GSR-00/000910, March 13, 2000 **(Annex C-210);** Official Letter No. GSR-003073, June 26, 2000 **(Annex C-212).**

[28] Reply, § 227; Shareholders' book of Imagen Televisión C.A., April 10, 2008 **(Appendix C-75 bis)** p. 6.

[29] Notice of Arbitration, § 21; Complaint Brief, § 51; Minutes of the Extraordinary General Meeting of Shareholders of Marte CVT, October 30, 2002 **(Appendix C-218)** pp. 5-6; LaTele Assembly Minutes, 7 February 2003 **(Annex C-66).**

[30] Lileska owned 30 percent of Inversiones Vistana 333 C.A., which in turn owns 100 percent of the shares of Marte CVT. Notice of Arbitration, § 21; Complaint Brief, § 49; Shareholders' book of Inversiones Vistana 333 C.A., 16 April 2001 **(Appendix C-60)** p. 11.

[31] Notice of Arbitration, § 21; Complaint Brief, § 55; Minutes of the Assembly of LaTele, March 30, 2007 **(Annex C-69)** pp. 3-4; LaTele Shareholders' Book, July 20, 1989 **(Appendix C-14)** p. 8.

[32] Notice of Arbitration, § 14; Complaint Brief, § 37; Organic Law on Telecommunications, published in the Official Gazette of the Bolivarian Republic of Venezuela No. 36.970 of 12 June 2000 **(Annex C-55).**

[33] Notice of Arbitration, § 23; Complaint Brief, § 50.

[34] Notice of Arbitration, § 23; Complaint Brief, § 56; Concession No. CRDF-00820, June 18, 2012, **(Annex C-252)** p. 2.





CONATEL also granted another national concession for five years[35] and signed two concession contracts with Marte CTV[36] (LaTele since October 2002[37] ).

75. In 2014, LaTele owned the LaTele[38] Studios, located in Caracas, as well as two transmission towers in the Waraira Repano National Park (El Ávila) and twelve transmitters with national coverage [39]. Likewise, LaTele was the owner of intellectual property rights over a catalog of audiovisual productions [40], in addition to the concessions for the provision of the open television service mentioned above.

### 3. Investments in the education sector

76. In 2010, Mr. Fraiz inherited 16.6 percent of the American Academy[41], an institute of tertiary studies founded by his father in 1959. In 2014, the Academy had twelve campuses distributed throughout the territory of Venezuela in which it taught more than 4000 students and employed more than 200 workers [42].

### 4. Real Estate Investments

77. Mr. Fraiz was also the owner of eleven companies intended for the ownership and management of various real estate and other assets[43]. One of these buildings was the Torre Imagen, on the

[35] Complaint Brief § 56; Grant No. CRDF-00821, June 18, 2012 **(Annex C-81).**

[36] Complaint Brief § 56; Concession Contract No. CRDF-00820-C, July 2, 2012 **(Annex C-253);** Amending Addendum to Concession Agreement No. CRDF-00820-C, July 2, 2012 **(Annex C-254);** Concession Contract No. CRDF-00821-C, July 2, 2012 **(Annex C-255).**

[37] *At* § 72 *supra.*

[38] Notice of Arbitration, § 24; Complaint Brief, § 57; Witness Statement of Fernando Fraiz Trapote **(Exhibit CWS-1)** § 49; Contract for the Sale of Lots and Constructions between Marte CVT and Textilana, S.A., November 8, 1991, **(Annex C-172)** pp. 5-6.

[39] Notice of Arbitration, § 24; Complaint Brief, § 54; Witness Statement of Fernando Fraiz Trapote **(Exhibit CWS-1)** § 42.

[40] Notice of Arbitration, § 24; Complaint Brief, § 57; Witness Statement of Fernando Fraiz Trapote **(Exhibit CWS-1)** § 49.

[41] Notice of Arbitration, § 25; Complaint Brief, § 59, footnote 100; Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis),** p. 5; Witness Statement of Fernando Fraiz Trapote **(Annexo CVS-1)** § 50.

[42] Notice of Arbitration, § 25; Complaint Brief, § 59; Witness Statement of Fernando Fraiz Trapote **(Exhibit CWS-1)** § 51.

[43] Notice of Arbitration, § 26; Complaint Brief, § 60 **(Appendices JCC-I through JCC-XXV).**





which were, among others, the administrative and commercial headquarters of the Cablevisión Group, Imagen Publicidad and Vepaco[44].

## B. THE MEASURES

78. According to the Complainant, the Venezuelan government intervened in its operations by unjustifiably revoking the permits of the Cablevisión Group and adopting expropriatory measures in the context of a criminal case initiated against Mr. Fraiz in 2002.

79. On May 20, 2013, CONATEL, by means of four rulings [45], rejected the requests for the transformation of the Reservation Offices and the Installation Permits of TMS and TVS, revoked their Regular Transmission Permits for the provision of services in Caracas and terminated the procedure for the transformation of the Regular Transmission Permits[46]. These permits were the ones that authorized Cablevisión to operate on the Spectrum Frequencies for the provision of its internet and subscription television services.

80. The decisions were appealed by TMS and TVS in August and September 2013[47].

81. In addition, on 20 June 2013, CONATEL initiated administrative sanctioning proceedings against Cablevisión for alleged breaches of the conditions for the provision of telecommunications services[48]. In the course of that procedure, it was ordered, as a measure

[44] Complaint Brief, § 61; Contracts of sale of the Torre Imagen, various dates **(Annex C-317).**

[45] Notice of Arbitration § 29; Complaint Brief, § 66; See Order No. PADS-GST-00268, 20 20, 2013 **(Annex C-84);** Ruling No. PADS-GST-00269, May 20, 2013, **(Annex C-85);** Ruling No. PADS-GST-00270, May 20, 2013 **(Annex C-86);** Ruling No. PADS-GST-00271, May 20, 2013 **(Annex C-87)** See also Permits of the Cablevisión Group and CONATEL Measures **(Appendix III).**

[46] Notice of Arbitration § 30; Complaint Brief, § 67-68; Ruling No. PADS-GST-00271, May 20, 2013 **(Annex C-87)** p. 4; Ruling No. PADS-GST-00268, May 20, 2013, **(Annex C-84)** pp. 5-6; Ruling No. PADS-GST-00270, May 20, 2013 **(Annex C-86)** pp. 4-5.

[47] Notice of Arbitration § 38; Complaint Brief, §§ 72, 74; Appeal for Reconsideration against Ruling No. PADS-GST-00270, August 6, 2013 **(Annex C-96);** Appeal for Reconsideration against Ruling No. PADS-GST-00271, August 6, 2013 **(Annex C-97);** Appeal for Reconsideration against Ruling No. PADS-GST-00268, August 7, 2013 **(Annex C-98);** Appeal for Reconsideration against Ruling No. PADS-GST-00269, August 7, 2013 **(Annex C-99);**

Hierarchical Appeal against Ruling No. PADS-GST-00270, September 17, 2013 **(Annex C-103);**
Hierarchical Appeal against Ruling No. PADS-GST-00271, September 17, 2013 **(Annex C-104 bis);**
Hierarchical Appeal against Ruling No. PADS-GST-00268, September 17, 2013 **(Annex C-101);**
Hierarchical Appeal against Ruling No. PADS-GST-00269, September 17, 2013 **(Annex C-102).**

[48] Notice of Arbitration § 40; Complaint Brief, § 69; Ruling No. PADS-064, June 20, 2013 **(Annex C-89).**





provisional order, the immediate suspension of Cablevision's operations on the Spectrum Frequencies and the immediate confiscation of the equipment that the company used to operate[49].

82. According to the Complainant, on June 27, 2013, representatives of CONATEL went to Cablevisión's premises and disconnected and seized the equipment, which forced Grupo Cablevisión to discontinue service to all of its customers[50]. A month later, on July 26, 2013, the precautionary measure of seizure was revoked and the return of the equipment[51] was ordered, while the precautionary measure of suspension of use[52 was confirmed].

83. At the same time, pending the resolution of the sanctioning proceedings against Cablevisión and of the appeals filed by TMS and TVS, on December 16, 2014, CONATEL awarded, through a public offering procedure[53], the Spectrum Frequencies to the companies Telefónica Venezolana C.A. and Galaxy Entertainment de Venezuela C.A.[Question 54].

84. In 2002, the company Lileska filed a criminal complaint against several of the persons involved in the purchase and sale of Marte CVT shares, including Mr. Fraiz[55]. In the course of the process, the case was assigned to the Sixth Court of First Instance in Control Functions of the Criminal Judicial Circuit of Caracas[56]. That court, in response to a request for interim measures

[49] Notice of Arbitration, § 42; Complaint Brief, § 70; Ruling No. PADS-064, June 20, 2013 **(Annex C-89),** p. 11.

[50] Notice of Arbitration, § 42; Complaint Brief, § 70; Record of Seizure in Building 123, June 27, 2013 **(Annex C-90);** Record of seizure in Torre Imagen, June 27, 2013 **(Annex C-91);** Record of Seizure at the Transmission Plant, June 27, 2013 **(Annex C-92);** Witness statement of Fernando Fraiz Trapote **(Exhibit CWS-1),** § 64.

[51] Notice of Arbitration, § 44; Complaint Brief, § 71; Record of return of equipment, July 26, 2013 **(Annex C-95).**

[52] Complaint Brief, § 71; See Ruling No. PADS 073, July 22, 2013 **(Annex C-265)** p. 17.

[53] Notice of Arbitration, § 45; Complaint Brief, § 75; Single General Specifications for Procedures 0037, 0038, 0039 and 0040, 28 November 2013 **(Annex C-267)** p. 3; First call for the award of the Frequencies, December 2, 2013 **(Annex C-105);** Second call for the award of the Frequencies, December 11, 2013 **(Annex C-106).**

[54] Notice of Arbitration, § 45; Complaint Brief, § 77; See Concession Agreement No. CTGS-00484-C, November 19, 2014 **(Annex C-279)** clause seventeen; See Concession Agreement No. CTGS-00486-C, November 19, 2014 **(Annex C-281),** clause seventeen.

[55] Notice of Arbitration, § 47; Complaint Brief, § 79; Complaint filed by Lileska with the Chief of the Criminal Records Distribution Office of the Judicial District of the Metropolitan Area of Caracas, March 18, 2002 **(Annex C-215).**

[56] Notice of Arbitration, § 54; Complaint Brief, § 83; Submission to the case of the judge of the Sixth Court, April 28, 2014 **(Annex C-109).**

*ex parte*[57], decreed, among others, the creation of a judicial audit board to *"guarantee the continuity of LaTele's activities"*[58], appointing Mr. Antonio Natividad Millán Moreno as its representative59.

85. According to the Applicant, on May 9, 2014, Mr. Millán, accompanied by a locksmith and armed agents of the Bolivarian Intelligence Service (SEBIN) and the Scientific, Criminal and Criminal Investigations Corps (CICPC), accessed, on behalf of the Audit Board, several offices located in the Torre Imagen, including those of Vepaco and the Cablevisión Group. violating their records and files and stealing documentation and computers[60]. The Plaintiff also alleges that this action was repeated at the headquarters of LaTele[61] and the American Academy[62], without Mr. Fraiz having been able to regain control of these companies[63].

86. In May 2014, the powers of the Judicial Audit Board were expanded[64]. On the basis of this extension, the Judicial Audit Board signed three contracts with the company Asociación Civil Valbuena & Makarem S.C. **("V&M")**[65], allowing them to dispose of the assets of Academia Americana, Vepaco and LaTele. According to the Claimant, this included payments obtained by these companies in the provision of their services which, thereafter, were diverted directly to V&M[66].

[57] Notice of Arbitration, § 56; Complaint Brief, § 84; Application for precautionary measures before the Sixth Court, April 30, 2014 **(Annex C-110).**

[58] Notice of Arbitration, § 57; Complaint Brief, §§ 84-85; Decision on the request for precautionary measures of the Sixth Court, May 7, 2014 **(Annex C-111)** pp. 21-22.

[59] Notice of Arbitration, § 57; Complaint Brief, § 86; Minutes of swearing-in of the Representative of the Audit Board, May 8, 2014 **(C-112);** Decision on the request for interim measures of the Sixth Court, 7 May 2014 **(C-111)** p. 21.

[60] Notice of Arbitration, § 58; Complaint Brief, §§ 88-89; Witness statement of Fernando Fraiz Trapote **(Exhibit CWS-1)** §§ 82-83; "Intervention Board Prevented Entry to La Tele", Ultimas Noticias, May 12, 2014 **(Annex C-113);** See Complaint to the Internal Policy Commission of the National Assembly, October 28, 2014 **(Annex C-130)** pp. 14-15.

[61] Notice of Arbitration, § 58; Complaint Brief, § 91; Witness statement of Fernando Fraiz Trapote **(Exhibit CWS-1)** § 85-86.

[62] Notice of Arbitration, § 60; Complaint Brief, § 101; Witness statement of Fernando Fraiz Trapote **(Exhibit CWS-1)** § 91.

[63] Complaint Brief, §§ 92 and 101; Witness statement of Fernando Fraiz Trapote **(Exhibit CWS-1)** § 90.

[64] Notice of Arbitration, § 63; Complaint Brief, § 100; Extension of powers of the Judicial Audit Board, May 19, 2014 **(Annex C-120).**

[65] Notice of Arbitration, § 63; Complaint Brief, § 103; Contract between LaTele and V&M, May 30, 2014 **(Exhibit C-121)** pp. 4-5; Contract between American Academy and V&M, May 30, 2014 **(Exhibit C-274)** pp. 6-7; Contract between Vepaco and V&M, May 30, 2014 **(Annex C-275)** pp. 4-5.

[66] Notice of Arbitration, § 63; Complaint Brief, § 103.





87. Subsequently, on August 8, 2014, an Advance Indemnity Agreement was concluded, by means of which certain assets of Vepaco, Cablevisión, LaTele and Academia Americana were transferred to Grupo Trust Mediático C.A. as an *"advance"* on future compensation and *"preliminary compensation for damages"* (among others, movable and immovable property, vehicles, billboards, telecommunications equipment and furniture)[67].

88. In addition, according to the Plaintiff, Mr. Fraiz's private residence was violently occupied on behalf of the Judicial Audit Board[68].

89. To this day, according to the Applicant, his companies remain in the hands of third parties or the Government[69].

[67] Notice of Arbitration, § 66; Complaint Brief, § 104; Contract between the Judicial Audit Board and the Media Trust Group, August 5, 2014 **(Annex C-124).**

[68] Complaint Brief, § 105; Witness statement of Fernando Fraiz Trapote **(Exhibit CWS-1)** § 97.

[69] Complaint Brief, §§ 122-129; Complaint to the Internal Policy Commission of the National Assembly, October 28, 2014 **(Annex C-130)** pp. 18-19; Witness Statement of Fernando Fraiz Trapote **(Exhibit CWS-1);** Judicial Inspection File before the 12th Municipal Court, December 14, 2015 **(Annex C-290)** p. 8.





## IV. THE FORMS OF ORDER SOUGHT BY THE PARTIES

### To. THE DEFENDANT 'S REQUEST

90. In its Brief on Objection *Ratione Personae,* as well as in its Rebuttal Brief on Objection *Ratione Personae,* the Respondent requests the Court to:

> *(a) DECLARE that it lacks jurisdiction or competence ratione personae to hear the claim made by Mr. Fraiz Trapote;*
>
> *(b) CONDEMN and ORDER Mr. Fraiz Trapote to pay all costs incurred by the Republic in connection with the arbitration, including the fees and expenses of the Arbitral Tribunal and all legal fees and expenses incurred by the Republic (including, but not limited to, attorneys' fees and expenses);*
>
> *(c) CONDEMN and ORDER Mr. Fraiz Trapote to pay the interest he deems appropriate on the amounts owed to the Republic that are generated between the time of the conviction by way of expenses y costs and the time of actual payment, and;*
>
> *(d) ORDER any other action it deems appropriate.* [70]

### B. THE PLAINTIFF 'S REQUEST

91. In his Brief of Application, the Applicant requests the Court to:

> *(a) DECLARE that it has jurisdiction to hear this dispute;*
>
> *(b) DECLARE that Venezuela has violated the Treaty and international law, and in particular that:*
>
> *(c) illegally expropriated Mr. Fraiz's investments in violation of Article V of the Treaty; and*
>
> *(d) failed to comply with its obligations to accord Mr. Fraiz's investments fair and equitable treatment, in violation of Article IV.1 of the Treaty;*

[70] Memorial, § 206; Rebuttal, § 216.





> *(e) ORDER Venezuela to compensate Mr. Fraiz for the damages suffered as a result of Venezuela's violations of the Treaty and international law, [...] plus compound interest until the effective payment of the total amount of the award takes place, without Venezuela being able to withhold any amount by way of taxes on said compensation;*
>
> *(f) GRANT any additional or other relief that the Court deems appropriate; and*
>
> *(g) ORDER Venezuela to pay the costs of this arbitration, including the fees and expenses of the Tribunal, the fees and expenses of the Permanent Court of Arbitration, the fees and expenses related to the legal representation of the Claimant, and the fees and expenses of the experts appointed by the Claimant and/or the Tribunal, plus interest thereon.* [71]

92. In his Reply Brief on Objection *Ratione Personae,* as well as in his Rejoinder Brief on Objection *Ratione Personae,* the Applicant requests the Court to:

> *(a) REJECT all jurisdictional objections ratione personae raised by Venezuela;*
>
> *(b) DECLARE that you have jurisdiction ratione personae with respect to your claim;*
>
> *(c) ORDER Venezuela to pay all costs resulting from the processing of its objections, including the fees and expenses of the Tribunal, the administrative costs of the PCA, as well as the fees and expenses related to the legal representation of the Plaintiff, plus interest; and*
>
> *(d) GRANT the Claimant any additional or different satisfaction it deems appropriate.* [72]

[71] Complaint Brief, § 388.

[72] Reply, § 231; Rejoinder, § 144.

## V. JURISDICCIÓN RATIONE PERSONAE

93. The Respondent maintains that Mr. Fraiz, as a Venezuelan national, cannot avail himself of the terms of the Treaty by invoking his Spanish nationality. This is because the Treaty, as interpreted in accordance with the 1969 Vienna Convention on the Law of Treaties (the **"VCLT"),** cannot be invoked by dual Venezuelan and Spanish nationals.

94. The Respondent also argues that the general principles of international law relating to equality between States, non-responsibility and dominant and effective nationality, insofar as they are relevant for the purposes of interpreting the Treaty and also directly applicable to the present dispute, also preclude the Claimant from bringing international arbitration before a State of which it is a national.

95. In the alternative, the Respondent argues that the Treaty prevents Mr. Fraiz from bringing a claim under the Treaty on the grounds that he had only Venezuelan nationality at the time of making his investments.

### To. THE INTERPRETATION OF THE TERM INVESTORS IN ACCORDANCE WITH ARTICLE 31 CVDT

96. The Respondent claims that Mr Fraiz is not an *investor* within the meaning of Article I(1)(a) of the Treaty, according to which:

> *For the purposes of this Agreement:*
>
> *1. 'Investors' means:*
>
> *(a) Natural persons who are nationals of one of the Contracting Parties under its legislation and make investments in the territory of the other Contracting Party*[73].

97. The Parties agree that the term *investors* must be interpreted in accordance with Article 31 of the VCLT, but they differ both in the manner in which the interpretative exercise is carried out and in the result of the interpretative exercise.

98. The Respondent submits that the only interpretation of the term *investors* under the VCLT is to conclude that the Treaty protects investors who hold the nationality of one of the

[73] Tretado **(Annexo C-27)** Art. I.1.A).





Contracting Parties, but not both[74]. It therefore considers that Mr Fraiz is not an investor protected by the Treaty as he holds dual Spanish-Venezuelan nationality. On the contrary, the Applicant submits that an interpretation in accordance with the VCLT allows it to be concluded that the term *investors* includes dual nationals of both Contracting Parties, which entitles Mr. Fraiz to invoke the Treaty.

99. Specifically, the areas of disagreement between the Parties are specified in: (1) the mode of application of the rules of interpretation of Article 31.1 CVDT; (2) the textual interpretation of the concept of *investor;* (3) interpretation in accordance with the context of the BIT; (4) the object and purpose of the Treaty; and (5) compatibility with principles of international law. These issues are discussed in the order set out above.

#### 1. Rules of interpretation

*(i) Position of the Respondent*

100. The Defendant maintains that Article 31.1 CVDT[75] establishes a general rule *"that must be applied as a whole, combining the different elements that compose it, without there being a hierarchy or order of application between them"*[76], that is, valuing equally *"the text, the context and the object and purpose of the treaty united by the principle of good faith"*[77].

101. According to the Respondent, this combined application was highlighted by the United Nations International Law Commission (the **"ILC")** in the drafting of the Draft Articles of the VCLT [78]

y by the arbitral tribunals in the cases *of Audit of Accounts between the Netherlands and France*[79] and *Manuel*

[74] Memorial, § 13.

[75] CVDT, May 23, 1969 **(Annex RLA-64)** art. 31.1.

[76] Memorial, § 17, 20; Mark E. Villiger, *Commentary on the 1969 Vienna Convention on the Law of Treaties,* ed. Leiden-Boston, 2009 **(Anexo RLA-65)** p. 435, § 29; Richard K. Gardiner, *Treaty Interpretation,* The Oxford International Law Library, 2016 **(Anexo RLA-66)** p. 161; Hervé Ascensio, *Article 31 of the Vienna Conventions on the Law of the Treaties and International Investment Law,* ICSID Review, Vol. 31, No. 2, 2016 **(Anexo RLA-69)** p. 373. Ver también Réplica, §§ 19, 21; Patrick Daillier, Mathias Forteau, Alain Pellet, *Droit international public,* L.G.D.J., Lextenso Ed. (8a Ed.) 2009 **(Anexo RLA-84)** nº 169.

[77] Rebuttal, § 19. See also Transcript, Day 1, 67:8-12.

[78] Memorial, § 17, International Law Commission, Draft Articles on the Law of Treaties with their commentaries, ILC Yearbook, Vol. II (1966) **(Annex RLA-67)** pp. 219-220.

[79] Memorial, § 18; Case concerning the audit of accounts between the Kingdom of the Netherlands and the French Republic under the Additional Protocol of 25 September 1991 to the Convention on the Protection of the Rhine against Chloride Pollution of 3 December 1976, Permanent Court of Arbitration, Award of 12 March 2004 **(Annex RLA-68)** § 62.





*García Armas v. Venezuela*[80]*,* as well as by some of the authors cited *"incompletely"* by Plaintiff[81].

102. As for the Claimant's *"literal interpretative proposal",* which puts the text of the treaty before the rest of the interpretative elements of Article 31(1) VCLT, the Respondent alleges that this is nothing more than an attempt to replicate *"the literal reading set by the arbitral tribunal in the case of Serafín García Armas v. Venezuela"* and the judicial judgment handed down in 2017 by the Paris Court of Appeal in relation to the same case[82], which, the Defendant reiterates, have been annulled in their entirety[83]. In addition, it states that this interpretation was expressly rejected by the arbitral tribunal in the *Manuel García Armas case*[84].

*(ii) Position of the Complainant*

103. The Applicant does not deny that the elements of Article 31(1) CVDT are *"interdependent"* or that *"the ordinary meaning of the text must be determined 'not in the abstract', but 'in the context of the treaty as a whole"*[85]. However, the Applicant defends the primacy of the text when it is drafted in clear and precise terms, since the text is the most *"authentic"* and *"recent" expression* of the intention of the Parties[86]. Therefore, the Plaintiff concludes that *"if the text does not make no sense*

[80] Memorial, § 19; *Manuel García Armas et al. v. Bolivarian Republic of Venezuela* (PCA Case No. 2016-08), Award on Jurisdiction, December 13, 2019 **(Annex RLA-5)** §§ 643-644.

[81] Réplica §§ 23-24; refiriéndose a Contestación, §§ 19-20; Oppenheim, *Oppenheim's International Law,* Vol. I, Longman (9a Ed.), 1996 **(Anexo RLA-85);** James Crawford, *Brownlie's Principles of Public International Law,* Oxford University Press (8a Ed.), 2012 **(Anexo RLA-86).**

[82] Reply, § 39; Serafín García Armas and Karina García Gruber v. Republic of Venezuela (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2);** Republic of Venezuela
c. Serafín García Armas and Karina García Gruber, Judgment of the Paris Court of Appeal, April 25, 2017 **(Annex CLA-3).**

[83] Reply, § 39; Paris Court of Appeal, RG No. 19/03588, *Bolivarian Republic of Venezuela v. Serafín García Armas and Karina García Gruber,* June 3, 2020 **(Annex RLA-7);** French Court of Cassation, First Civil Chamber, Appeal of Cassation No. A 17-25.851, *Bolivarian Republic of Venezuela*
*c. Serafín García Armas and Karina García Gruber,* February 13, 2019 **(Annex RLA-6).** See also Memorial, § 102.

[84] Reply, § 40; *Manuel García Armas et al. v. Bolivarian Republic of Venezuela* (PCA Case No. 2016-08), Award on Jurisdiction, December 13, 2019 **(Annex RLA-5)** § 644.

[85] Dúplica, § 18; Réplica, § 21, 23-24; Patrick Daillier, Mathias Forteau, Alain Pellet, *Droit international public,* L.G.D.J., Lextenso Ed. (8a Ed.), 2009 **(Anexo RLA-84)** § 169; Oppenheim, *Oppenheim's International Law,* Vol. I, Longman (9a Ed.), 1996 **(Anexo RLA-85);** James Crawford, *Brownlie's Principles of Public International Law,* Oxford University Press (8a Ed.), 2012 **(Anexo RLA-86).**

[86] Reply, § 19; citing *Asian Agricultural Products Ltd. v. Republic of Sri Lanka* (ICSID Case No. ARB/87/3), Final Award, 27 June 1990 **(Annex CLA-26)** § 40; Oppenheim, *Oppenheim's International Law,* Vol. I, Longman (9th ed.) (1996) **(Annex CLA-28)** p. 1271. See also Rejoinder, §
15.





*in the context of the treaty in which it is found, and in relation to its object and purpose, it must be given effect"*[87], without the context of the treaty or its object and purpose being used to deny the literal interpretation

o to justify other interpretations[88].

104. The Applicant asserts that this position has been adopted by numerous authors89 and tribunals, including the International Court of Justice in the Territorial *Dispute case (Libya v. Chad)* and *"the vast majority of investment tribunals"*[90].

105. The Claimant also indicates that the arbitral tribunals in the cases *of Rompetrol v. Romania* and *Ping v. Belgium,* respectively, considered that: (i) *"an interpretation that ignores the definition of investor established by the BIT when that definition is clear"*[91] and (ii) *"that the alleged intentions of the parties should not be used to replace the definitions of a BIT"*[could not be acceptedQuestion 92].

106. Like the Respondent, the Complainant refers to the Draft Articles of the VCLT drafted by the Commission, but maintains that *"Venezuela fails to cite the fundamental part of the report, in which the Commission explains the textual approach applicable to any interpretation of a treaty"*[93].

[87] Rejoinder, § 19.

[88] Dúplica, § 20; citando Sergei Viktorovich Pugachev c. Federación Rusa (CNUDMI), Laudo sobre Jurisdicción, 18 de junio de 2020 **(Anexo CLA-173)** § 379 ("purpose and context […] cannot be used to negate the meaning of a treaty provision if that meaning is plain and if the interpretation is consonant with the treaty's object and purpose and any other relevant context").

[89] Contestación, § 20; Dúplica, § 15; I. Brownlie, *Principles of Public International Law,* Oxford University Press, ed. 7, 2008 **(Anexo CLA-52)** p. 631. Ver también Contestación, § 21; P. Reuter, *Introduction to the Law of Treaties,* Routledge, 1995 **(Anexo CLA-110)** §§ 141-142.

[90] Reply, § 24-26; citing *Case of Territorial Dispute (Libya v. Chad),* Judgment, 1994 ICJ Reports 6, February 3, 1994 **(Annex CLA-109)** § 41; *Serafín García Armas and Karina García Gruber v. Republic of Venezuela* (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2)** §§ 156, 161, 163-164, 166; *El Paso Energy International Company Inc. v. Argentine Republic* (ICSID Case No. ARB/03/15), Award, October 31, 2011 **(Annex CLA-129)** § 590. See also Rejoinder, §§ 14-15, 22-24; *Sergei Viktorovich Pugachev v. Russian Federation* (UNCITRAL), Award on Jurisdiction, June 18, 2020 **(Annex CLA-173)** §§ 374-376.

[91] Reply, § 28; *The Rompetrol Group N.V. v. Romania* (ICSID Case No. ARB/06/3), Decision on Objections to Jurisdiction and Admissibility, April 18, 2008 **(Annex CLA-124)** § 85.

[92] Contestación, § 29; Dúplica, § 25; Ping An Life Insurance Company of China, Limited and Ping An Insurance (Group) Company of China, Limited c. Reino de Bélgica (Caso CIADI No. ARB/12/29), Laudo, 30 de abril de 2015 **(Anexo CLA-167)** §§ 165-166.

[93] Reply, § 22; Rejoinder, §§ 16-17; referring to International Law Commission, Draft Articles on the Law of Treaties with their commentaries, ILC Yearbook, Vol. II (1966) **(Annex RLA-67)** pp. 220-221. See also Transcript, Day 1, 163:13-21.

107. Finally, the Claimant refers to Venezuela's claims regarding the total annulment of the arbitral tribunal's decision in the *Serafín García Armas* case and the 2017 judgment of the Paris Court of Appeal[94]. The Claimant indicates that *"the annulment of these decisions was based on other grounds that have nothing to do with the conclusions on the protection of dual nationals in the Treaty, and therefore does not affect either their reasoning or their persuasive value in relation to that issue"*[95] as, he indicates, was recognized by the arbitral tribunal in the case *of Sergey Pugachev v. Russia*[96].

## 2. Textual interpretation of the concept of *investor*

*(i) Position of the Respondent*

108. The Defendant submits that the ordinary meaning of the terms of Article I.1(a) indicates that dual nationals cannot be considered investors under Treaty[97]. In particular, the Respondent considers that the use of the term *"of one of the Contracting Parties"* in that provision, rather than alternative expressions such as *"of one or the other"* or *"of the two Contracting Parties", "highlights the uniqueness required as regards the nationality requirement"*[98]. It also refers to the opposition between the expressions *"of a Contracting Party"* and *"of the other Contracting Party",*

and the use of the term *"and"* between them, which, in its view, evidences the need for simultaneous opposition between the State of nationality of the investor and the State where the investment is made[99].

*(ii) Position of the Complainant*

109. The Applicant denies that the ordinary meaning of the terms of the Treaty allows it to be concluded that the intention of the Parties was not to grant protection to dual nationals[100]. According to the Applicant, the only conditions arising from Article I(1)(a) of the Treaty are to possess the

[94] See Rebuttal, § 120.

[95] Rejoinder, § 35; Reply, §§ 155-158. See also Transcript, Day 1, 145:7-16, 193:10-19.

[96] Rejoinder, § 35; *Sergei Viktorovich Pugachev v. Russian Federation* (UNCITRAL), Award on Jurisdiction, 18 18, 2020 **(Exhibit CLA-173)** § 424.

[97] Memorial, § 26.

[98] Memorial, § 27; Reply, § 38.

[99] Reply, §§ 35-36; Memorial, §§ 28-29.

[100] Reply, § 34.





nationality of one Contracting Party, regardless of whether one is also a national of the other, and having made an investment in the territory of the other Contracting Party[101].

110. In response to the Respondent, the Plaintiff argues that the use of the word *"a"* in the definition of the term *investors* is not significant, since *"a"* is an indeterminate or indefinite article that accompanies the words *"of the Contracting Parties"* but does not indicate a cardinal number[102].

## 3. Context of the Treaty

111. The Defendant submits that the context of the Treaty confirms the exclusion of dual nationals from its scope of protection. In particular, the Respondent refers to substantive provisions of the Treaty, with particular emphasis on the National Treatment Standard;

***(A)*** Protections

***(B)*** the dispute settlement mechanism of the Treaty; and ***(C)*** the General Treaty of Cooperation and Friendship between the Kingdom of Spain and the Bolivarian Republic of Venezuela, signed in Madrid on 7 June 1990 (the

**"Treaty of Friendship").**

### *(A) Substantive protections of the Agreement and, in particular, the National Treatment Standard*

*(i) Position of the Respondent*

112. First, the Respondent states that, both in the preamble to the Treaty and in Articles II.1, III.1, IV, V.1, XI.1, the use of the contrasting expressions *"of one Contracting Party"* and *"of the other Contracting Party" is repeated103*. In addition, the Respondent submits that the Complainant's interpretation *"renders inoperative the Preamble, Articles II, III, IV, V and XI.4 [sic] of the BIT* [...]*"*[104], as well as Article VII of the Treaty[105], which is contrary to a good faith interpretation[106]. For example, it argues that it makes no sense to grant the benefit of the national treatment standard of the

[101] Reply, §§ 32, 34; Transcript, Day 1, 144:3-14.

[102] Reply, §§ 32-33; Rejoinder, § 32.

[103] Memorial, §§ 32, 34-39; Treaty, preamble, arts. II, II, III, IV, V and XI; Reply, § 45.

[104] Reply, § 49. See also Rebuttal, §§ 50-57.

[105] Rebuttal, § 55.

[106] Reply, § 48.





Article IV.2 (the **"National Treatment Standard")** to their own nationals, since they *"already benefit from national protection by virtue of being nationals of that same State"*[107].

113. The Defendant also considers it inadmissible to incorporate elements outside Article 31 CVDT into the interpretation of the Treaty, referring, in particular, to the comparison of treaties concluded by Venezuela and Spain with third States made by the Applicant[108].

*(ii) Position of the Complainant*

114. First, the Applicant insists that there is no expression in the text of the Treaty that would allow it to conclude that dual national claims are excluded or limited, again rejecting the interpretation put forward by the Respondent regarding the use of the words *"of a Contracting Party"* and *"of the other Contracting Party"*[109].

115. With respect to the National Treatment Standard, the Complainant asserts that *"such protection seeks to ensure that dual nationals are not discriminated against on the basis of their second nationality"* and adds that, even if a treaty protection did not operate with respect to a dual national investor (which it denies is the case with the National Treatment Standard), this does not imply that *"such investor should be denied the protection of the entire Treaty"*[110].

116. The Complainant stresses that if the Parties had wished to exclude dual nationals from the protection of the treaty, they would have done so expressly[111], as was done in the Additional Protocol to the Venezuela-Italy BIT (1990), the Venezuela-Canada BIT (1996), the Venezuela-Iran BIT (2005), the Venezuela-Argentina BIT (1993) and the Venezuela-Ecuador BIT (1993)[112]. The first three exclude

[107] Memorial, §§ 41-42.

[108] Reply, §§ 27-29; Transcript, Day 1, 74:16-22, 75:1-6.

[109] Reply, § 83; Rejoinder, § 47.

[110] Reply, § 87; Rejoinder, § 50.

[111] Reply, §§ 34, 46, 53, 59; Rejoinder, § 31; Transcript, Day 1, 151:16-19, 201:5-9.

[112] Reply, §§ 47-52; Additional Protocol to the Agreement between the Government of the Italian Republic and the Government of the Republic of Venezuela on the Promotion and Protection of Investments, June 1990 **(Annex C-166),** clause 1.a; Agreement between the Government of the Republic of Venezuela and the Government of Canada for the Promotion and Protection of Investments, July 1, 1996 **(Annex C-195),** art. I.g; Agreement on the Promotion and Reciprocal Protection of Investments between the Government of the Bolivarian Republic of Venezuela and the Government of the Islamic Republic of Iran, 11 March 2005 **(Annex C-224)** art.1.2.a); Agreement between the Government of the Republic of Venezuela and the Government of the Argentine Republic for the Reciprocal Promotion and Protection of Investments, November 16, 1993 **(Annex C-332)** art. 2.2; Agreement between the Government of the Republic of Venezuela and the Government of the Republic of Ecuador for the Reciprocal Promotion and Protection of Investments, November 18, 1993 **(Annex C-333),** art. I.3.c.





expressly to dual nationals, while the latter two *"exclude claims by a national of a State Party who has resided for more than two years in the other State Party where he or she has made his or her investment"* [113].

117. The Claimant also refers to the BITs signed by Spain with Uruguay (1992) and Colombia (2007), which expressly exclude dual nationals; the BITs signed with Argentina (1991) and Tunisia (1991), in which the natural person must have both the nationality and residence of a Contracting Party in order to qualify as a protected investor; and the BIT signed with the Dominican Republic (1995), in which residence, and not nationality, is used as a criterion to define whether a natural person is protected by BIT[114].

118. The Applicant denies that the comparison with other treaties is an *"artificial and sterile" exercise* y *"without any support in the VCLT",* as Respondent[115] maintains, and alleges that this analysis has been used by arbitral tribunals in similar cases, citing *Serafín García Armas v. Venezuela*[116], *Bahgat v. Egypt*[117], *Pugachev v. Russia*[118] and *Rawat v. Mauricio*[119] and in other cases[120], as well as by

[113] Reply, § 52.

[114] Reply, §§ 54-58; Agreement for the Promotion and Reciprocal Protection of Investments between the Kingdom of Spain and the Oriental Republic of Uruguay, 7 April 1992 **(Annex C-176)** art I.3.c); Agreement between the Kingdom of Spain and the Republic of Colombia for the Reciprocal Promotion and Protection of Investments, 3 September 2007 **(Annex C-233),** arts. 11.4-11.5; Agreement for the Promotion and Reciprocal Protection of Investments between the Argentine Republic and the Kingdom of Spain, 3 October 1991 **(Annex C-171),** art. I.1.a; Agreement for the Promotion and Reciprocal Protection of Investments between the Kingdom of Spain and the Tunisian Republic, 28 May 1991 **(Annex C-331),** art. 1.a; Agreement for the Reciprocal Protection and Promotion of Investments between the Kingdom of Spain and the Dominican Republic, 16 March 1995 **(Annex C-192),** art. 1.1.a).

[115] Ver Memorial, §§ 110-115.

[116] Reply, § 62; Rejoinder, § 44; *Serafín García Armas and Karina García Gruber v. Bolivarian Republic of Venezuela* (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2)** §§ 180-181.

[117] Reply, § 63; Rejoinder, § 44; *Mohamed Abdel Raouf Bahgat v. Arab Republic of Egypt* (PCA Case No. 2012-07), Decision on Jurisdiction, November 30, 2017 **(Annex CLA-168)** §§ 221-222.

[118] Rejoinder, § 44; *Sergei Viktorovich Pugachev v. Russian Federation* (UNCITRAL), Award on Jurisdiction, June 18, 2020 **(Annex CLA-173)** §§ 385-386. See also Reply, § 64.

[119] Reply, § 65; Rejoinder, § 44; *Dawood Rawat v. Republic of Mauritius* (PCA Case No. 2016-20), Award on Jurisdiction, 6 April 2018 **(Annex CLA-4/RLA-54)** § 170.

[120] See Reply, §§ 68, 74-76; Rejoinder, § 43.

the International Court of Justice[121] to interpret the clauses of a treaty, and even by Venezuela itself in several investment arbitrations[122].

***(B) Treaty Dispute Settlement Mechanism***

*(i) Position of the Respondent*

119. The Respondent considers the choice of the International Centre for Settlement of Investment Disputes (the **"ICSID")** as the first and main forum for dispute settlement (Article XI.2 of the Treaty)[123] to be decisive, since ICSID does not admit claims from nationals of the State party to the dispute[124].

120. The Respondent asserts that ICSID is the first and foremost forum, because the Treaty provides for the possibility of initiating ad *hoc* arbitration under the UNCITRAL Rules only when ICSID or the ICSID Additional Facility *is "for any reason unavailable"*[125]. The Respondent considers that the term *"for any reason"* should be limited to those situations in which ICSID or the Additional Facility is not available due to ICSID[126] circumstances. According to the Respondent, this stems from the context of the Treaty, since during the negotiation of the Treaty neither Spain nor Venezuela had yet ratified ICSID Convention[127].

121. According to the Respondent, this is confirmed by the travaux préparatoires of the ICSID Convention, which show that the representatives of Spain and Venezuela objected to a national

121 Reply, § 77; Rejoinder, § 43; Case concerning Military and Paramilitary Activities in and Against Nicaragua (Nicaragua v. United States of America), Judgment, 1986 ICJ Reports 14, June 27, 1986 **(Annex CLA-108)** § 222.

122 Reply, § 68; Venezuela US, S.R.L. v. Bolivarian Republic of Venezuela (PCA Case No. 2013-34), Interim Award on Jurisdiction, July 26, 2016 **(Annex CLA-146)** § 57; ConocoPhillips Petrozuata BV et al. v. Bolivarian Republic of Venezuela (ICSID Case No. ARB/07/30), Decision on Jurisdiction and Merits, September 3, 2013 **(Annex CLA-78)** § 282; Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela (ICSID Case No. ARB/12/13), Decision on Liability and the Quantum Principles, December 30, 2016 **(Annex CLA-93)** §§ 391, 549; Crystallex International Corporation v. Bolivarian Republic of Venezuela (ICSID Case No. ARB(AF)/11/2), Award, April 4, 2016 **(Annex CLA-89)** § 495; Tenaris S.A. and Talta – Trading and Marketing Sociedade Unipessoal Lda. v. Bolivarian Republic of Venezuela (ICSID Case No. ARB/11/26), Award, January 29, 2016 **(Annex CLA-87)** § 157.

123 Memorial, § 47; Reply, § 64.

124 Memorial, § 44; Reply, § 67; Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 18 March 1965 **(Annex R-2),** art. 25(2)(a).

125 Memorial, § 55; Reply, § 71; Transcript, Day 1, 123:8-14, 124:4-17.

126 Transcript, Day 2, 309:4-9.

127 Transcript, Day 2, 316:14-21.





could sue his own State before an international forum[128]. Furthermore, in the Respondent's view, it would be absurd to argue *"that the term 'investors' would have a different meaning depending on the arbitral forum"*[129], as this would be contrary to the *"principle of the inalterability of the terms of the BIT depending on the international forum",* which has been recognized by numerous arbitral tribunals[130]. In this regard, the Respondent has particular emphasis on the decisions in *the cases of Manuel García Armas et al. v.*[Venezuela 131], *Hermanos Heemsen v. Venezuela*[132] and *Dawood Rawat v. Mauricio*[133]. In relation to the latter case, the Respondent rejects the *"partial reading"* of Claimant[134], and explains that the arbitral tribunal *"resorted to the context of the treaty to determine that, precisely, the term investors did not include dual nationals",* giving value to the choice of ICSID as a dispute resolution forum[135].

122. As regards the case *of Pey Casado v. Chile,* in which, according to the Applicant, the tribunal *"considered that the ICSID Convention did not preclude the recognition of Mr. Pey Casado as an investor protected by the Treaty"*[136], the Respondent states that this *" bears no relation to the case at hand"* because: (i) Mr. Pey Casado renounced one of his two nationalities before initiating proceedings against Chile[137]; and (ii) unlike the Treaty, *"the Chilean BIT invoked by Mr. Pey*

128 Memorial, § 46; Travaux Travatoires del Convención ICSID, Historia del Convención ICSID, Vol. IV, 1969 original, 2009 reprinted, pp. 87, 164-165 **(Annex R-3).**

129 Rebuttal, § 71. See also Transcript, Day 1, 122:9-11.

130 Brief, §§ 50-57, *Romak S.A. v. Republic of Uzbekistan* (PCA Case No. AA280), Award of November 26, 2009 **(Exhibit RLA-8)** §§ 193-194 and § 207; *Nova Scotia Power Incorporated v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB(AF)/11/1), Excerpts from the April 30, 2014 Award **(Annex RLA-9)** § 80; *Dawood Rawat v. Republic of Mauritius* (PCA Case No. 2016-20), Award on Jurisdiction, 6 April 2018 **(Annex CLA-4/RLA-54)** § 179; *Enrique Heemsen and Jorge Heemsen v. Bolivarian Republic of Venezuela* (PCA Case No. 2017-18), Award of Jurisdiction of October 29, 2019 **(Exhibit RLA-4)** §§ 413-419; *Manuel García Armas et al. v. Bolivarian Republic of Venezuela* (PCA Case No. 2016-08), Award on Jurisdiction, December 13, 2019 **(Annex RLA-5)** §§ 718-723.

131 *Manuel García Armas et al. v. Bolivarian Republic of Venezuela* (PCA Case No. 2016-08), Award on Jurisdiction, December 13, 2019 **(Annex RLA-5)** §§ 721-722.

132 *Enrique Heemsen and Jorge Heemsen v. Bolivarian Republic of Venezuela* (PCA Case No. 2017-18), Award of Jurisdiction **(Annex RLA-4)** §§ 413-414, 417-419.

133 *Dawood Rawat v. Republic of Mauritius* (PCA Case 2016-20), Award on Jurisdiction, 6 April 2018 **(Annex CLA-4/RLA-54)** § 179.

134 Memorial, § 105; Transcript, Day 1, 116:12-17.

135 Rebuttal, § 122.

136 Reply, § 95.

137 Memorial, § 106; Reply, § 124; *Victor Pey Casado and Fundación Presidente Allende v. Republic of Chile* (ICSID Case No. ARB/98/2), Award, May 8, 2008 **(Annex CLA-1)** §§ 106-112, 252, 287-292 and 322.





*Casado did not contain an element of temporality"* on the moment in which the nationality requirement 138 had to be met .

123. Regarding the *Bahgat case,* which would supposedly support the Applicant's interpretative proposal, the Respondent points out that this case is different from the present one, since the applicable treaties did not provide for ICSID as the primary jurisdiction[139].

124. Finally, the Respondent denies that the use of the ICSID Convention to interpret the term *investor* is contradictory to its arguments regarding the critical date on which the nationality requirement must be verified[140], since the ICSID Convention *"does not inhibit the ability of the Contracting Parties to incorporate an additional condition, another critical moment in which the conditions must be met, as established by the BIT"*[141].

*(ii) Position of the Complainant*

125. In the Claimant's view, the choice of ICSID as a forum does not imply that the rules of the ICSID Convention are automatically incorporated into the Treaty, and, if they were, *"the ICSID Convention would modify BITs in many respects"*[142]. It asserts that the same position was expressed by the arbitral tribunals in the cases *of Serafín García Armas v. Venezuela*[143], *Pey Casado v. Chile*[144], *Pugachev v. Russia*[145] *and Rawat v. Mauricio*[146].

126. In response to the Respondent's assertions in the *Rawat*[147 case], the Applicant notes that the Tribunal *"agreed to the inclusion of dual nationals in treaties offering*

138 Rebuttal, § 77.

139 Reply, § 125; *Mohamed Abdel Raouf Bahgat v. Arab Republic of Egypt* (PCA Case No. 2012-07), Decision on Jurisdiction, November 30, 2017 **(Annex CLA-168)** § 223.

140 Reply, § 75.

141 Reply, § 75.

142 Reply, § 93. In the same sense Transcription, day 1, 225:7-14.

143 Reply, § 94; Rejoinder, § 58; *Serafín García Armas and Karina García Gruber v. Republic of Venezuela* (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2)** § 194.

144 Reply, § 95; Rejoinder, § 59; *Victor Pey Casado and Fundación Presidente Allende v. Republic of Chile* (ICSID Case No. ARB/98/2), Award, May 8, 2008 **(Annex CLA-1)** §§ 414-415.

145 Rejoinder, § 54; *Sergei Viktorovich Pugachev v. Russian Federation* (UNCITRAL), Award on Jurisdiction, 18 18, 2020, **(Exhibit CLA-173)** § 384.

146 Rejoinder, § 55; *Dawood Rawat v. Republic of Mauritius* (PCA Case No. 2016-20), Award on Jurisdiction, 6 April 2018 **(Annex CLA-4/RLA-54),** footnote 150.

147 Memorial, § 51; Reply, §§ 121-123.





*a menu of forums",* and clarified that it did not intend to contradict the conclusions reached in the *Pey Casado* and *Serafín García Armas cases,* emphasizing that the treaties offered a menu of forums, while the France-Mauritius BIT, applicable to the case, included ICSID[148 as the only option].

127. With regard to the Respondent's statement regarding *Pey Casado*[149], the Plaintiff states that

(i) *"Mr. Pey Casado was a dual Spanish-Chilean national at the time of the alleged violations of the applicable treaty"*[150], so the tribunal had to analyze whether dual nationals were included in the definition of investors in the Spain-Chile BIT, *"and decided affirmatively"*[151]; (ii) the *"element of temporality" "has nothing to do with the question of whether a BIT protects dual nationals"*[152]; and

(iii) *"the court* [...] *ruled that the jurisdictional requirements of the BIT are different from those of the Convention ICSID"*[153].

128. Regarding the case *of Heemsen v. Venezuela,* cited by Respondent[154], the Plaintiff points out that the tribunal did not reject jurisdiction due to the dual nationality of the plaintiffs, but referred to this issue *obiter dicta,* understanding *"that the plaintiffs would not be protected by the Venezuela-Germany BIT because said treaty provided for ICSID as the only forum for dispute resolution"*[155]. The Claimant reiterates that the Treaty is different in that it offers a menu of forums, including the possibility of initiating arbitration under UNCITRAL Rule[156]. In addition, the Plaintiff states that the expression *"for any reason",* used in Article XI.2 of the Treaty, cannot be interpreted in the sense proposed by the Respondent, since this would be equivalent to incorporating requirements that were not agreed upon by the Contracting Parties by way of interpretation[157].

148 Reply, § 149; Rejoinder, § 35, footnote 119; *Dawood Rawat v. Republic of Mauritius* (PCA Case No. 2016-20), Award on Jurisdiction, 6 April 2018 **(Annex CLA-4/RLA-54),** footnote 150. See also Transcript, Day 1, 150:6-8.

149 Rebuttal, § 77

150 Rejoinder, § 35; *Victor Pey Casado and Fundación Presidente Allende v. Republic of Chile* (ICSID Case No. ARB/98/2), Award, May 8, 2008 **(Annex CLA-1)** §§ 254, 415.

151 Rejoinder, § 35; referring to Reply, §§ 39-40; *Victor Pey Casado and Fundación Presidente Allende v. Republic of Chile* (ICSID Case No. ARB/98/2), Award, May 8, 2008 **(Annex CLA-1)** § 415.

152 Rejoinder, footnote 128.

153 Rejoinder, footnote 128.

154 Rejoinder, § 63.

155 Reply, § 154; Rejoinder, § 63, footnote 139; *Enrique Heemsen and Jorge Heemsen v. Bolivarian Republic of Venezuela* (PCA Case No. 2017-18), Award of Jurisdiction **(Annex RLA-4)** §§ 414-418. See also Transcript, Day 1, 240:1-7.

156 Reply, § 154; Rejoinder, § 63. See also Transcript, Day 1, 224:17-22, 225:1-6.

157 Transcript, Day 2, 420:8-18.

129. As regards *Manuel García Armas v.*[Venezuela158], the Applicant states that the tribunal did not correctly interpret Article XI of the Treaty, since *"the jurisdictional requirements of the Treaty and the requirements of the ICSID are independent and separable from each other"*[159]. In addition, the Plaintiff argues that these two cases constitute *"an isolated case"* and that *"the doctrine has been consistently rejected by the courts"*[160].

130. In addition to the above, the Claimant indicates that it is necessary to distinguish between the jurisdictional requirements of the Treaty, relevant to determining whether a person qualifies as a protected investor under the Treaty[161], and the requirements for access to dispute resolution forums (such as ICSID), relevant to determining access to that forum, as well as other issues such as the effects of the arbitral award or its enforcement[162]. The Claimant considers that the provisions of the Treaty *"apply regardless of the forum accessed"*[163] and that *"as stated in the citation of the decision in Bahgat included by Venezuela in its Rebuttal, '[w]hether a dual national is able to bring a claim under a treaty is also dependent on the legal framework governing the arbitral forum'"*[164]. In the latter case, the Claimant denies that, as the Respondent points out, the treaties applicable to the case did not provide for ICSID as the primary jurisdiction[165].

131. The Applicant also asserts that Venezuela's argument is *"inconsistent"* with its position on the timing of the nationality requirement[166]. For Venezuela, *"according to the Treaty, the investor must also possess the relevant nationality at the time of making the investment"*[167], while the ICSID Convention marks as critical dates the day on which the Parties consented to submit the dispute to arbitration and the date on which the request for arbitration was registered[168]. The Applicant argues that *"it is not clear why the Treaty could depart from the*

158 *Manuel García Armas et al. v. Bolivarian Republic of Venezuela* (PCA Case No. 2016-08), Award on Jurisdiction, December 13, 2019 **(Annex CLA-102)** §§ 719-722.

159 Reply, § 153; Rejoinder, § 64.

160 Reply, §§ 154, 198-202; Rejoinder, §§ 63, 107-117.

161 Reply, § 92.

162 Reply, § 92; Rejoinder, § 57.

163 Reply, § 92; Rejoinder, § 57.

164 Rejoinder, § 57; *Mohamed Abdel Raouf Bahgat v. Arab Republic of Egypt* (PCA Case No. 2012-07), Decision on Jurisdiction, November 30, 2017 **(Annex CLA-168)** § 223.

165 Rejoinder, § 35.

166 Reply, § 98.

167 Rejoinder, § 61.

168 Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 18 March 1965 **(Annex R-2),** art. 25(2)(a).





*requirements of the ICSID Convention"* on this issue, *"but not with respect to the inclusion of dual nationals in its scope of protection"*[169].

***(C) Treaty of Friendship***

*(i) Position of the Respondent*

132. The Respondent submits that the Treaty of Amity[170] is also part of the context of Article I(1)(a) of the Treaty under the prism of Article 31(2)(a) CVDT because, in addition to having served as the basis for the signing of Treaty[171], it has a relevant connection with its conclusion, both because of the chronology (the Treaty was signed within the 5-year economic and financial cooperation programme established by the Economic and Economic Cooperation Agreement and The financial component of the Treaty of Friendship[172]) and the object and purpose they share[173]. In the Respondent's view, the Plaintiff denies that the Treaty of Amity is part of the context because its content does not favor him, and clarifies that the decision of jurisdiction in the *Serafín García Armas* case (which rejected a similar argument) *"was annulled in its entirety"*[174].

133. As to the relevance of the content of the Treaty of Amity, the Defendant argues that allowing a dual national to sue his own State before an international forum would be incompatible with the principle of legal equality embodied in the preamble to that treaty, since this would imply privileging one nationality over the other, creating a conflict of sovereignty[175].

169 Reply, § 98; Rejoinder, § 60.

170 General Treaty of Cooperation and Friendship between the Kingdom of Spain and the Bolivarian Republic of Venezuela, signed in Madrid on 7 June 1990, published in the Official State Gazette of 16 July 1992 **(Annex R-5).**

171 Memorial, § 58, 59; Rebuttal §§ 78, 80; CVDT, May 23, 1969 **(Annex RLA-64)** art. 31.2.a.

172 Memorandum, § 59, General Treaty of Cooperation and Friendship between the Kingdom of Spain and the Bolivarian Republic of Venezuela, signed in Madrid on 7 June 1990, published in the Official State Gazette of 16 July 1992 **(Annex R-5)** art. 5.

173 Reply, §§ 81-83 Mark E. Villiger, *Commentary on the 1969 Vienna Convention on the Law of Treaties,* ed. Leiden-Boston **(Appendix RLA-65)** pp. 429-430; General Treaty of Cooperation and Friendship between the Kingdom of Spain and the Bolivarian Republic of Venezuela, signed in Madrid on 7 June 1990, published in the Official State Gazette of 16 July 1992 **(Annex R-5)** preamble, art. 1, art. 2 of the Economic Agreement between the Kingdom of Spain and the Republic of Venezuela Member of the Spanish-Venezuelan General Treaty of Cooperation and Friendship, signed in Madrid on 14 July 1992.

174 Reply, §§ 78-79 referring to Reply, §§ 100-104; Paris Court of Appeal, RG No. 19/03588, *Bolivarian Republic of Venezuela v. Serafin Garcia Armas and Karina Garcia Gruber,* June 3, 2020 **(Annex RLA-7).**

175 Memorial, §§ 60-61; Reply, § 86.





*(ii) Position of the Complainant*

134. The Applicant denies that the Treaty of Amity and the Economic Agreement *"refer"* to the Treaty and *"were concluded in connection with the conclusion of the Treaty",* as required by Article 31(2)(a) CVDT[176]. It explains that these were signed three and five years before the signing of the Treaty

y that they do not refer with any specificity to the Treaty, nor has this point been proven by Venezuela[177]. In any case, it points out that there is nothing in the Treaty of Friendship or in the Economic Agreement that *"refers to the concept of investor, to the nationality of natural persons or to the nationality of natural persons".*

*a national doubles"*[178].

**4. Object and purpose of the Treaty**

*(i) Position of the Respondent*

135. As regards the object and purpose of the Treaty, the Defendant recalls, in the first place, that the objective of investment treaties is to encourage and facilitate transnational investment flows and not investments by nationals in their own territory[179]. In this regard, it cites the OECD Investment Action Framework[180] and the preamble to Treaty[181], also highlighting the use of the term *"reciprocal"* in both the preamble and the title of Treaty[182], which, in its view, are contrary to the inclusion of dual nationals in its scope of protection.

176 Reply, § 101; Rejoinder, § 66; CVDT, May 23, 1969 **(Annex CLA-23)** art. 31.2.

177 Reply, § 101; Rejoinder, § 67.

178 Reply, § 102; Rejoinder, § 68; *Serafín García Armas and Karina García Gruber v. Republic of Venezuela* (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2)** § 187.

179 Memorial, § 64; Reply, §§ 87, 90; Campbell McLachlan QC, Laurence Shore, Matthew Weiniger, *International Investment Arbitration, Substantive Principles,* Oxford University Press (2a Ed.), 2017 **(Anexo RLA-87)** § 5.01; Mathias Audit, Sylvain Bollée and Pierre Callé, *Droit du commerce international et des investissements étrangers,* L.G.D.J., Lextenso Ed., 2014 **(Anexo RLA-90)** § 976; Ch. Leben (ss. Dir.), *Droit international des investissements et de l'arbitrage transnational,* ed. Pedone: "Les sources du Droit International des Investissements", Claire Crépet Daigremont, 2015 **(Anexo RLA-91)**

p. 102.

180 Memorial, § 65; OECD, Investment Action Framework, ed. 2015 (last visited 16 September 2020): https://read.oecd-ilibrary.org/finance-and-investment/marco-de-accion-para-la-inversion-edition-2015_9789264251106-en#page1, p. 27 and p. 32.

181 Memorial, § 66; Treaty **(Annex C-27)** preamble ("to create favourable conditions for investments made by investors of each of the Contracting Parties in the territory of the other").

182 Memorial, § 70; Treaty **(Annex C-27)** preamble.





136. The Defendant rejects the Applicant's arguments concerning the object and purpose of the Treaty because they are based: (i) on a court judgment which *"no longer exists in the French legal system"*[183];

(ii) in treaties concluded by Venezuela with third[States184], which it considers an *"artificial and sterile"* exercise and without any support in the VCLT[185], since these treaties are limited to the Parties that negotiated them; and (iii) in the comments of a Spanish deputy that constitute *"personal opinions on the text that the Contracting Parties had already negotiated and agreed"*[186].

*(ii) Position of the Complainant*

137. The applicant also disputes that the object and purpose of the Treaty is contrary to the inclusion of dual nationals in its scope of protection[187].

138. First, it indicates that the inclusion of dual nationals furthers the purposes expressed in the preamble to the Treaty[188] because the widening of the circle of investors protected under the Treaty *"substantially increases investment opportunities in the territories of the Parties"*[189]. In this regard, it cites the decisions of the Paris Court of Appeal in the case of *Serafín García Armas v. Venezuela*[190], as well as of the arbitral tribunals in the cases of *Rawat v. Mauricio*[191] and *Feldman v. Mexico*[192]. In addition, it adds that "[t]he *text of the Treaty does not include concepts such as the origin of capital or*

183 Reply, § 92 French Court of Cassation, First Civil Chamber, Cassation Appeal No. A 17-25.851, *Bolivarian Republic of Venezuela v. Serafín Garcia Armas and Karina Garcia Gruber,* February 13, 2019 **(Annex RLA-6).**

184 Reply, §§ 89, 92; Agreement between the Government of the Republic of Venezuela and the Government of the Argentine Republic for the Reciprocal Promotion and Protection of Investments, of November 16, 1993 **(Annex C-332);** Agreement between the Government of the Republic of Venezuela and the Government of the Republic of Ecuador for the Reciprocal Promotion and Protection of Investments, November 18, 1993 **(Annex C-333).** See also Memorial, §§ 111-117; Rebuttal §§ 27-29.

185 Memorial, §§ 111, 114-115.

186 Reply, § 89 referring to Reply, § 113-114.

187 Memorial, §§ 63-71.

188 Reply, § 108; Rejoinder, § 74; Treaty **(Annex C-27)** preamble.

189 Reply, § 110; *Marvin Roy Feldman Karpa v. United Mexican States* (ICSID Case No. ARB(AF)/99/1), Provisional Decision on Preliminary Jurisdictional Issues, 6 December 2006 **(Annex CLA-114)** § 35.

190 Reply, § 108; Rejoinder, § 74; *Republic of Venezuela v. Serafín Garcia Armas and Karina Garcia Gruber,* Judgment of the Paris Court of Appeal, April 25, 2017 **(Annex CLA-3)** p. 6.

191 Reply, § 109; Rejoinder, § 75; *Dawood Rawat v. Republic of Mauritius* (PCA Case No. 2016-20), Award on Jurisdiction, 6 April 2018 **(Annex CLA-4/RLA-54)** § 172.

192 Reply, § 110; Rejoinder, § 76; *Marvin Roy Feldman Karpa v. United Mexican States* (ICSID Case No. ARB(AF)/99/1), Provisional Decision on Preliminary Jurisdictional Issues, 6 December 2006 **(Annex CLA-114)** § 35.

*cross-border flows to determine the protection of an investment, as is the case in other BITs concluded by Venezuela"*[193].

139. Second, the Applicant argues that it is incorrect to consider that the sole and exclusive purpose of investment treaties is to stimulate the flow of capital between States, and that there may be others such as *"the strengthening of bilateral relations in general, and even the protection of the interests of emigrants from one country to another"*[194]. The latter considers it especially relevant, given the migratory flows between Spain and Venezuela, as was pointed out *"during the parliamentary debate for the approval of the Treaty by the Spanish parliament"*[195].

140. The Complainant further notes that a number of arbitral tribunals have warned of the danger of altering the text of a treaty on the pretext that it better matches the *"true"* object and purpose of the treaty. Thus, it cites the decisions of the arbitral tribunals in the cases of *Wintershall v. Argentina*[196], *European American Investment Bank AG v. Slovakia*[197], *Rompetrol v. Romania*[198] and *Societé Générale v. Dominican Republic*[199]. By way of illustration, in *European American Investment Bank AG v. Slovakia,* the Court concluded that "[t]he *reference to the object and purpose of a treaty does not entitle the court to rewrite the agreement between the parties* [...]"[200].

193 Reply, §§ 115-116; Rejoinder, § 73; Agreement between the Government of the Republic of Venezuela and the Government of the Argentine Republic for the Reciprocal Promotion and Protection of Investments, November 16, 1993 **(Annex C-332),** art. 2.2; Agreement between the Government of the Republic of Venezuela and the Government of the Republic of Ecuador for the Reciprocal Promotion and Protection of Investments, November 18, 1993 **(Annex C-333),** art. I.3.

194 Reply, § 111; Rejoinder, § 77.

195 Reply, § 112; Rejoinder, § 77; Journal of Sessions of the Congress of Deputies – Commissions, Year 1996, VI Legislature, No. 66, 1996 **(Annex C-334)** p. 1445 ("[...] *there are 300,000 Spanish citizens from the Canary Islands, of Canarian origin, in the Republic of Venezuela who carry out practically their entire economic and family life there").*

196 Reply, § 117; Rejoinder, § 73; *Wintershall Aktiengesellschaft v. Argentine Republic* (ICSID Case No. ARB/04/14), Award, December 8, 2008 **(Annex CLA-161)** § 88.

197 Reply, § 117; Rejoinder, § 73; *European American Investment Bank AG (Austria) v. Slovak Republic (* CPA Case No. 2010-17), Award on Jurisdiction, October 22, 2012 **(Exhibit CLA-165)** § 385.

198 Reply, § 118; Rejoinder, § 73; *The Rompetrol Group N.V. v. Romania* (ICSID Case No. ARB/06/3), Decision on Objections to Jurisdiction and Admissibility, April 18, 2008 **(Annex CLA-124)** § 85.

199 Reply, § 119; Rejoinder, § 73; Société Générale In respect of DR Energy Holdings Limited and Empresa Distribuidora de Electricidad del Este, S.A. v. Dominican Republic (UNCITRAL), Award on Preliminary Objections to Jurisdiction, September 19, 2008 **(Annex CLA-159)** § 32.

200 *European American Investment Bank AG (Austria) v. Slovak Republic* (CPA Case No. 2010-17), Award on Jurisdiction, October 22, 2012 **(Exhibit CLA-165)** § 385 (Tribunal's translation).





### 5. Principles of International Law

141. The Respondent submits that the consideration of a dual national as an *investor* protected by the Treaty is not compatible with the principles of international law, in particular the principles of equality, non-responsibility and dominant and effective nationality. The Defendant considers it relevant to have recourse to these principles under Articles 31(3)(c) of the VCLT and XI(4)(b) of the Treaty.

142. For his part, the applicant submits that those principles are not applicable to the question of the jurisdiction of the Court, since the Treaty is *lex specialis* and cannot be amended by them.

#### *(A) The Treaty as* lex specialis *between the Parties*

*(i) Position of the Respondent*

143. The Respondent points out that the Treaty does not constitute *lex specialis,* referring in particular to Article XI(4)(b) of the Treaty which provides that, in an arbitration constituted under the Treaty, the rules and principles of international law must be applied, without distinguishing between the law applicable to questions of jurisdiction or of substance[201]. In addition, the Respondent determines that, in accordance with Article 31(3)(c) of the VCLT, a correct interpretation of the term *investors* must be made in the light of the international law applicable between the Contracting Parties[202].

144. The Respondent also maintains that general international law is applicable because the Treaty *"is an instrument of international law and the Treaty does not expressly exclude its application"*[203]. Furthermore, as the Commission has explained on two occasions,[204] the application of the *lex specialis principle* does not always imply the exclusion of the general rule in order to apply the particular rule *(lex specialis derogat legi generalis)*.[205] According to the Defendant, such exclusion only occurs if: (i) the conflicting rules regulate the same matter; and (ii) its simultaneous application is incompatible or expressly undesired[206].

201 Memorial, §§ 119-122; Reply, § 130; Treaty **(Annex C-27)** art. XI.4. See also Transcript, Day 1, 108:4-7.

202 Memorial, §§ 76-77; CVDT, May 23, 1969 **(Annex CLA-23)** art. 31.3.c. See also Transcript, Day 1, 73:17-20, 108:21-22, 109:1-3.

203 Reply, § 134; Transcript, Day 1, 130:17-20.

204 Reply, § 138-140; International Law Commission, "Articles on Responsibility of States for Internationally Wrongful Acts, with their commentaries", 2001 **(Annex CLA-32);** Draft Articles on Diplomatic Protection of the United Nations International Law Commission with its commentaries (excerpt), 2006 **(Annex CLA-158)** p. 100.

205 Reply, § 137.

206 Reply, § 141.





145. The Respondent submits that none of these conditions are met in the present case because:
(i) the Treaty does not exclude, but expressly provides, for the application of international law[207]; and
(ii) the simultaneous application of the Treaty and the principles of sovereign equality, non-responsibility and dominant and effective nationality is not incompatible, nor has the Applicant demonstrated[208]. In this regard, the Respondent indicates that article 17 of the 2006 ILC Draft Articles on Diplomatic Protection (the **"Draft Articles on Diplomatic Protection")** excludes the application of the principles of diplomatic protection only when they are incompatible with special rules of international law, which is not the case in the present case

146. Finally, the Respondent rejects the relevance of the *Diallo* case cited by the Applicant, reiterating that in the present case the Treaty expressly recognizes the applicability of international law in Article XI.4 and pointing out that in the *Diallo* case the situation of dual nationality of a natural person was not analysed[210].

*(ii) Position of the Complainant*

147. First, the Applicant submits that the Treaty is *lex specialis* between the parties that concluded it[211] and that the Treaty determines to whom it applies through the definition of *investor,* which has been expressly negotiated, studied, analysed and agreed upon by the Contracting Parties[212]. Therefore, it maintains that it cannot be modified by principles or norms of general international law[213], since this would imply altering the commitment reached by the parties[214]. Consequently, the absence of a

207 Reply, § 142.

208 Reply, §§ 143-144.

209 Transcript, Day 2, 298:12-22.

210 Reply, §§ 163-164 referring to Reply, § 88; *Case of Ahmadou Sadio Diallo (Republic of Guinea v. Democratic Republic of the Congo), Preliminary* Objections, Judgment, 2007 ICJ Reports 582, May 24, 2007 **(Annex CLA-123).**

211 Reply, § 163-164, *Serafín García Armas and Karina García Gruber v. Republic of Venezuela* (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2)** §§ 154 and 158; *Mohamed Abdel Raouf Bahgat v. Arab Republic of Egypt* (PCA Case No. 2012-07), Decision on Jurisdiction, November 30, 2017 **(Annex CLA-168)** §§ 230-231. See also Rejoinder, §§ 82-84; *Sergei Viktorovich Pugachev v. Russian Federation* (UNCITRAL), Award on Jurisdiction, June 18, 2020 **(Annex CLA-173)** § 384.

212 Reply, § 161; Rejoinder, § 82.

213 Reply, § 163-164; Rejoinder, § 82; *Serafín García Armas and Karina García Gruber v. Republic of Venezuela* (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2)** §§ 154, 158; *Mohamed Abdel Raouf Bahgat v. Arab Republic of Egypt* (PCA Case No. 2012-07), Decision on Jurisdiction, November 30, 2017 **(Annex CLA-168)** §§ 230-231.

214 Rejoinder, § 91, footnote 208; *Tza Yap Shum v. Republic of Peru* (ICSID Case No. ARB/07/6), Decision on Jurisdiction and Competence, June 19, 2009 **(Annex CLA-171)** §§ 107-108; *Siemens*





exclusion of dual nationals in the definition of *investor* cannot be interpreted as an oversight by the Contracting Parties[215].

148. The Applicant further points out that the *lex specialis* character of BITs with respect to customary international law, and in particular with respect to the rules of diplomatic protection (such as the principles of non-liability and dominant and effective nationality) has been recognized by the ICJ in the *Diallo case*[216], as well as by the jurisprudence on investment protection[217]. It also refers to the Draft Articles on Diplomatic Protection, article 17 of which provides that it *"does not apply to the extent that it is inconsistent with special rules of international law, such as treaty provisions relating to the protection of investments"*.[218]

*A.G. v. Argentine Republic* (ICSID Case No. ARB/02/8), Decision on Jurisdiction, August 3, 2004 **(Annex CLA-170)** § 137; *Tokyo Tokelés v. Ukraine* (ICSID Case No. ARB/02/18), Decision on Jurisdiction, 29 April 2004 **(Annex CLA-119)** §§ 77, 82; *Saluka Investments BV v. Czech Republic* (UNCITRAL), Partial Award, 17 March 2006 **(Annex CLA-42)** § 241.

215 Reply, § 162, 165-166; Rejoinder, § 82, 90-91; *Acquisition of Polish citizenship,* Advisory Opinion, CPJI ser. B, No. 7, September 15, 1923 **(Exhibit CLA-104)** p. 20; *El Paso Energy International Company Inc. v. Argentine Republic* (ICSID Case No. ARB/03/15), Award, October 31, 2011 **(Annex CLA-129)** § 590; *Serafín García Armas and Karina García Gruber v. Bolivarian Republic of Venezuela* (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2)** § 156; *Waste Management Inc. v. United Mexican States* (ICSID Case No. ARB(AF)/00/3), Award, April 30, 2004 **(Annex CLA-38)** § 85; *Yukos Universal Limited (Isle of Man) v. Russian Federation* (PCA Case No. 2005-04/AA227), Interim Decision on Jurisdiction and Admissibility, November 30, 2009 **(Annex CLA-62)** § 415; *Sergei Viktorovich Pugachev v. Russian Federation* (UNCITRAL), Award on Jurisdiction, June 18, 2020 **(Annex CLA-173)** § 382.

216 Reply, § 167; Rejoinder, § 85; *Case of Ahmadou Sadio Diallo (Republic of Guinea v. Democratic Republic of the Congo), Preliminary* Objections, Judgment, 2007 ICJ Reports 582, May 24, 2007 **(Annex CLA-123)** § 88.

217 Reply, § 170; Rejoinder, §§ 87-88; citing as an example of courts that have refused to incorporate to BITs the rules of diplomatic protection on the exhaustion of local remedies or the limitation of shareholder claims for damages caused to the company: *BG Group Plc. v. Argentine Republic* (UNCITRAL), Final Award, 24 December 2007 **(Annex CLA-50)** §§ 143-146; *RosInvestCo UK Ltd. v. Russian Federation* (SCC Case No. ARB. V 079/2005), Award on Jurisdiction, Oct. 5, 2007 **(Exhibit CLA-48)** §§ 153-155; *CMS Gas Transmission Company v. Republic of Argentina* (ICSID Case No. ARB/01/8), Decision of the Tribunal on Objections to Jurisdiction, July 17, 2003 **(Attachment CLA-37)** §§ 45-48; *Camuzzi International S.A. v. Argentine Republic* (ICSID Case No. ARB/03/7), Decision on Exceptions to Jurisdiction, June 10, 2005 **(Annex CLA-120)** § 44. The Plaintiff cites, to the same effect, M.S. Duchesne, *The Continuous-Nationality-of- Claims Principle: Its Historical Development and Current Relevance to Investor-State Investment Disputes* (2004) 36 Geo. Wash. Intl. L. 783, 2004 **(Annex CLA-156),** p. 804; *KT Asia Investment Group B.V. v. Republic of Kazakhstan* (ICSID Case No. ARB/09/8), Award, October 17, 2013 **(Annex RLA-29)** §§ 125-129.

218 Reply, § 168; Draft Articles on Diplomatic Protection of the United Nations International Law Commission with its commentaries (excerpt), 2006 **(Annex CLA-158)** p. 100.

149. The Applicant adds that the Draft Articles on Diplomatic Protection regulate a right of a State to exercise diplomatic protection against another State, not a right of a person,

and only in the field of diplomatic protection[219]. Thus, the Applicant points out that, in accordance with Article 16 thereof, the Draft Articles on Diplomatic Protection do not apply to actions

or procedures other than diplomatic protection[220], such as investment arbitrations[221]. The Complainant indicates that the Commission itself, in its commentaries on the Draft Articles on Diplomatic Protection, established that the dispute settlement procedures established in BITs *"exempt from the conditions for the exercise of diplomatic protection"*[222].

150. The Applicant submits that the Respondent's allegations in the *Diallo* case are irrelevant because *"the ICJ expressed itself in a general manner on the development of investment treaties and their evolution with respect to the regime of diplomatic protection"*[223].

151. In addition, the Applicant submits that the applicable law clause in Article XI.4 of the Treaty determines the law applicable to the merits, but not to questions of jurisdiction[224]. In this regard, it cites the jurisprudence of ICSID[225] (with special reference to the case *of CMS v. Argentina*[226])

[219] Transcript, Day 2, 378:3-13.

[220] Transcript, day 2, 379:5-18.

[221] Transcript, Day 2, 380:14-20.

[222] Transcript, Day 2, 387:17-22, 379:1-3; Draft Articles on Diplomatic Protection of the United Nations International Law Commission with its commentaries (excerpt), 2006 **(Annex CLA-158)** p. 101.

[223] Rejoinder, footnote 199; referring to Reply, § 164.

[224] Reply, §§ 172-173; Rejoinder, § 94, Transcript, Day 1, 255:17-21.

[225] Reply, §§ 173-175; Rejoinder, §§ 95-97; *Azurix Corp v. Republic of Argentina* (ICSID Case No. ARB/01/12), Decision on Jurisdiction, December 8, 2003 **(Annex CLA-117)** §§ 48-50; *Camuzzi International S.A. v. Argentine Republic* (ICSID Case No. ARB/03/2), Decision on Exceptions to Jurisdiction, May 11, 2005 **(Annex CLA-157)** §§ 15-17; *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt* (ICSID Case No. ARB/04/13), Decision on Jurisdiction, 16 June 2006 **(Annex RLA-22)** §§ 65-68; *KT Asia Investment Group B.V. v. Republic of Kazakhstan* (ICSID Case No. ARB/09/8), Award, 17 October 2013 **(Annex RLA-29)**

§ 85; *Abaclat et al. v. Argentine Republic* (ICSID Case No. ARB/07/5), Decision on Jurisdiction and Admissibility, 4 August 2011 **(Annex CLA-163)** § 430 *("In this regard, Article 8(7) of the BIT, which refers to the law applicable to the merits of the dispute within the meaning of Article 42 of the ICSID Convention, is irrelevant to the determination of the existence of consent"); Ambiente Ufficio S.p.a. et al. v. Argentine Republic* (ICSID Case No. ARB/08/9), Decision on Jurisdiction and Admissibility, February 8, 2013 **(Annex CLA-134)** § 236 *("However, the Tribunal is not convinced by this argument and rather adheres to the predominant opinion in this field, namely that the afore-cited provisions address the question of the law applicable to the merits of the case, and not the law applicable to the determination of the Tribunal's jurisdiction for the purposes of Art. 25 of the ICSID Convention").*

[226] Reply, §§ 173-175; Rejoinder, §§ 95-97; *CMS Gas Transmission Company v. Republic of Argentina* (ICSID Case No. ARB/01/8), Decision of the Tribunal on Objections to Jurisdiction, 17 July 2003 **(Annex CLA-37)** § 88 *("Article 42* [of the ICSID Convention] *is mainly designed for the resolution*





which, according to the Claimant, would have been *"clear in specifying that the applicable law referred to in Article 42 of the ICSID Convention refers only to the law applicable to the substance of the dispute"*[227].

152. The Applicant states that Venezuela decides *to "ignore the arguments put forward and the authorities cited by Mr. Fraiz",* without explaining *"how this principle* [...] *would be compatible with the other principle that Venezuela invokes, the doctrine of dominant and effective nationality"*[228].

**(B) *Principle of equality of States***

*(i) Position of the Respondent*

153. The Respondent submits that the principle of equality, which is part of international law and has been explicitly recognized in the preamble to the Treaty of Amity, prohibits a national from bringing an action in an international forum against his or her own State[229]. Otherwise, the Respondent states that the nationality of one State would prevail over the nationality of the other State, which would create a sovereignty conflict contrary to the principle of equality[230].

154. Contrary to the Claimant's contention, the Respondent argues that if Mr. Fraiz were allowed to initiate arbitration proceedings against Venezuela, his Venezuelan nationality would be ignored, and not his Spanish nationality[231].

*of disputes on the merits and, as such, it is in principle independent from the decision on jurisdiction, governed solely by Article 25 of the Convention and those other provisions of the consent instrument which might be applicable, in the instant case the Treaty provisions").*

[227] Reply, § 175; Transcript, Day 1, 257:2-15.

[228] Rejoinder, § 101; referring to Reply, § 156.

[229] Memorial, §§ 125-126; General Treaty of Cooperation and Friendship between the Kingdom of Spain and the Bolivarian Republic of Venezuela, signed in Madrid, published in the Official State Gazette, 16 July 1992 **(Annex R-5)** preamble; Z. R. Rode, *Notes and Comments: Dual Nationals and the Doctrine of Dominant Nationality,* The American Journal of International Law, Vol. 53, 1959 **(Annex RLA-11)** p. 141; Prof. J. F. Rezek, *Le Droit international de la nationalité: Le principe de l'effectivité,* Chapter III Recueil des cours de l'Académie de droit international de La Haye, Vol. 198, 1986 **(Annex RLA-12)** p. 363. See also Rebuttal, § 153.

[230] Memorial, § 127; Rejoinder, § 68; *Serafín García Armas and Karina García Gruber v. Republic of Venezuela* (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2)** § 187. See also Transcript, Day 1, 132:18-20.

[231] Reply, § 155.





*(ii) Position of the Complainant*

155. The Applicant submits that, beyond the fact that the principle of equality is not applicable to the issue of the jurisdiction of the court, the arguments provided by Venezuela regarding this principle are incorrect[232].

156. In the first place, in relation to the Treaty of Friendship, it determines that it *"does not contain any rule or norm regarding dual nationals or any connection with the Treaty",* and is therefore *"irrelevant"* [233].

157. It goes on to add that, by allowing Mr. Fraiz to sue Venezuela, no nationality would be made to prevail over the other, since *"any dual Spanish-Venezuelan national could also sue Spain under the Treaty, under the same conditions."*[234] On the contrary, the Applicant asserts that, if Mr Fraiz were not considered an *investor* protected by the Treaty, the sovereignty of the Spanish State would be infringed, since his Spanish nationality would be ignored[235].

158. In addition, it maintains that *"it is not contrary to the principle of equality* [...] *that one of its nationals sues it before an international court if the State has consented to it"*[236].

**(C) *Principle of non-liability***

*(i) Position of the Respondent*

159. The Respondent asserts that the principle of non-liability, enshrined in Article 4 of the 1930 Hague Convention on Certain Questions Relating to Conflicts of Nationality Laws (the **"Nationality Convention")** and *"regarded as one of the*

[232] Reply, § 178.

[233] Reply, § 179; Transcript, Day 1, 227:11-16.

[234] Reply, § 181.

[235] Reply, §§ 181-182; Serafín García Armas and Karina García Gruber v. Republic of Venezuela (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2)** § 187 ("On the contrary, it could well be argued that legal equality between Venezuela and Spain would be compromised if a national of one of those nations were denied the protection granted by APPRI"). See also Transcript, Day 1, 229:1-3.

[236] Dúplica, § 69; James Crawford, *Brownlie's Principles of Public International Law,* Oxford University Press, ed. 8 (2012) (extracto), 2012 **(Anexo CLA-164),** pp. 660-663.





*fundamental principles of international law"*[237], prevents Mr. Fraiz from suing his own State (Venezuela) before an international[tribunal238].

160. The Respondent submits that the basis of this principle is that *"disputes between a State and its own nationals must be settled at the national level"*[239] and asserts that it was this principle that *"inspired the exclusion of dual nationals* [...] *in the framework of the negotiation of the ICSID Convention"*[240]. The Respondent also recalls that the principle of non-liability has led several arbitral tribunals to decline jurisdiction in cases brought by dual nationals[241].

*(ii) Position of the Complainant*

161. The Claimant submits that this argument cannot succeed either, since the principle of non-liability is an *"anachronistic"* principle and has been applied mainly in the regime of diplomatic protection which, the Claimant reiterates, is inapplicable in the context of investment arbitrations[242].

162. The Applicant asserts that *"the principle of non-responsibility has even been rejected in the field of general international law and diplomatic protection,"*[243] referring to the decision of the Iran-United States Claims Tribunal in the case *of Dual Nationals Case A/18,* referred to by Venezuela[244], in which the tribunal: (i) determined that the Nationality Convention is *"more tan 50 years old and* [...] *a treaty to which only 20 States are*

[237] Memorial, § 130; Reply, § 156.

[238] Memorial, § 131; Reply, § 157; Hague Convention Concerning Certain Questions Relating to Conflicts of Nationality Laws, 12 April 1930 **(Annex RLA-13),** art. 4 ("[a] *State may not exercise diplomatic protection in respect of one of its nationals against a State of which that person is also a national")* (translation by the Court).

[239] Memorial, § 132; Reply, § 156.

[240] Memorial, § 134; Transcript, Day 1, 131:19-20.

[241] Memorial, § 131; E. M. Borchard, *Basic Elements of Diplomatic Protection of Citizens Abroad,* The American Journal of International Law, Vol. 7, No. 3, agosto de 1913 **(Anexo RLA-14)** pp. 497-520.

[242] Reply, § 185; Rejoinder, § 99.

[243] Rejoinder, § 100; *Case of Barcelona Traction Light and Power Company Limited (Belgium v. Spain),* Second Phase, Judgment, 1970 ICJ Reports 3, February 5, 1970 **(Annex CLA-107)** § 90.

[244] Memorial, § 143; Reply, footnote 146.

*parties"*[245]; y (ii) incidió en los *"great changes* [that] *have occurred since then in the concept of diplomatic protection"* y la *"trend toward modification of the* […] *rule of non-responsibility"*[246].

163. As for Venezuela's argument that a claim by a national against his or her own State should be resolved at the national level and not at the international[level247], the Applicant asserts that "[t] *here is no rule that prevents a national of a State from having access to an international judicial instance against his own State if the State so consented."*[248]. In addition, it points out that this is not applicable to the case of Mr. Fraiz, who is suing Venezuela in his capacity as a Spanish national and not as a Venezuelan national.

164. With regard to Venezuela's reference to the ICSID Convention, the Applicant again stresses that it has not been incorporated into the Treaty and repeats that the only thing that demonstrates the exclusion of dual nationals is that, when States have wished to exclude them, they have done so expressly[249].

***(D) Principle of effective and dominant nationality***

*(i) Position of the Respondent*

165. The Respondent submits that the principle of dominant and effective nationality is a recognized and perfectly applicable rule of international law in investor-State arbitration based on an investment treaty [250]. The Respondent adds that this principle prevents Mr. Fraiz from suing Venezuela, since his dominant and effective nationality is Venezuelan[251].

166. According to the Respondent, this principle has been developed by various international tribunals [252]. For example, the Respondent indicates that the principle of dominant nationality and

245 Reply, § 186; Rejoinder, § 99; *Islamic Republic of Iran v. United States of America,* IUSCT Case No. A/18, Decision, 6 April 1984 **(Annex RLA-15)** p. 17.

246 Reply, §§ 185-186; Rejoinder, §§ 99-100; *Islamic Republic of Iran v. United States of America,* IUSCT Case No. A/18, Decision, 6 April 1984 **(Annex RLA-15)** pp. 17, 24.

247 Memorial, § 132.

248 Reply, § 188.

249 Reply, § 190-191.

250 Rebuttal, § 168.

251 *See* section V.C *below.*

252 Memorial, § 140-144; *Nottebohm Case (Liechtenstein v. Guatemala),* Judgment, 1955, ICJ Reports, April 6, 1955 **(Annex RLA-17),** p. 22; *Florence Strusky Mergé,* Italian-American Conciliation Commission, Decision No. 55, Compilation of Arbitral Awards, Vol. XIV, Award, June 10, 1955 **(Annex RLA-83)** pp. 246-247; *Islamic Republic of Iran v. United States of America,* IUSCT Case No. A/18, Decision, 6 April 1984 **(Annex RLA-15),** p. 25; *Morteza Khatami v. Government of the Republic*





The effective application was applied by the Iran-United States Claims Tribunal in its decision *A/18,* in which *"the tribunal itself explained that it was not a case of diplomatic protection"*[253]. It also indicates that Prof. Kunz's work, cited by the Applicant, does not criticize the customary norm of the principle of dominant and effective nationality, but refers *"to the difficulty of establishing a customary rule with respect to the genuine link of nationality by virtue of the various cases that may arise when dealing with cases involving an individual of more than one nationality"*[254].

167. In addition, the Respondent points out that the principle of dominant and effective nationality has been recognized and applied in several investment arbitrations, in particular, in the cases of *Manuel García Armas et al., Hermanos Heemsen* and *Dawood Rawat*[255].

168. The Defendant rejects the allegedly contrary case-law cited by the Plaintiff[256] for the following reasons: (i) the case *of Saba Fakes v. Turkey,* being a case conducted under the ICSID Convention, was not brought by a dual national with the nationality of the State receiving the investment[257]; (ii) the dominant and effective nationality test was not applied in the case of *Oostergetel v. Slovakia* because the court did not consider the dual nationality of the plaintiffs to be proven[258]; (iii) the plaintiffs in *ADC v. Hungary, Waste Management v. Mexico, Yukos v. Russia* and *Saluka c. Czech Republic* were legal persons[259]; and (iv) reiterates what has already been indicated about the *Pey Casado case*[260].

*Islamic Court of Iran,* IUSCT Case No. 767, Award No. 562-767-3, December 13, 1994 **(Annex RLA-16)** § 39, p. 10.

253 Transcript, Day 2, 301:7-18.

254 Rebuttal, § 161; J. Kunz, *The Nottebohm Judgment,* 54 AJIL 536, 1960 **(Addendum-CLA-106)** p. 558.

255 Reply, §§ 166-167; Manuel García Armas et al. v. Bolivarian Republic of Venezuela (PCA Case No. 2016-08), Award on Jurisdiction, December 13, 2019 **(Annex RLA-5)** §§ 734, 737; Enrique Heemsen and Jorge Heemsen v. Bolivarian Republic of Venezuela (PCA Case No. 2017-18), Award of Jurisdiction **(Annex RLA-4)** §§ 439-440; Dawood Rawat v. Republic of Mauritius (PCA Case No. 2016-20), Award on Jurisdiction, April 6, 2018 **(Annex CLA-4/RLA-54)** § 166.

256 Memorial, § 144; referring to Reply, §§ 198-202.

257 Memorial, §§ 144, 108; *Saba Fakes v. Republic of Turkey* (ICSID Case No. ARB/07/20), Award, 14 July 2010 **(Annex CLA-66)** § 69.

258 Memorial, § 107.

259 Memorial, § 109; *ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary* (ICSID Case No. ARB/03/16), Award, 2 October 2006 **(Annex CLA-44);** *Waste Management, Inc. v. United Mexican States* (ICSID Case No. ARB(AF)/00/3), Award, April 30, 2004 **(Annex CLA-38);** *Yukos Universal Limited (Isle of Man) v. Russian Federation* (PCA Case No. 2005-04/AA227), Interim Decision on Jurisdiction and Admissibility, 30 November 2009 **(Annex CLA-62);** *Saluka Investments BV v. Czech Republic* (UNCITRAL), Partial Award, 17 March 2006 **(Annex CLA-42).**

260 Reply, § 165.





*(ii) Position of the Complainant*

169. The Applicant asserts that *"the doctrine of effective and dominant nationality and its character as a true customary rule have been widely criticized and questioned"*[261].

170. In this regard, it cites first of all the writings of the author Jürgen Kunz[262], who, according to the Applicant, has concluded that: (i) there is no repeated and recurrent practice as regards the principle of dominant and effective nationality; (ii) the application of the rule is uncertain because it is based on subjective criteria; and (iii) it clashes with nationality attribution policies, which, although perfectly legitimate, often do not require the existence of a *"genuine link".*

171. It also cites Prof. Mervyn Jones, who, according to the Applicant, determined, in relation to the decision in the *Nottebohm case,* that there is a danger of restricting the protection of the individual at the international level and that the application of the rule was uncertain[263].

172. In addition, the Plaintiff maintains that *"the jurisprudence* [...] *has rejected the application of the doctrine of effective and dominant nationality in the context of BITs",* insisting that *"if the definitions of BITs do not expressly establish the relevance of the requirement of effective and dominant nationality, it cannot be incorporated by way of interpretation* [...]"[Article 264]. In this sense

261 Reply, § 193.

262 Reply, §§ 193-194, 196; Rejoinder, § 105; J. Kunz, *The Nottebohm Judgment,* 54 AJIL 536 **(Annex CLA-106)** pp. 557, 559, 564, 566-567.

263 Contestación, § 197; J. Mervyn Jones, *The Nottebohm Case,* The International and Comparative Law Quarterly, vol. 5, No. 2 (1956) **(Anexo CLA-105)** p. 244.

264 Reply, § 198; Rejoinder, § 108; Transcript, Day 1, 249:7-14.





cites, among others,[265], the cases *Saba Fakes v. Turkey*[266], *Oostergetel v. Slovakia*[267], *ADC v. Hungary*[268] y *Pey Casado v. Chile*[269].

173. The Applicant rejects Venezuela's assertions about the *"inaccuracy and lack of relevance"*[270] of these cases and explains that: (i) the *Pey Casado case* dealt with the issue *"of the scope of the BIT with respect to a national of both States Parties to the BIT (as in this case)"*[271]; (ii) what is important in the *Saba Fakes* and *Oostergetel cases* is that in both cases the application of the rule of effective and dominant nationality was rejected, regardless of the fact that the dual nationals were not nationals of the State against which they were suing[272]; and (iii) regardless of the fact that in the *ADC* case the plaintiff was a legal person, the tribunal *"rejected the possibility of including the requirement of a 'genuine link' in the generally applicable text of the BIT"*[273].

174. The Applicant goes on to point out that "[t] *he majority of the sources cited by Venezuela, such as the Nottebohm case of the ICJ and some cases of the Iran-São Paulo Claims Tribunal,*

265 Reply, §§ 199-201; Rejoinder, § 108; *Mohamed Abdel Raouf Bahgat v. Arab Republic of Egypt* (PCA Case No. 2012-07), Decision on Jurisdiction, November 30, 2017 **(Annex CLA-168)** § 231; *KT Asia Investment Group B.V. v. Republic of Kazakhstan* (ICSID Case No. ARB/09/8), Award, October 17, 2013 **(Annex RLA-29)** §§ 126-129; *The Rompetrol Group N.V. v. Romania* (ICSID Case No. ARB/06/3), Decision on Objections to Jurisdiction and Admissibility, April 18, 2008 **(Annex CLA-44)** § 359.

266 Contestación, § 199; Dúplica, § 108; *Saba Fakes c. República de Turquía* (Caso CIADI No. ARB/07/20), Laudo, 14 de julio de 2010 **(Anexo CLA-66)** § 64 ("[i]t *clearly results from this definition that the Netherlands-Turkey BIT does not require an investor's nationality to be effective for him or her to bring a claim against the host State on the basis of the BIT")* y §§ 69-70 *("The rules of customary international law applicable in the context of diplomatic protection do not apply as such to investor-State arbitration").*

267 Contestación, § 200; Dúplica, § 108; *Jan Oostergetel y Theodora Laurentius c. República Eslovaca* (CNUDMI), Decisión sobre Jurisdicción, 30 de abril de 2010 **(Anexo CLA-65)** § 130 *("The BIT does not require such nationality to be 'effective' or imposes any further conditions such as the existence of a genuine link to the respective Contracting Party").*

268 Reply, § 201; Rejoinder, § 108; *ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary* (ICSID Case No. ARB/03/16), Award, October 2, 2006 **(Annex CLA-44)** § 359 *("The Tribunal cannot find a 'genuine link' requirement in the Cyprus-Hungary BIT either* […] *The Tribunal cannot read more into the BIT than one can discern from its plain text").*

269 Reply, § 202; Rejoinder, § 108; Victor Pey Casado and Fundación Presidente Allende v. Republic of Chile (ICSID Case No. ARB/98/2), Award, 8 May 2008 **(Annex CLA-1),** § 415 *("In the opinion of the Arbitral Tribunal, in this context there is no 'effective and dominant' nationality status of dual nationals* [...] *In the opinion of the arbitral tribunal, it would not be justified (on the basis of purported rules of customary international law) to add a requirement of application that does not follow either its letter or its spirit").*

270 Memorial, § 144.

271 Reply, § 203.

272 Reply, §§ 204-205; Rejoinder, § 111.

273 Reply, § 203.

*United States, are irrelevant* [...], *since their conclusions do not apply to disputes arising under the lex specialis of BITs"*[274]. In particular, the Claimant contends that the case of the Iran-US Claims Tribunal is not comparable to an investment arbitration because: (i) it was based on treaties that did not seek to encourage or protect foreign investment, but merely to establish a dispute resolution mechanism; (ii) the applicable treaty did not provide for standards of protection, but a generic reference to general international law; and (iii) it is a decision that predates the entire investment protection system[275]. In addition, it indicates that, in both *Manuel García Armas* and *Heemsen,* cited by Defendant[276], the court rejected jurisdiction for a reason other than the dominant and effective nationality of the plaintiffs, and that it referred to this issue only in *obiter dicta*[277]. As to the Rawat *case ,* also cited by the Respondent, the Plaintiff contends that the court *"did not even establish whether the dominant nationality doctrine*

*y effective was applicable,"* and reiterates that the court stated that it did not intend to disagree with the decisions in the Pey *Casado* and *Serafín García Armas*[cases 278].

### B. COMPLEMENTARY MEANS OF INTERPRETATION

175. The Defendant submits that the supplementary means of interpretation of Article 32 CVDT confirm that the Treaty does not apply to dual nationals. In particular, the Respondent refers to (1) the travaux préparatoires of the Treaty; (2) the Constitution of Venezuela of 1961; and (3) the preparatory work for the ICSID Convention.

---

274 Rejoinder, § 110; *Saba Fakes v. Republic of Turkey* (ICSID Case No. ARB/07/20), Award, 14 July 2010 **(Annex CLA-66)** §§ 69-77.

275 Transcript, Day 2, 372:6-22, 373:1-19.

276 Reply, §§ 166-167.

277 Rejoinder, §§ 113-114; referring to *Manuel García Armas et al. v. Bolivarian Republic of Venezuela* (PCA Case No. 2016-08), Award on Jurisdiction, December 13, 2019 **(Annex CLA-102)** §§ 718-723, 734, 737; *Enrique Heemsen and Jorge Heemsen v. Bolivarian Republic of Venezuela* (PCA Case No. 2017-18), Award of Jurisdiction, October 29, 2019 **(Exhibit CLA-101)** §§ 377, 388, and 442.

278 Rejoinder, § 115; *Dawood Rawat v. Republic of Mauritius* (PCA Case No. 2016-20), Award on Jurisdiction, 6 April 2018 **(Annex CLA-4/RLA-54),** footnote 150. See also Transcript, Day 1, 150:1-4





#### 1. Preparatory work for the Treaty

*(i) Position of the Respondent*

176. First, the Respondent refers to the use of the term *"Foreign Investment"* in the memorandums and notes of the preparatory work of the Treaty[279]. It also indicates that, in the meetings held in January 1991, Venezuela expressed its *"concern"* as to whether the Treaty should cover Spanish nationals residing in Venezuela, to which Spain replied that *"No, they are not covered because they are not resident in Spain."*[280]

177. The Respondent describes the Plaintiff's interpretation of the preparatory work of the Treaty as "adventurous", pointing out that the observations made by the Venezuelan Congress may have *"a multiplicity of reasons, including of a political nature"*[281]. It also explains that, in the "Explanatory Memorandum" sent by the Ministry of Foreign Affairs to the Venezuelan Congress, no reference was made to the Venezuela-Italy BIT because that instrument had not been ratified, nor has it been ratified to date282.

*(ii) Position of the Complainant*

178. The Applicant considers that the analysis offered by Venezuela on the preparatory work of the Treaty is *"erroneous and incomplete"*[283] and, after expanding on the passage of the exchanges between Spain and Venezuela to which the Respondent refers284 , explains that it referred to an initial draft that defined

---

279 Memorial, § 83; File of the preparatory work of the Treaty **(Annex C-320)** in particular, the Minutes of the negotiation meeting between the Kingdom of Spain and Venezuela, p. 8.

280 Memorial, § 84; File of the preparatory work of the Treaty **(Annex C-320)** in particular, the Minutes of the negotiation meeting between the Kingdom of Spain and Venezuela, p. 19.

281 Rebuttal, § 105.

282 Reply, § 106; referring to Reply, § 134; Discussion of the Draft Law Approving the Agreement between the Republic of Venezuela and the Kingdom of Spain for the Promotion and Reciprocal Protection of Investments **(Annex C-371),** p. 9.

283 Reply, § 121.

284 Reply, § 123; Rejoinder, § 119; File of the preparatory work for the Treaty **(Annex C-320)** p. 19 *("Venezuela: - With Italy we exclude from the application of the treaty citizens who made use of or had the right to dual nationality. Spain: - In our case it is not raised because nationality is not applied as a qualifying requirement. Italy implicitly applies the residency requirement to consider investors. Venezuela: - So the treaty must cover Spaniards residing in Venezuela. Spain: - No, they are not covered because they are not resident in Spain").*





to the natural person investor on the basis of his residence, requiring opposition between the State of residence and the State of investment[285].

179. For the Applicant, the only evidence of this exchange is that the Parties had two alternatives on the table: (i) the express exclusion provided for in the Venezuela-Italy BIT; and (ii) the limitation of protection to dual nationals residing in the State other than the recipient of the investment[286]. However, the Claimant asserts that the parties *"ultimately decided not to adopt any exclusion or restriction with respect to dual nationals, as evidenced by the agreed final text of Article I.1.a of the Treaty"*[287].

180. The Applicant also refers to the letters by which Venezuela transmitted a new draft to Spain in 1993[288], in which reference was made to the 1991 Venezuela-Netherlands BIT, which does not exclude dual nationals and which had been approved by the National Congress, and to the 1990 Venezuela-Italy BIT, which does exclude the double nationals, and with respect to which, according to Venezuela, *"the National Congress presented objections and abstained from approving it"*[289]. According to the Complainant, in its September 1993 communication, Venezuela stated that *"the views of Venezuela [had] been analysed*

*y objections that were expressed within the Congress of the Republic in relation to both instruments"* and that "in *the light of that analysis, a new model of Agreement [had] been developed"*[290]. The Claimant concludes that "[w]hen *Congress had objected to the 1990 Venezuela-Italy BIT, but not the Venezuela-Netherlands BIT, it stands to reason that the draft followed the latter model* [which] *does not exclude or limit dual national claims."*[291]

---

285 Reply, § 125; Rejoinder, § 119.

286 Reply, § 126.

287 Reply, § 127.

288 Reply, §§ 129-130.

289 Reply, § 129; Rejoinder, § 119; File of the preparatory work for the Treaty **(Annex C-320)** p. 38.

290 Reply, § 129; citing File of the Preparatory Work for the Treaty **(Annex C-320)** p. 38.

291 Reply, § 130; Rejoinder, § 119.





#### 2. Constitution of Venezuela of 1961

*(i) Position of the Respondent*

181. Regarding the circumstances of the conclusion of the Treaty, the Respondent points out that the Venezuelan Constitution in force on the date of signing the Treaty did not allow dual nationality[292], so that "it *makes no sense to maintain that the Venezuelan negotiator of the BIT had expressly or tacitly included dual nationals contrary to the Venezuelan constitutional order"*[293]. According to the Respondent, dual nationality was not admitted into the Venezuelan legal system until the Constitution of 1999[294], a change that was highlighted by several Venezuelan authors[295] and recognized by the Supreme Court of Justice in its judgment of October 28, 2016[296], as well as by the Venezuelan Delegation in the framework of the working meetings of the Spanish-Venezuelan Joint Commission in 1972[297].

182. The Respondent acknowledges that Prof. Parra Aranguren, cited by the Applicant, gave examples in which a Venezuelan individual could have simultaneous access to two nationalities when the Constitution of 1961 was in force[298], but argues that these would be cases of dual nationality *"de facto",* without legal recognition in the Venezuelan legal system[299].

---

292 Memorial, § 89; Reply, § 110; Transcript, Day 1, 127:12-17; Constitution of the Bolivarian Republic of Venezuela of 1961, Extraordinary Official Gazette No. 662, January 23, 1961 **(Annex RLA-10)** art. 39 *("Venezuelan nationality is lost: 1°— By option or voluntary acquisition of another nationality").*

293 Memorial, § 95.

294 Memorial, § 90 Constitution of the Bolivarian Republic of Venezuela of 1999, Extraordinary Official Gazette No. 36.860, December 30, 1999 **(Annex RLA-74).**

295 Memorial, §§ 92-93; Tatiana B. de Maekelt, *The Reform of the 1961 Constitution. Fundamental Aspects in Matters of Nationality,* Offprint of the Journal of the Bar Association of the Federal District, No. 152, 1993 **(Annex RLA-76)** pp. 26-27; Allan R. Brewer-Carías, *Legal Regime of Nationality, Citizenship and Foreigners,* Collection of Legislative Texts, N°31, 2005 **(Annex RLA-77)** p. 19; Luis Enrique Ferrer Rojas, *La doble nacionalidad en el ordenamiento constitucional venezolano,* Revista de la Facultad de Ciencias Jurídicas y Políticas, N°5, 2009 **(Annex RLA-78)** pp. 197-213, 204-205.

296 Memorial, § 91; Judgment No. 907, Supreme Court of Justice, Constitution Chamber, Exp. 16-1017, October 28, 2016 **(Annex RLA-75)** p. 25, § 2.

297 Memorial, § 94; Transcript, Day 2, 306:7-10; Gonzalo Parra Aranguren, *The 1974 Spanish-Venezuelan Agreement on the Exchange of Information in the Granting of Nationality,* Separata Revista Facultad de Derecho, Universidad Católica Andrés Bello, 1976 **(Annex RLA-79)** p. 10.

298 Reply, § 111; Gonzalo Parra Aranguren, *La doble nacionalidad,* Journal of the Faculty of Law of the Central University of Venezuela, vol. 9, 1962 **(Annex C-328)** p. 14.

299 Rebuttal, § 112.

*(ii) Position of the Complainant*

183. As regards the Constitution of Venezuela of 1961 and the travaux préparatoires of the ICSID Convention, the Claimant determines that these *"do not form part of either the travaux préparatoires of the treaty or the 'circumstances of its conclusion'"* and that, even if they were considered relevant, they do not confirm the interpretation proposed by Venezuela[300].

184. First, the Plaintiff maintains, unlike the Respondent, that the Venezuelan Constitution of 1961 did expressly contemplate cases of dual nationality *"de jure"* by allowing, in Article 40, to recover Venezuelan nationality by birth[301]. It also refers to the cases mentioned by Prof. Parra Aranguren, which include: (i) those individuals born in Venezuela to foreign parents from countries that adopted *jus sanguinis* as a criterion for attributing nationality; or (ii) the foreigner married to a Venezuelan who availed herself of the benefit of Article 37 of said Constitution[302]. In addition, it adds that the Spanish Constitution in force on the date of signing the Treaty also expressly recognized dual nationality with Ibero-American countries[303].

### 3. Preparatory work for the ICSID Convention

*(i) Position of the Respondent*

185. The Respondent states that the preparatory work for ICSID is also relevant as a supplementary means of interpretation because *"the BIT is part of the logic of the system of protection for foreign investments* [and] *the negotiation of the ICSID Convention is a milestone within the*

300 Reply, § 136; Rejoinder, § 123.

301 Reply, § 138; Constitution of the Bolivarian Republic of Venezuela of 1961, Extraordinary Official Gazette No. 662, January 23, 1961 **(Annex RLA-10)** art. 40 *("Venezuelan nationality by birth is recovered when the person who has lost it is domiciled in the territory of the Republic and declares his or her desire to recover it, or when he or she remains in the country for a period of not less than two years").* See also Rejoinder, § 127; Transcript, Day 1, 230:10-12.

302 Reply, § 139; Rejoinder, § 124; Gonzalo Parra Aranguren, *La doble nacionalidad,* Journal of the Faculty of Law of the Central University of Venezuela, vol. 9, 1962 **(Annex C-328)** p. 14.

303 Reply, § 141; Rejoinder, § 125; Spanish Constitution (extract), 27 December 1978, published in the Official State Gazette No. 311.1, 29 December 1978 **(Annex C-329)** art. 11 *("The State may conclude dual nationality treaties with Ibero-American countries or with those that have had or have a particular link with Spain").*





*investment protection system"*[304]. In addition, it indicates that the Parties chose ICSID as the main forum for dispute resolution, thereby incorporating the ICSID Convention into Treaty[305].

186. The Respondent points out that, during the negotiation of the ICSID Convention, both Parties determined that it was impossible for a dual national to sue his own State before an international forum [306], which shows that the intention of the parties to the Treaty was none other than to provide protection to foreign investors, not to their own nationals[307].

*(ii) Position of the Complainant*

187. The Applicant submits that the travaux préparatoires of the ICSID Convention do not form part of the travaux préparatoires of the Treaty or of the circumstances of its conclusion[308]. It further adds that the ICSID negotiations took place more than thirty years before the signing of the Treaty and are entirely independent of the negotiations of Treaty[309].

188. In addition, the Applicant considers that the only thing that the travaux préparatoires of the ICSID Convention demonstrates is that *"when there has been an attempt to exclude dual nationals from the scope of protection of a treaty, this has been done expressly"*[310].

### C. DOMINANT AND EFFECTIVE NATIONALITY OF MR. FRAIZ

189. The Respondent states that Mr. Fraiz's dominant and effective nationality is Venezuelan, so that, under the principle of dominant and effective nationality, he is not protected by the Treaty.

190. The Applicant reiterates that the principle of dominant and effective nationality is not applicable in the field of investment arbitration and, in any event, asserts that Mr. Fraiz's links with Spain are real.

304 Reply, § 107.

305 Reply, § 107.

306 Memorial, §§ 46, 85; Reply, § 73; Travaux Travatoires del Convención ICSID, Historia del Convención ICSID, Vol. IV, 1969 original, 2009 reprinted **(Annex R-3)** p. 87; Travaux Travatoires del Convención ICSID, Historia del Convención ICSID, Vol. III, 1969 original, 2009 reprinted **(Annex R-4)** pp. 164-165.

307 Memorial, § 88.

308 Reply, § 136.

309 Reply, § 145.

310 Reply, § 145.





*(i) Undisputed facts*

191. Mr. Fraiz was born on August 29, 1965 in Caracas,[Venezuela 311], to parents born in Spain[312] and Venezuelans by naturalization[313].

192. In 1978, his birth was registered with the Spanish Consulate in Caracas[314] and, subsequently, on February 21, 2003, at the age of 37, Mr. Fraiz acquired Spanish nationality, without renouncing his previous Venezuelan nationality[315].

193. In 1986, Mr. Fraiz graduated from the Andrés Bello Catholic University in Caracas and began his professional career in Venezuela *"while he was still a university student."*[316]

194. In 1993, his daughter Alejandra was born in Venezuela[317].

195. Mr. Fraiz resided in Venezuela until 2014, when, in Mr. Fraiz's words, after being *"dispossessed"* of his companies, he had to *"leave Venezuela and settle in Miami, United States, where I currently reside."* [318]

196. Mr. Fraiz has an identity card, passport, tax identification number and social security number in Spain[319] and, according to the Applicant, legal residence in Spain, in a

311 Complaint Brief, § 133; Memorial, § 152; Birth certificate of Fernando Fraiz Trapote, September 22, 2016 **(Annex C-138).**

312 Certification of the birth certificate of Fernando Fraiz Ulecia, December 13, 2004 **(Annex C-363);** Certification of Spanish nationality of Anita Trapote Villaescusa, May 25, 1953 **(Annex C-347).**

313 Complaint Brief, § 133; Memorial § 148; Birth certificate of Fernando Fraiz Trapote, September 22, 2016 **(Annex C-138).**

314 Complaint Brief, § 133; Memorial, § 152; Birth Certificate of Fernando Fraiz Trapote before the Spanish Consulate, May 3, 1978 **(C-3).**

315 Complaint Brief, § 134; Memorial, § 150-151; Birth Certificate of Fernando Fraiz Trapote before the Spanish Consulate, May 3, 1978 **(Annex C-3),** see annotation of March 15, 2004.

316 Memorial, § 153; Witness Statement of Fernando Fraiz Trapote **(Exhibit CWS-1)** §§ 2-3.

317 Memorial, § 153; Birth certificate of Alejandra Fraiz González, March 29, 1993 **(Annexo R-13).**

318 Memorial, § 169; Witness Statement of Fernando Fraiz Trapote, May 18, 2020 **(Exhibit CWS-1)** § 3.

319 Reply, § 206; Spanish national identity card of Fernando Fraiz Trapote **(Annex C-373);** Spanish passport of Fernando Fraiz Trapote, October 8, 2018 **(Annex C-368);** Accreditation of the Spanish tax identification number of Fernando Fraiz Trapote, 11 January 2008 **(Annex C-365);** Document accrediting the right to Spanish health care of Fernando Fraiz Trapote, 30 October 2018 **(Annex C-369).**





his family's property where his sister[320 currently lives]. The Plaintiff states that his entire paternal and maternal family lives in Spain, his mother, sister and daughter being Spanish[321].

*(ii) Position of the Respondent*

197. In view of Mr. Fraiz's ties with Venezuela, the Respondent concludes that Mr. Fraiz's dominant and effective nationality is Venezuelan.

198. First, because, at the date of his birth, Mr. Fraiz's parents were not Spaniards, but naturalized Venezuelans [322], since Spanish legislation provides for the automatic loss of Spanish nationality in the event of acquiring another nationality[323]. The Respondent asserts that none of the documents submitted by the Plaintiff *"modifies the fact that his parents decided to become naturalized Venezuelans."*[324]

199. Second, because Mr. Fraiz: (i) has held Venezuelan nationality since birth, having been exclusively Venezuelan for 38 of his 55 years of life[325] and (ii) continues to maintain it to date, since he did not renounce his Venezuelan nationality when he acquired Spanish nationality in 2003[326].

320 Reply, § 206; Nota Simple of the Property Registry of Pozuelo de Alarcón No. 1 on the property C/ Portugal 1, portal 2°, under C. 28224 Pozuelo de Alarcón, June 10, 2020 **(Annex R-6)** p. 2; Municipal registration flyer of the City Council of Pozuelo de Alarcón, Spain, by Fernando Fraiz Trapote, January 18, 2019 **(Annex C-370).**

321 Reply, § 206; Spanish passport of Anita Trapote Villaescusa, 17 January 2014 **(Annex C-367);** Certification of birth certificate of Ana Fraiz Trapote, May 24, 2006 **(Annex C-364);** Spanish passport of Alexandra Fraiz González, September 11, 2009 **(Annex C-366).**

322 Memorial, § 148; Birth certificate of Fernando Fraiz Trapote, September 22, 2016 **(Annex C-138)** p. 2 *("Fernando Fraiz Ulecia father, married, thirty-three years of age,* [...] *Venezuelan by naturalization") ("Ana Trapote, married, twenty-eight years old,* [...] *Venezuelan by naturalization");* Birth Certificate of Fernando Fraiz Trapote before the Spanish Consulate, May 3, 1978 **(Annex C-3)** see annotation of March 15, 2004, p. 1 *("birth registration stating that the nationality of the father of the registrant is Venezuelan and not Spanish").* In the same vein, Reply, § 173.

323 Memorial, § 149; Spanish Civil Code, BOE No. 197, 16 July 1954 **(Annex RLA-18)** art. 22; in force in 1965 ("[t] *he Spanish nationality shall be lost by those who have voluntarily acquired another nationality").*

324 Reply, § 174; referring to Reply, § 206; Certification of the birth certificate of Fernando Fraiz Ulecia, December 13, 2004 **(Annex C-363);** Certification of Spanish nationality of Anita Trapote Villaescusa, 25 May 1953 **(Annex C-347).**

325 Memorial, §§ 151-152; Reply, § 175.

326 Memorial, § 151; Birth Certificate of Fernando Fraiz Trapote before the Spanish Consulate, May 3, 1978 **(Annex C-3)** see annotation of March 15, 2004, p. 2 *("By act registered on 21-2-2003*

200. Third, because Venezuela is the place where Mr. Fraiz graduated, embarked on his professional career, and resided with his family for 49 years until 2014[327]. The Respondent also points out that her daughter Alejandra was born in Venezuela in 1993 and that, on her birth certificate, the Plaintiff identifies himself with his Venezuelan identity card and as a native of Caracas[328].

201. Fourth, because in 2019 and 2020 he was registered on the Venezuelan electoral list, which enables him to exercise his political rights as a Venezuelan national[329].

202. Fifth, because after acquiring Spanish nationality, Mr. Fraiz continued to identify and act exclusively as Venezuelan: (i) *"in the context of his business"*[330]; (ii) before the Venezuelan courts[331] and (iii) before the President of the Republic, Nicolás Maduro Moros, requesting his help and protection to be *"'favored' by and in his capacity as Venezuelan over foreign companies"*[332]. As additional evidence, it refers to several press articles that identify Mr. Fraiz only as a Venezuelan national .

*before the Mr. Registrar of the Civil Registry Consult of Caracas* [...] *has opted for* [...] *in accordance with Law 36/2007 he did not renounce his previous Venezuelan nationality").*

327 Memorial, § 153; Witness Statement of Fernando Fraiz Trapote, May 18, 2020 **(Exhibit CWS-1)** §§ 2-3.

328 Memorial, § 153; Birth certificate of Alejandra Fraiz González, March 29, 1993 **(Annex R-13).**

329 Memorial, § 154; Voter registration of voter Fernando Fraiz Trapote, Court as of July 31, 2019, National Electoral Council of the Bolivarian Republic of Venezuela **(Annex R-7);** Voter registration of voter Fernando Fraiz Trapote, as of July 29, 2020, National Electoral Council of the Bolivarian Republic of Venezuela, July 29, 2020 **(Annex R-14).**

330 Memorial, § 155-157; referring to Contract for the Sale of a Parcel of Land in El Hatillo, Sucre, Miranda between Corporación La Urbina S.A. and Paso Alto Venezuela C.A., September 27, 2006 **(Attachment C-232)** p. 2; Intent Agreement between Corporación Telemic C.A. (Inter) and Sistemas Cablevisión C.A., April 20, 2012 **(Exhibit C-251),** p. 1; CONATEL Concession No. CRDF-00821, June 18, 2012 **(Annex C-81),** p. 1; CONATEL Resolution No. GST-RS-00285, June 18, 2012 **(Annex C-82)** p. 1; Habilitación de Radiodifusión Sonora y Televisión Abierta No. HRCF-00276 of CONATEL, June 18, 2012 **(Annex C-83)** p. 2; CONATEL Concession No. CRDF-00820, June 18, 2012 **(Annex C-252)** p. 2.

331 Memorial, § 158; Visual inspection file of the Image Tower, May 16, 2014 **(Annex C-119)** pp. 3-4, 7, 54-55.

332 Memorial, § 159; Letter from Fernando Fraiz Trapote to Nicolás Maduro, January 17, 2014 **(Annex C-107)** p. 3.

333 Memorial, § 161; Robaina con los venezolanos, Juntos por un futuro brillante, El Venezolano, May 19-25, 2011 **(Annex R-8);** M. Sanchez and E. Flor, Carlos Giménez returns money from foreign donor, El Nuevo Herald, June 5, 2012 **(Exhibit R-9);** N. Hartnell, Ansbacher In $2myacht Lien Battle, The Tribune, July 3, 2014 **(Exhibit R-10);** S. Stewart-Muniz, Venezuelan cuts price of Versace-style Gables mansion to $11.5 M, The Real Deal, February 26, 2016 **(Exhibit R-11);**

Miami-Dade lawyers investigate possible fraud in bus stop tender, Diarios Las Américas, July 30, 2016 **(Exhibit R-12).**





203. On the basis of the foregoing, the Defendant concludes that Mr. Fraiz has always presented himself, in a *"clear and unequivocal"* manner,[334] as a Venezuelan investor, and this in order to obtain the benefits granted to national entrepreneurs, so that invoking his Spanish nationality now would be contrary to the rule *venire contra factum propium non valet* and the principle of good faith[335].

204. Sixth, the Defendant argues that Mr. Fraiz's links with Spain are *"a mere fiction",* since, beyond obtaining Spanish nationality in 2003, Mr. Fraiz only holds *"'one piece of documentation' (i.e. ID card and passport)"*[336], which *"has no bearing on the Court's consideration of the dominant and effective nationality"*[337]. In addition, the Defendant indicates that Mr. Fraiz's Spanish tax identification number shows *"that in 2008 the Plaintiff did not have a Spanish national identity document"*[338].

205. Finally, the Respondent asserts that his alleged residential ties are *"non-existent"* because: (i) the address he indicated in the Notice of Arbitration is not his residence, given that Mr. Fraiz actually resides in Miami, United States[339]; (ii) the address of said address is not his property either, but belongs to his sister and his spouse[340]; (iii) the registration in the municipal register of Pozuelo de Alarcón in February 2015 is contradictory to the witness statement of Mr. Fraiz, in which he stated that he was a resident of Miami from 2014 to the present[341]; and (iv) the document accrediting the right to health care *"mentions his knowledge of insurance as a resident in Spain as of October 30, 2018"*[342].

334 Memorial, § 163.

335 Memorial, § 165; Reply, § 184.

336 Memorial, § 168.

337 Reply, § 186.

338 Reply, § 186; Accreditation of the Spanish tax identification number of Fernando Fraiz Trapote, 11 January 2008 **(Annex C-365).** The Defendant indicates that this is deduced, in accordance with Spanish law, because that number begins with the letter "L".

339 Memorial, § 169; Witness Statement of Fernando Fraiz Trapote, May 18, 2020 **(Exhibit CWS-1)** § 3.

340 Memorial, § 169; Nota Simple of the Property Registry of Pozuelo de Alarcón No. 1 on the property C/ Portugal 1, portal 2°, bajo C. 28224 Pozuelo de Alarcón, June 10, 2020 **(Annex R-6)** p. 2.

341 Reply, § 187.

342 Reply, § 188; Document accrediting the right to health care of Fernando Fraiz Trapote, 30 30, 2018 **(Annex C-369).**





*(iii) Position of the Complainant*

206. For the reasons set out in section 5. (D), the Plaintiff reiterates that it is irrelevant to determine the dominant and effective nationality of Mr. Fraiz. However, the Plaintiff refers to a series of facts that would demonstrate that Mr. Fraiz's links with Spain are *"real"*[343], namely: (i) *"Mr. Fraiz's parents never renounced their Spanish nationality and Spain considered them Spanish nationals uninterruptedly"*[344]; (ii) Mr. Fraiz, in addition to possessing a Spanish identity card, passport, tax identification number and security number, is authorized to exercise his political rights in Spain[345]; and (iii) Mr. Fraiz has legal residence in Spain, where his paternal and maternal family also live.

207. The Claimant also argues that Venezuela's argument regarding the *estoppel principle is "unfounded"*[346] since case law has determined that this principle is not applicable to jurisdictional issues[347] and *"there is no known case in which estoppel has been used to deny jurisdiction in an investment arbitration and, of course, Venezuela does not cite any"*[348]. The Claimant asserts that jurisdiction is based on the instrument containing consent, the Treaty, and that it *"cannot be denied or created on the basis of arguments that a party has relied on 'representations' of the other party"*[349].

343 Reply, § 206.

344 Reply, § 206; Certification of the birth certificate of Fernando Fraiz Ulecia, December 13, 2004 **(Annex C-363);** Certification of Spanish nationality of Anita Trapote Villaescusa, May 25, 1953 **(Annex C-347);** Birth Certificate of Fernando Fraiz Trapote before the Spanish Consulate, May 3, 1978 **(Annex C-3)** pp. 1-2, where it is established that the parents have "Spanish nationality of origin".

345 Reply, § 206; Census cards of Fernando Fraiz Trapote for the Spanish general elections of 2016 and 2019, various dates **(Annex C-372);** Spanish national identity card of Fernando Fraiz Trapote **(Annex C-373);** Spanish passport of Fernando Fraiz Trapote, October 8, 2018 **(Annex C-368);** Accreditation of Spanish tax identification number of Fernando Fraiz Trapote, 11 January 2008 **(Annex C-365);** Document accrediting the right to Spanish health care of Fernando Fraiz Trapote, 30 October 2018 **(Annex C-369).**

346 Reply, § 207.

347 Reply, § 208, Rejoinder, § 129; *Achmea B.V. (formerly Eureko B.V.) v. Slovak Republic (* PCA Case No. 2008-13), Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010 **(Annexo CLA-162)** § 219.

348 Reply, § 209; Rejoinder, § 129.

349 Reply, § 209.





208. In the alternative, the Plaintiff states that, as stated by the courts in *the cases of Chevron v. Ecuador*[350] and *Mamidoil v. Albania*[351], *"the doctrine of estoppel is subject to very demanding evidentiary requirements"*[352] and Venezuela has not proven that these requirements are met, in particular those of *"clear and unequivocal representation"* and *"detrimental reliance".* which would prevent Mr. Fraiz from invoking his Spanish nationality[353].

209. The Plaintiff further indicates that "Mr. *Fraiz simply made use of his Venezuelan nationality, in the same way that in other contexts he may have done the same with Spanish nationality,"* without ever denying his Spanish nationality or representing *"in a clear and unequivocal way that he is exclusively Venezuelan or that he is not Spanish"*[354].

**D. SUBSIDIARY ARGUMENT: THE EXTENSION OF TREATY PROTECTION**

210. In the alternative, in the event that the Court finds that Mr. Fraiz is an *investor* protected by the Treaty, the Parties differ as to the extent to which the requirement of nationality in Article I(1)(a) of the Treaty *("Natural persons having the nationality of one of the Contracting Parties ... and make investments in the territory of the other Contracting Party")* it must be verified.

211. The Parties also differ as to whether Mr. Fraiz's investments were effectively protected by the Treaty. On this point, in accordance with the Court's Bifurcation Decision, the parties analyze the Plaintiff's investments *"as they were presented or described in its Application"*[355].

350 Contestación, § 210; Dúplica, § 130; *Chevron Corporation and Texaco Petroleum Corporation c. República de Ecuador* (Caso CPA No. 2007-02/AA277), Laudo Interino, 1 de diciembre de 2008 **(Anexo CLA-160)** § 143 *("in all legal systems, the doctrines of abuse of rights, estoppel and waiver are subject to a high threshold.* […] *It is only in very exceptional circumstances that a holder of a right can nevertheless not raise and enforce the resulting claim").*

351 Contestación, § 211; Dúplica, nota al pie 289; *Mamidoil Jetoil Greek Petroleum Products Societe Anonyme S.A. c. República de Albania* (Caso CIADI No. ARB/11/24), Laudo, 30 de marzo de 2015 **(Anexo CLA-166)** § 469 *("[estoppel] is a principle where for reasons of material justice a person is hindered from exercising an existing right. It is apparent that such a consequence must be restricted to exceptional circumstances").*

352 Reply, § 210.

353 Reply, § 215; Rejoinder, § 131; Transcript, Day 1, 258:18-22, 259:1-3.

354 Reply, §§ 212-214.

355 Decision on Bifurcation of 18 July 2020, § 36.

**1. The time of fulfilment of the nationality status of Article I.1(a) of the Treaty**

212. The Respondent argues that compliance with the nationality condition must be verified at the time of making the investment. The Claimant, on the other hand, submits that the critical dates are the date of the measures affecting the investments and the date of initiation of the arbitration.

*(i) Position of the Respondent*

213. For the Respondent, the nationality of one of the Contracting Parties must be verified at the time of the investment. If it is not complied with, the investment would not be protected by the Treaty even if the person had acquired the nationality of the relevant Contracting Party (in this case, the Spanish Contracting Party) at a later time.

214. In reaching that conclusion, the Defendant interprets Article I(1)(a) of the Treaty in accordance with Article 31 CVDT. The Respondent argues that the use of the conjunction *"and"* between the expressions *"Natural persons having the nationality of one of the Contracting Parties"* y *"make investments in the territory of the other Contracting Party"* of Article I.1(a) *"reveals that these two requirements must be considered together and inseparably"*[356].

215. It also points out that Article I.2 of the Treaty defines *investments* as assets invested by *investors,* which shows *"that the conditions for being investors must be met at the time of making the investment"* [357].

216. In support of his argument, he refers to the decision of the Paris Court of Appeal of 3 June 2020 that *"annulled in its entirety the award on jurisdiction issued by the arbitral tribunal in the Serafín García Armas case"*[358] precisely because it had not verified the nationality of the investor from the moment of making the investment:

> [...] *the arbitral tribunal,* [...] *By failing to verify that the nationality status of the investors was fulfilled on the day on which the investments were made, it erroneously declared itself competent to hear all the claims of the* [claimants] [359]

[356] Memorial, § 183.

[357] Rebuttal, § 203; Treaty **(Annex C-27),** art. I.2.

[358] Memorial, § 186.

[359] Paris Court of Appeal, RG No. 19/03588, *Bolivarian Republic of Venezuela v. Serafín García Armas and Karina García Gruber,* June 3, 2020 **(Exhibit RLA-7)** §§ 55-57 (Tribunal translation).





217. Unlike the Claimant, the Respondent considers that *"the fact that the BIT provides for its application to investments made prior to its entry into force could in no way alter the fact that, under the BIT, it is necessary to be an investor at the time of making the investment, whether before or after the entry into force of the BIT"*[360].

*(ii) Position of the Complainant*

218. The Claimant points out that the majority investment arbitration case law has understood that national status must be verified: (i) on the date on which the measures affecting the investments were adopted; and (ii) on the date on which the investor consents to the arbitration and submits the dispute to arbitration[361]. The Claimant explains that the importance of these dates lies in the fact that it is at these times that *"the BIT unfolds its effects, protects the investment against measures and allows the investor to resort to arbitration"*[362]. According to the Plaintiff, Venezuela *"completely ignores the precedents cited herein."* [363]

219. As regards Venezuela's reference to the decision of the Paris Court of Appeal of 3 June 2020 in the *Serafín García Armas case,* the Applicant acknowledges that the Court understood that the nationality requirement had to be verified at the time of making the investment[364]. However, it determines that *"this Court is not subject to the review of the French courts or to French law, nor therefore subject to the criteria established by the Paris Court of Appeal"* and reiterates that the position defended by that Court does not find support either in the text of the Treaty or in the majority jurisprudence[365].

[360] Rebuttal, § 202.

[361] Reply, § 219; *Antoine Goetz et al. v. Republic of Burundi* (ICSID Case No. ARB/95/3), Award, 10 February 1999 **(Annex CLA-111)** § 72; *Bayindir Insaat Turizm Ticaret Ve Sanayi v. Islamic Republic of Pakistan* (ICSID Case ARB/03/29), Jurisdiction Decision, 14 November 2005 **(Annex CLA-121)** § 178; *Victor Pey Casado and Fundación Presidente Allende v. Republic of Chile* (ICSID Case No. ARB/98/2), Award, May 8, 2008 **(Annex CLA-1)** § 414; *Ceskoslovenska Obchodni Banka, A.S. v. Slovak Republic (* ICSID Case No. ARB/97/4), Decision on Jurisdiction, 24 May 1999 **(Annex CLA-113)** § 31; *Serafín García Armas and Karina García Gruber v. Republic of Venezuela* (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2)** § 214. See also Rejoinder, § 135; Transcript, Day 1, 155:4-8, 261:13-16.

[362] Reply, § 219; Rejoinder, § 136.

[363] Reply, § 221; Rejoinder, § 137.

[364] Reply, § 221; Rejoinder, § 137.

[365] Reply, § 221; Rejoinder, § 137.





**2. The Applicant's investments protected by the Treaty**

220. Even if Venezuela's criterion were adopted that the relevant date is the date of realization of the investment, the Parties differ in that Mr. Fraiz's investments would indeed be protected by the Treaty.

*(i) Position of the Respondent*

221. The Respondent clarifies that its analysis of Mr. Fraiz's investments is carried out *"under the instructions of the Arbitral Tribunal, without this entailing an acknowledgement on its part of the existence of Mr. Fraiz Trapote's alleged investments under the terms of the Venezuela-Spain BIT or recognition on its part of the relevance of the documents and references submitted by Mr. Fraiz Trapote"*[366]. In particular, the Defendant limits its analysis to the rights and properties *"allegedly held by Fernando Fraiz Trapote via his alleged shareholdings in the companies Academia Americana, Cablevisión, La Tele, Vepaco and the eleven Real Estate companies"*[367].

222. The Respondent alleges that none of Mr. Fraiz's investments – except for Paso Alto Venezuela – are protected because they were made before February 21, 2003, the date on which Mr. Fraiz acquired Spanish nationality[368].

223. First, the Respondent indicates that the date of the investment in Academia Americana is February 24, 1959, the date on which the company was created by Mr. Fraiz's father . In addition, it adds that there is no document that proves Mr. Fraiz's possession of the American Academy.

[366] Memorial, §§ 177, 193-194; Rebuttal, § 208.

[367] Memorial, § 193.

[368] Memorial, § 191-192, 203. Birth Certificate of Fernando Fraiz Trapote before the Spanish Consulate, May 3, 1978 **(Annex C-3)** annotation of March 15, 2004.

[369] Notice of Arbitration, § 25; Complaint Brief, § 58; Memorial, § 195; American Academy "Road Show" Presentation, 2016 **(Exhibit C-291);** Witness statement of Fernando Fraiz Trapote **(Exhibit CWS-1)** § 50.





224. With regard to the Cablevisión Group, made up of the companies Cablevisión, TMS and TVS, the Defendant points to 1998 as the date of the investment, when Mr. Fraiz, together with his father and other investors, acquired 100 per cent of Cablevisión, TMS and TVS[370].

225. With respect to LaTele, it identifies September 12, 2001 as the date on which the investment was made, when Mr. Fraiz acquired, indirectly through Imagen Televisión C.A., 70 per cent of the shares of Inversiones Vistana 333 C.A., the sole shareholder of Marte CVT (which was later renamed LaTele) [371]

226. The Defendant also determines that the investment in Vepaco was made on April 27, 1998, when Mr. Fraiz's father and another partner acquired 100 percent of that company[372].

227. Finally, with regard to the Real Estate Companies, it considers that Mr. Fraiz's *"alleged"* participation in the company Imagen Standard was carried out in 1992[373], in Imagen Real Estate in 1997[374] and, finally, in the companies INLECU, Inmobiliaria Arlose, Versan, Inversiones SCC, Vebarq and Desarrollos LCU all on the same date, April 27, 1998[375].

228. Next, the Defendant asserts that the exercise requested by the Court *"cannot be carried out with respect to the companies Aluminios Celosías and INLCU since Fernando Fraiz Trapote did not submit any document that would indicate a date for the realization of these alleged investments"*[376].

[370] Complaint Brief, § 36; Memorial, § 198; Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis)** footnote 2.

[371] Memorial, § 199; Corporate Structure of Mr. Fraiz's Investments, footnote 4; Witness Statement of Fernando Fraiz Trapote **(Exhibit CWS-1)** § 40.

[372] Memorial, § 200; Corporate Structure of Mr Fraiz's investments, footnote 3; Witness Statement of Fernando Fraiz Trapote **(Exhibit CWS-1)** **(Apéndice I bis)** § 14.

[373] Memorial, § 201; Shareholders' Book of Imagen Standard C.A., December 16, 1992 **(Appendix C-179).**

[374] Memorial, § 201; Shareholder book of Imagen Real Estate C.A., June 9, 2009 **(Exhibit C-239)** pp. 6, 9.

[375] Memorial, § 201; Shareholders' book of Inversiones Inmobiliarias Lecu C.A., November 28, 1981 **(Appendix C-160);** Shareholders' Book of Inmobiliaria Arlose C.A., January 24, 1992 **(Exhibit C-175)** pp. 3, 13, 18, 21, 23, 25, 27 and 29; Vesan C.A. Shareholders' Book (excerpt), August 17, 1976 **(Appendix C-159)** pp. 8, 16, 22, 26, 27 and 29; Shareholders' book of Inversiones SCC C.A., February 3, 1993 **(Appendix C-180)** pp. 4, 14, 18, 22, 26, 27, 30, 31 and 33; Shareholders' book of Vebarq C.A. (extract), 29 April 1976 **(Appendix C-158)** pp. 16, 18, 22, 26, 27 and 29; Desarrollos LCU C.A. Shareholders' Book, January 21, 1992 **(Appendix C-174)** pp. 12, 18, 22, 23, 25, 28 and 29.

[376] Memorial, § 202.

229. Finally, it acknowledges that the investment in the company Palo Alto Venezuela, via the Panamanian company Paso Alto Corporation, was made in 2006, although it categorically rejects that the alleged indirect shareholding in that company *"can be classified as an investment under the terms of the Venezuela-Spain BIT"*[377].

230. In view of the above, the Respondent concludes that the Court lacks jurisdiction over the dispute relating to all but one of Mr. Fraiz's investments (his shareholding in Palo Alto Venezuela), given that these investments were made before Mr. Fraiz acquired Spanish nationality.

231. In addition, the Respondent alleges that, "[a] *t both the new documents and the new facts or characterization"* submitted by the Plaintiff together with his Response Brief *"should be dismissed by the court for not complying with the instructions of a pro tem exercise"*[378].

232. It also maintains that *"Mr. Fraiz Trapote's analysis is erroneous because it is based on capital increase operations or shares or assets held indirectly through vehicles that do not meet the nationality requirement of the BIT, which requires considering the original transaction and not* [...] *the subsequent operations or derivatives of the 'primary' investment operation"*[379].

*(ii) Position of the Complainant*

233. The Plaintiff argues that, even if Venezuela's argument regarding the date of the investment were accepted, *"this would not affect the jurisdiction of this Court,"* since Mr. Fraiz made multiple investments (through acquisitions of assets and shares, capital increases, and contributions of *know-how,* among others) after acquiring Spanish nationality in 2003[380].

---

377 Memorial, § 203.

378 Reply, §§ 211-213; referring to Reply, § 227; Minutes of the General Meeting of Shareholders of Invesco, July 31, 2001 **(Exhibit C-359);** Civil Code of Venezuela, July 25, 1982, Law on the Partial Reform of the Civil Code, published in Official Gazette No. 2.990 (Extraordinary) (excerpt), July 26, 1982 **(Annex C-330 bis);** Francisco López Herrera, *Inheritance Law,* Third edition (updated) Volume II (excerpt) **(Annex C-361);** Shareholders' book of Inversiones LCU C.A., January 21, 1992 **(Exhibit C-353).**

379 Rebuttal, § 214.

380 Reply, § 223; Rejoinder, § 140; Transcript, Day 1, 155:11-14.





234. With regard to the Cablevisión Group, the Plaintiff points to November 12, 2004 as the date of the investment in TMS, when Mr. Fraiz indirectly acquired 100 per cent of that company[381]. For TVS, on October 19, 2005, the date of indirect acquisition of 100 percent of the company by Mr. Fraiz[382]. Finally, with respect to Cablevision, the Plaintiff considers that the relevant date is 2007, when Mr. Fraiz became the sole indirect owner of Cablevisión[383].

235. With respect to LaTele, the Plaintiff refers to the transactions of 2005 and 2007, through which Mr. Fraiz indirectly acquired the additional 10.5 per cent of that company, as well as new shares through a significant capital increase, respectively[384].

236. With regard to Vepaco, the Plaintiff mentions the indirect acquisition of the remaining 50 per cent of Vepaco in 2004[385] and the restructuring of that holding in 2007, through the direct acquisition of all the shares of Proxima Investment and Charari, regaining 99.27 per cent of Vepaco[386].

237. With regard to Mr. Fraiz's investments in Academia Americana, the Plaintiff explains that Mr. Fraiz inherited 16.6 per cent of the company from his father in 2010[387], after his father's death, which is to be considered as the date on which the investment was made.

238. With regard to the Real Estate Companies, the Plaintiff considers that the date of the investment in Imagen Standard is 2004, when Mr. Fraiz's father transferred to Mr. Fraiz 100 percent of the shares of the company[388]. In Imagen Real Estate, in 2009, when

---

381 Reply, § 227; Shareholders' book of Imagen Publicidad Corporativa C.A., December 16, 1990 **(Appendix C-23)** p. 3.; Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis)** footnote 2.

382 Reply, § 227; Shareholders' book of Latinoamerican Media Group C.A., June 10, 1998 **(Appendix C-41),** p. 11.; Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis)** footnote 2.

383 Reply, § 227; Minutes of the meeting of Invesco A.V.V., November 12, 2007 **(Exhibit C-71);** Share Certificate No. 4 issued by Invesco A.V.V., November 12, 2007 **(Exhibit C-72);** Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis)** footnote 2.

384 Reply, § 227; Shareholders' book of Imagen Televisión C.A., April 10, 2008 **(Appendix C-75 bis)** p. 6.

385 Reply, § 227; Imagen Publicidad's shareholders' book, April 30, 1990 **(Appendix C-20)** p. 9.

386 Reply, § 227; Share Certificate No. 5 issued by Proxima Investment Inc., November 12, 2007 **(Exhibit C-73);** Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis)** footnote 3.

387 Reply, § 227.

388 Reply, § 227; Shareholders' Book of Imagen Standard C.A., December 16, 1992 **(Appendix C-179)** pp. 9-10; Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis)** footnote 7.





Mr. Fraiz reacquired 100 percent of his shares[389]. Finally, it refers to the indirect acquisition by Mr. Fraiz in 2007 of 100 percent of INLECU, Inmobiliaria Arlose, Inversiones SCC, Desarrollos LCU and INLCU[390], as well as 90 percent of Verbaq and Vesan[391].

239. Finally, the Parties agree that the investment in the company Paso Alto Venezuela was made in 2006[392].

240. The Applicant submits that Venezuela does not cite any source to justify why only the original transaction should be taken into account and not the subsequent ones, and adds that this does not arise from the ordinary meaning of Treaty[393] either. It also states that *"Venezuela assumes (incorrectly) that the only way to make investments would be through the acquisition of shares"* and that the Respondent also fails to explain why all the *"assets, goods, rights, and contributions and contributions"* cited by the Plaintiff would not be protected investments under Treaty[394].

241. Finally, it denies having ignored *"the framework of the pro tem exercise"* or having modified its presentation by incorporating new annexes, as indicated by the Respondent[395]. The Plaintiff points out that (i) *"Venezuela's objection ratione persone subsidiaria requires consideration of whether Mr. Fraiz made investments after acquiring Spanish nationality"*[396]; and (ii) *"the Court's order does not prohibit the inclusion of new documents, which, in any event, do not alter the facts and arguments as presented in the Brief of Claim"*[397].

---

389 Reply, § 227; Shareholders' Book of Imagen Real Estate C.A., July 9, 2009 **(Exhibit C-239)** p. 9; Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis)** footnote 8.

390 Reply, § 227; Shareholders' Book of Inversiones Inmobiliarias Lecu C.A., November 28, 1991 **(Appendix C-160)** pp. 21-23; Shareholders' Book of Inmobiliaria Arlose C.A., January 24, 1992 **(Appendix C-175)** pp. 23-29; Shareholders' Book of Inversiones SCC C.A., February 3, 1993 **(Appendix C-180)** pp. 27-33; Desarrollos LCU Shareholders' Book, January 21, 1992 **(Appendix C-174)** p. 23-29; Shareholders' Book of Inversiones LCU C.A. (INLCU), January 21, 1992 **(Exhibit C-353);** Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis)** footnotes 9, 14, 16 and 11-12.

391 Reply, § 227; Shareholders' Book of Vebarq C.A. (excerpt), April 29, 1976 **(Exhibit C-158)** pp. 27-32; Shareholders' Book of Vesan C.A. (excerpt), August 17, 1976 **(Appendix C-159)** pp. 27-29; Corporate Structure of Mr. Fraiz's Investments **(Appendix I bis)** footnotes 13, 15.

392 Reply, § 227.

393 Reply, § 224; Rejoinder, §§ 141-142.

394 Rejoinder, § 142.

395 Rejoinder, § 143.

396 Rejoinder, § 143.

397 Rejoinder, § 143; Decision on Bifurcation, 18 July 2020, § 40.





**SAW. ANALYSIS OF THE ARBITRAL TRIBUNAL**

242. The Arbitral Tribunal's analysis will be divided into the following sections: Chapter A (paras. 243-400) develops the interpretation of the concept of *investors* in Article I.1(a) of the BIT, in accordance with Article 31 of the VCLT; in chapter B (paragraphs 401 to 404) a brief reference is made to the supplementary means of interpretation of Article 32 of the VCLT; Chapter C (paras. 405 to 415) discusses Mr. Fraiz's specific situation in light of the meaning of the concept of *investors* determined by the Tribunal; Chapter D (paras. 416 to 418) refers to the alternative argument of Venezuela's *Objection Ratione Personae*; Chapter E (paras. 421 to 431) addresses the Tribunal's considerations regarding the costs of the case.

**To. INTERPRETATION OF THE CONCEPT OF INVESTORS IN ARTICLE I.1(A) OF THE BIT**

243. For the interpretation of the term *investors* contained in the Treaty, the Arbitral Tribunal will divide its analysis into the following subsections: (1) first, some general considerations are made about the rules of interpretation provided for in Article 31 of the VCLT; (2) the textual interpretation of the term *investor in* Article I.1(a) of the BIT is then addressed; (3) the term investor is then analysed in the light of the context of the BIT; (4) the concept of investor is then dealt with in accordance with the object and purpose of the BIT; (5) then the term investor is analyzed in the light of the principles of international law; (6) Finally, the Court's conclusion is established with respect to the interpretation of the concept of *investor* contained in the BIT.

**1. Rules of interpretation set out in the Vienna Convention on the Law of Treaties (VCLT)**

*(i) Summary of the discussion*

244. While the Parties agree that the interpretation of the Treaty should be made in accordance with the criteria set out in the VCLT, they differ as to how these criteria should be applied.

245. The Respondent submits that Article 31 of the VCLT underlies the principle of interpretation of the treaty as a whole, so that its text, context, object and purpose must be harmonized, without there being any hierarchy or preference between those elements.

246. The Applicant points out that, although all the elements of Article 31 of the VCLT are relevant, in the interpretation of a treaty its text always prevails, because if it is clear, it must be understood that it reflects the agreement of the parties. In addition, it submits that the literal wording of a treaty cannot be ignored under the pretext of adapting it to its context, object and purpose.

*(ii) Analysis*

247. The Tribunal agrees with the Parties that the interpretation of an international treaty is governed by the criteria set out in Article 31 of the VCLT, which reads as follows:

> *31. General rule of interpretation.*
>
> *1 A treaty should be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*
>
> *2. For the purposes of interpreting a treaty, the context shall include, in addition to the text, including its preamble and annexes:*
>
> *(a) any agreement relating to the treaty which has been concluded between all the parties on the occasion of the conclusion of the treaty;*
>
> *(b) any instrument formulated by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument relating to the treaty.*
>
> *3. Along with the context, the following must be taken into account:*
>
> *(a) any subsequent agreement between the parties concerning the interpretation of the treaty or the application of its provisions;*
>
> *(b) any subsequent practice in the application of the treaty which reflects the agreement of the parties on the interpretation of the treaty;*
>
> *(c) any relevant rules of international law applicable in the relations between the parties.*
>
> *4. A term shall be given a special meaning if it is established that such was the intention of the parties.*

248. Although the Parties argued at length on the correct understanding of this rule, they both recognize that all the elements referred to in Article 31 are relevant to the correct interpretation of the treaty. The substantive difference refers to the relative value of the text. While the Respondent points out that this is one of several elements to be considered, the Complainant maintains that, if its terms are clear, they should prevail over the other criteria indicated by Article 31. 249. The interpretation of an international





treaty requires, in the first place, an exercise in textual hermeneutics. Consequently, the starting point of any interpretation must be the text agreed upon by the contracting parties. However, two important precautions must be taken.

250. First of all, the fact that the enumeration of criteria for interpretation of the CVDT refers first to the text does not mean that it establishes a purely semantic system of interpretation. The interpretation of the text is not an abstract and isolated exercise, but must be done in good faith, which refers to the context, object and purpose of the treaty. A literal application of the terms of the treaty that is incompatible with these other elements must therefore be rejected. In other words, although considerations relating to the context, object and purpose of the treaty cannot be used to *modify* what has been agreed by the parties, the *determination* of that agreement cannot disregard that context, object and purpose. These are not elements extraneous to the agreement, but, being part of it, contribute to clarifying its content.

251. Second, in determining the meaning and scope of a treaty, the Tribunal must take into account any rules of international law relevant and applicable to the relations between the parties, so that the interpretation of the agreed terms is made in a manner consistent with international law. In this regard, the Court shares the approach of the tribunal in *AAPL v. Sri Lanka,* which in interpreting the Sri Lanka-United Kingdom BIT stated: *"it should be noted that the Bilateral Investment Treaty is not a self-contained closed legal system limited to provide for substantive material rules of direct applicability, but it has to be envisaged within a wider juridical context in which rules from other sources are integrated through implied incorporation methods, or by direct reference to certain supplementary rules, whether of international law character or of domestic law nature"*[398].

*(iii) Conclusion*

252. According to Article 31 of the VCLT, the Court is aware that the interpretation of the BIT must be made in good faith, based on the analysis of its text, but understanding that literal content in the light of its context, object and purpose.

[398] *Asian Agricultural Products Ltd. v. Republic of Sri Lanka* (ICSID Case No. ARB/87/3), Final Award, 27 June 1990 **(Annex CLA-26)** § 21.





### 2. Textual interpretation of the concept of *investor*

*(i) Summary of the discussion*

253. The Respondent submits that Article I.1(a) of the BIT, in its ordinary sense, excludes dual nationals from the definition of *an investor.* In particular, it points out that the contrast made by that definition between persons who *"have the nationality of a Contracting Party"* and who invest *"in the territory of the other Contracting Party"* necessarily implies that there must be a difference in nationality between the investor and the State receiving the investment. Consequently, persons who, having the nationality of a contracting party, also possess that of the host State of the investment, would be excluded from the protection of the BIT.

254. The applicant points out that the only conditions laid down by the Treaty in this area would be

(i) the investor is a national of one of the Contracting Parties, and (ii) the investor makes an investment in the other Contracting Party. In its view, the fact that the investor is also a national of the host State is irrelevant, since the conditions laid down in the Treaty are also fulfilled in that case. It adds that, if the parties had wished to exclude dual nationals, they would have done so expressly, as they did in other treaties contemporaneous with or subsequent to the

BIT.

*(ii) Analysis*

255. Article I.1(a) of the BIT defines the term *investors* as follows:

> *I. For the purposes of this Agreement:*
>
> *1. "Investors" means:*
>
> *(a) Natural persons who are nationals of one of the Contracting Parties in accordance with its legislation and make investments in the territory of the other Contracting Party.*

256. For the purposes of order, the Arbitral Tribunal shall first analyze the position of the Respondent in this matter, and then the arguments of the Complainant.

257. Venezuela's argument in this area is essentially grammatical, and rests on the contrast between the phrases *"one of the Contracting Parties"* and *"the other Contracting Party"* used in the definition of *investor.* In particular, the Defendant points out that where the Treaty refers to *one party,* it means *only one party.* In its view, in order for the Treaty to include dual nationals, it should have used expressions





such as *"of one or the other"* or *"of both parties".* Moreover, the conjunction *"and"* separating the terms *"one of the Contracting Parties"* and *"the other Contracting Party"* would imply an opposition between the two. Thus, the investor must not only have the nationality of one of the parties, but also that it must be different from that of the State receiving the investment.

258. The Arbitral Tribunal does not consider this interpretation to be convincing, for the following reasons:

a) The term *"one",* in the context of the phrase *"natural persons having the nationality of one of the Contracting Parties"* (emphasis added), is not used for numbering, but simply as an indeterminate article. Nothing in the ordinary meaning of the terms of this provision suggests that this is an expression relating to the *number* of nationalities that the investor may have (which, as indicated in paragraph (d) *below,* would have required the insertion of additional terms). On the contrary, that meaning indicates that the provision requires only that the nationality be that of one of the Contracting Parties.

b) The term *"other Contracting Party"* in the definition is a contradictory, but not in the sense indicated by Venezuela. By the way, a person who only has Spanish nationality cannot be considered an investor with respect to investments made in Spain. Thus, it is clear that the definition of *investor* requires that there be two different nationalities. But nothing in the definition of the BIT refers to other nationalities that the investor may have.

c) In this sense, the definition of investor requires that a person has at least one of the nationalities of the Contracting Parties and makes investments in the territory of the other. But it is a minimum requirement, that is, a difference of nationalities that conditions the protection of the BIT. However, in the opinion of the Arbitral Tribunal, it is not a maximum requirement, since it does not follow from the literal meaning of the term *investor,* that dual nationals are excluded from the protection of the Treaty.

(d) In addition, the contrast between *"one"* and *"the other"* contracting party is a common expression in the definition of *investor* contained in other treaties concluded by both Venezuela and Spain. When these countries have wanted to exclude all national doubles events, they have added some express mention of it, either in the same definition or in an additional instrument. In the case of Venezuela, this is what happens in the treaties

concluded with Italy[399] and Canada[400]; in the case of Spain, this is what happens in the treaty signed with Uruguay[401].

259. Thus, in the absence of precise language in this regard, the Court cannot understand the BIT as providing for a total and complete exclusion of dual nationals. In other words, it cannot be inferred from the text of the definition of *investor* alone that the Contracting Parties intended to exclude dual nationals from the scope of the BIT entirely.

260. Having rejected that argument, the Court will analyse the applicant's position that the Treaty includes dual nationals without any limitation.

261. As noted, the Applicant submits that the Treaty contains only two requirements for a natural person to qualify as an investor: (i) have the nationality of a contracting party; and (ii) invest in the territory of the other contracting party. Consequently, any dual national would meet these two conditions, and to require another requirement would be to add an extraneous element to the agreement of the Contracting Parties. If the Contracting Parties remained silent on the matter, it must be understood that they agreed to include the dual nationals.

262. Indeed, the BIT makes no mention of double nationals. It does not refer to them in the definition of *investor,* or anywhere else. Consequently, it is the task of the Court to determine whether this silence can be understood as an inclusion in all events of persons who simultaneously hold the nationalities of Spain and Venezuela.

263. As a first point, the Arbitral Tribunal notes that, in the context of an international treaty, the ordinary meaning of the term *national* is not necessarily inclusive of the term *dual national.* In fact, in the field of international law, dual nationality constitutes a particular legal situation. Thus, for example, Articles 4 and 5 of the Convention on Nationality[402] grant special treatment to persons who possess dual nationality, not only in terms of diplomatic protection, but also for the purposes of relations with third States.

399 Additional Protocol to the Agreement between the Italian Republic and the Republic of Venezuela on the Promotion and Protection of Investments, June 1990 **(Annex C-166),** clause 1(a).

400 Agreement between the Government of the Republic of Venezuela and the Government of Canada for the Promotion and Protection of Investments, July 1, 1996 **(Annex C-195)** art. I.g.

401 Agreement for the Promotion and Reciprocal Protection of Investments between the Kingdom of Spain and the Oriental Republic of Uruguay, 7 April 1992 **(Annex C-176)** art I.3.c).

402 Hague Convention Concerning Certain Questions Relating to Conflicts of Nationality Laws, 12 April 1930 **(Annex RLA-13).**





264. Although the principles enshrined in the Convention on Nationality have evolved in international law[403], it is clear that, even today, a dual national is in a particular legal situation with respect to a person with a single nationality. For example, the ICSID Convention does not allow a dual national to sue his or her own State[404].

265. Thus, it is not possible to say that the term *national* used in the BIT *necessarily* includes dual nationals, as the Applicant claims. As indicated *above (supra* § 259), it does not follow either that the Contracting Parties have excluded dual nationals, but simply that one term does not necessarily imply the other.

266. In general terms, as shown by the practice of Spain, Venezuela and third States, the Contracting Parties had alternatives to define the treatment applicable to dual nationals: (i) to exclude them expressly and in any event, as is done by the ICSID Convention[405], the Italy-Venezuela BIT[406], the Canada-Venezuela BIT[407], the Iran-Venezuela BIT[408] and the Spain-Uruguay BIT[409]; (ii) include them only partially, based on a link of domicile or residence, or applying the principle of effective and dominant nationality, such as the Argentina-Venezuela BIT[410], the Ecuador-Venezuela BIT.

403 As explained in the case of *Enrique Heemsen and Jorge Heemsen v. Bolivarian Republic of Venezuela* (PCA Case No. 2017-18), Award of Jurisdiction, October 29, 2019 **(Annex CLA-101)** §§ 429-433.

404 Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 18 March 1965 **(Annex R-2),** art. 25(2)(a).

405 Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 18 March 1965 **(Annex R-2),** art. 25(2)(a).

406 Additional Protocol to the Agreement between the Italian Republic and the Republic of Venezuela on the Promotion and Protection of Investments, June 1990 **(Annex C-166),** clause 1(a).

407 Agreement between the Government of the Republic of Venezuela and the Government of Canada for the Promotion and Protection of Investments, July 1, 1996 **(Annex C-195)** art. I.g.

408 Agreement on the Reciprocal Promotion and Protection of Investments between the Government of the Bolivarian Republic of Venezuela and the Government of the Islamic Republic of Iran, 11 March 2005 **(Annex C-224)** art.1.2.a).

409 Agreement for the Promotion and Reciprocal Protection of Investments between the Kingdom of Spain and the Oriental Republic of Uruguay, 7 April 1992 **(Annex C-176)** art I.3.c).

410 Agreement between the Government of the Republic of Venezuela and the Government of the Argentine Republic for the Reciprocal Promotion and Protection of Investments, November 16, 1993 **(Annex C-332),** art. 2.2.





Venezuela[411], the Spain-Dominican Republic BIT[412], the Spain-Colombia BIT[413] and multinational agreements such as DR-CAFTA[414]; (iii) include them expressly and in any event; or (iv) not regulating the matter.

267. The Court has ruled out that the text of the Treaty excludes dual nationals *per se (supra* § 259). On the other hand, it is clear that the Contracting Parties did not opt for the second alternative, since the Treaty makes no reference to dominant and effective nationality, domicile, residence or any other circumstance that could mean an express option for some kind of partial protection of dual nationals.

268. It is therefore necessary to analyse whether the Contracting Parties have agreed to include all national doubles events. As acknowledged by the Claimant in response to a question from the President of the Tribunal during the jurisdiction hearing, there is no known investment treaty that contains express protection and every event of dual nationals[415].

269. In view of this circumstance, the Court considers it implausible that the Contracting Parties have agreed to such extensive protection tacitly or implicitly. Indeed, as will be seen *(infra* Section 5), international law at the time of the conclusion of the Treaty, as well as the practice of both Contracting Parties, was moving in a very different direction. The fact that in the mid-1990s the Contracting Parties had agreed on a complete protection of dual nationals would have been an important innovation, which would mean a radical departure from the usual practice of the time. Therefore, it is highly unlikely that such an agreement would have been established in such an oblique and implicit way.

270. Some arbitral awards have concluded that the silence of the contracting parties in the matter must be interpreted as a complete inclusion of dual nationals *(infra* §§ 276 et seq.). All these awards are subsequent to the conclusion of the BIT. The Arbitral Tribunal is not aware of any convention or practice contemporaneous with the Treaty in which the absence of express mention of doubles

411 Agreement between the Government of the Republic of Venezuela and the Government of the Republic of Ecuador for the Reciprocal Promotion and Protection of Investments, November 18, 1993 **(Annex C-333),** art. I.3.

412 Agreement for the Reciprocal Protection and Promotion of Investments between the Kingdom of Spain and the Dominican Republic, 16 March 1995 **(Annex C-192),** art. 1.1.a).

413 Agreement between the Kingdom of Spain and the Republic of Colombia for the Reciprocal Promotion and Protection of Investments, 3 September 2007 **(Annex C-233)** arts. 11.4 -11.5.

414 Free Trade Agreement between the Dominican Republic, Central America and the United States of America (DR-CAFTA), August 5, 2004 **(Annex C-338),** art. 10.28.

415 Transcript, day 2, 407:12-17; Transcript, Day 1, 280:8-9.





national should be understood as an inclusion in all events. This background supports the conclusion that the Contracting Parties did not intend to depart from the usual practice and to protect dual nationals in all circumstances.

271. In addition, the Court is not convinced of the Applicant's argument that if the Contracting Parties expressly excluded dual nationals in other treaties, their silence in this case should be interpreted as an inclusion. While the comparison between different treaties concluded by the Contracting Parties with third parties may be relevant as an element of interpretation, the Claimant's conclusion involves a *non sequitur.* In effect, the argument rests on the premise that the general rule is the protection of all events of double nationals and that, therefore, the only way to exclude them is by means of an express agreement. As will be discussed, the Court finds that this is not effective *(infra* Section 5). The BIT is simply silent on the question of whether the term *national* encompasses dual nationals who also have the nationality of the host State.

272. In view of this circumstance, the Court considers that the text of the Treaty does not include a clear definition, so that the issue in dispute must be resolved on the basis of an analysis of the context and the object and purpose of the Treaty, as well as the other interpretative guidelines established by Articles 31(2) and 31(3) of the VCLT.

273. The Tribunal is aware that other arbitral tribunals have reached different conclusions from the one to be adopted in the present award, on the basis of texts similar to that of the BIT ( *Pey Casado v. Chile, Bahgat v. Egypt* and *Pugachev v. Russia).* In addition, in two cases the courts, interpreting the Treaty, have reached contradictory conclusions *(Manuel García Armas*

*c. Venezuela* and *Serafín García Armas v. Venezuela).* As a preliminary matter, with respect to the relevance of this background, the Court is aware that a principle of binding precedents does not apply in international law. The decisions of other arbitral tribunals are not a source of international law in accordance with article 38 of the Statute of the International Court of Justice. However, the decisions of other courts can become relevant if the persuasive force of their arguments is shared by other courts. In this context, previous arbitral awards may, to some extent, reflect the current state of international law. The Court must therefore consider, but not necessarily follow, the arguments made by other courts in the matters in which it is relevant.

274. Two additional clarifications should be made. First, the analysis of previous awards must be essentially limited to their legal reasoning. The Court should not give special consideration to the factual assumptions heard by other courts, but only insofar as they are illustrative for the interpretation of the

applicable law. Second, despite their similarities, each investment treaty is distinct and must be interpreted in its own terms and circumstances. Each one has its own text, context, object and purpose. Therefore, the interpretation of a particular treaty cannot be extrapolated without qualifications to another treaty.

275. Having made these precautions, in the following paragraphs the Court will analyze the cases referred to in *§* 273 above, in which the jurisdiction of the court was given rise despite the fact that the treaty did not expressly provide for the protection of dual nationals.

276. The first is the decision of the court in the case of *Pey Casado v. Chile*[416]. After resolving the main question of jurisdiction, the court went on to consider, *ex abundanti caution,* what were the conditions of nationality necessary to have the protection of the bilateral investment treaty concluded between Chile and Spain, in accordance with its text[417].

277. In circumstances where that treaty did not expressly address the situation of dual nationals, but merely required the nationality of the non-receiving State, the court considered that both the wording and the object of the treaty prevented it from *adding* additional requirements to those arising from the letter and spirit of the agreement[418].

278. The Court does not agree with that reasoning. In interpreting an international treaty, the spirit must be the point of arrival and not the starting point of the court's reasoning. Indeed, when the VCLT refers to the *ordinary meaning* of the terms, it is not referring to the literal scope of the terms, but to the way in which they are to be understood after considering all the elements referred to in Article 31. In this sense, as indicated in § 250 above, the VCLT does not establish a primacy of the literal meaning of the terms of the treaty, but indicates different elements that, applied together, allow the determination of the ordinary meaning of the treaty[419].

---

416 *Victor Pey Casado and Fundación Presidente Allende v. Republic of Chile* (ICSID Case No. ARB/98/2), Award, May 8, 2008 **(Annex CLA-1).**

417 *Victor Pey Casado and Fundación Presidente Allende v. Republic of Chile* (ICSID Case No. ARB/98/2), Award, May 8, 2008 **(Annex CLA-1)** §§ 412-418.

418 *Victor Pey Casado and Fundación Presidente Allende v. Republic of Chile* (ICSID Case No. ARB/98/2), Award, May 8, 2008 **(Annex CLA-1)** § 415.

419 In this regard, the International Law Commission's commentary on the draft VCLT indicated, in relation to the different elements of interpretation, that "[a]ll the *different elements, to the extent that they are present in a given case, will be mixed in the crucible, and their reciprocal action will then give the relevant legal interpretation"* (translation by the Court) (International Law Commission, Draft Articles on the Law of Treaties with their commentaries, ILC Yearbook, Vol. II (1966) **(Annex RLA-67)** p. 219-220, § 8.





279. Thus, although the semantic scope of the term *nationals* included in the treaty between Chile and Spain did not exclude or limit the protection of dual nationals, determining whether they were covered by that term was not exhausted in a literal analysis, but required consideration of the other elements mentioned in Article 31 of the VCLT.

280. This must be understood because the situation of dual nationals in international law is not identical to that of nationals, both in terms of diplomatic protection and investment treaties *(supra* §§ 263-264).

281. Therefore, considering elements that transcend the text of a treaty in its interpretation does not imply adding a foreign requirement to the agreement of the contracting parties, as the Pey *Casado* court held.On the contrary, they can be elements conducive to determining the scope of a treaty. The court in the *Pey Casado case,* in order to determine the relevant moment for the fulfillment of the nationality requirement, complemented the grammatical tenor of the treaty by resorting to non-textual elements of interpretation, which it later discarded when setting out its *ratio decidendi*[420].

282. Similar reasons are the basis for the decision in the case of *Bahgat v. Egypt*[421]. Based on the decision in the *Pey Casado case,* the tribunal considered that the only nationality requirement for international protection was the literal analysis of the relevant investment treaty, i.e., that the claimant had the nationality of the non-recipient State of the investment[422]. Furthermore, the court added that international law did not contain any clear principle excluding the protection of dual nationals, but that, even if such a principle existed, any developments in the matter must yield to the *lex specialis* of treaty[423].

283. The Court also does not agree with that reasoning. Any international treaty must be interpreted using the set of elements set forth in Article 31 of the VCLT and not only the literal element. Therefore, the only requirement *ratione personae* required by the treaties invoked in

---

420 This was noted by the tribunal in the case of Manuel García Armas *(Manuel García Armas et al. v. Bolivarian Republic of Venezuela* (PCA Case No. 2016-08), Award on Jurisdiction, December 13, 2019 **(Annex CLA-102)** § 731), in relation to the Pey Casado award *(Victor Pey Casado and Fundación Presidente Allende v. Republic of Chile* (ICSID Case No. ARB/98/2), Award, May 8, 2008 **(Annex CLA-1)** § 414 in contrast to § 415).

421 *Mohamed Abdel Raouf Bahgat v. Arab Republic of Egypt* (PCA Case No. 2012-07), Decision on Jurisdiction, November 30, 2017 **(Annex CLA-168).**

422 *Mohamed Abdel Raouf Bahgat v. Arab Republic of Egypt* (PCA Case No. 2012-07), Decision on Jurisdiction, November 30, 2017 **(Annex CLA-168)** §§ 220-227.

423 *Mohamed Abdel Raouf Bahgat v. Arab Republic of Egypt* (PCA Case No. 2012-07), Decision on Jurisdiction, November 30, 2017 **(Annex CLA-168)** §§ 230-231.





the *Bahgat case* was the nationality of the non-host State of the investment, was precisely the substantive issue that the tribunal had to decide, and not the starting point for reaching such a decision.

284. The third relevant decision in this line of argument is that of the tribunal in *Pugachev v. Russian Federation* [424], which was based on reasons similar to those of the two awards referred[to 425]. However, the court added an argument that was especially discussed by the Parties before this Court.

285. In the view of the Pugachev court, its interpretation of the applicable treaty, based on the primacy of the grammatical element, was reinforced by the fact that the contracting parties did not include an express rule excluding dual nationals from their scope of protection, despite having done so in other agreements[426]. Although this argument seems reasonable, it can only be sustained if it is assumed that the default rule in force at the time of the treaty was the unrestricted inclusion of dual nationals.

286. There is every indication that this is not effective, because international law does not provide for a general and supplementary rule that would allow dual nationals to sue, in an unrestricted manner, their own State *(infra* Section 5).

287. The three cases analysed refer to bilateral treaties other than the one to be interpreted in this award. However, there are two cases in which the decision of the respective tribunals referred precisely to the BIT: *Serafín García Armas v. Venezuela* and *Manuel García Armas v. Venezuela.* As mentioned above, in both disputes the courts reached contradictory conclusions regarding the understanding of the meaning of the provisions of the Treaty. The Court will then analyse both decisions.

288. The first of these was the relapse in the case *of Serafín García Armas*[427]. As a preliminary matter, the Tribunal wishes to refer to the relevance of the annulment of that award by the French courts, an issue that was discussed at length by the Parties in this case.

289. The Court considers that, in principle, the annulment of that award is irrelevant in this case. The decision of the French courts deprives the judgment of its binding effect, but the

---

424 *Sergei Viktorovich Pugachev v. Russian Federation* (UNCITRAL), Award on Jurisdiction, 18 June 2020 **(Annex CLA-173).**

425 *Sergei Viktorovich Pugachev v. Russian Federation* (UNCITRAL), Award on Jurisdiction, 18 June 2020 **(Annex CLA-173)** §§ 368-382.

426 *Sergei Viktorovich Pugachev v. Russian Federation* (UNCITRAL), Award on Jurisdiction, 18 June 2020 **(Annex CLA-173)** §§ 385-386.

427 *Serafín García Armas and Karina García Gruber v. Republic of Venezuela* (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2).**





The relevance of other awards does not depend on their formally binding nature, but on their potential persuasive value. Thus, the fact that the French courts have annulled that award does not affect the arguments contained therein[428]. For this reason, the Court considers it necessary to analyze it as pertinent to this case.

290. The tribunal in the *Serafín García Armas case* concluded that the definition of *investor* in Article I.1(a) of the BIT protects dual nationals without any limitation. In reaching this solution, the court considered, first, that bilateral investment treaties constitute a *lex specialis,* the interpretation of which is not subject to the application of international law[429]. Next, the court considered that the CVDT adopted a grammatical criterion that, barring ambiguities or unreasonable results, privileges the text over other elements of interpretation[430].

291. Thus, to the extent that the terms included in the concept of *investor* in the BIT were intelligible and consistent, the court concluded that the Treaty had to be interpreted within its semantic limits, which did not exclude or limit dual nationals[431].

292. The Court agrees with the award in the *Serafín García Armas* case that the definition of *investor* in the BIT does not contain a rule that allows, on its own, to exclude or limit protection to dual nationals *(supra* §§ 257-272). However, the Court disagrees with the premises that led the court to conclude that, in the absence of such an exclusion or limitation, dual nationals should be understood to be included in all events in the protection of the Treaty.

293. First of all, this conclusion is strongly supported by the fact that, under a purely literal analysis, the semantic scope of the term *national* used in the BIT includes dual nationals, who, by virtue of possessing the nationality of the host State, do not cease to be nationals of the non-receiving State of the investment.

294. The Court considers that a literal analysis of the BIT would not be sufficiently exhaustive to resolve the point in dispute. The VCLT requires that an international treaty be read in accordance with the ordinary meaning of its terms, taking into account in good faith the text, context, object and purpose *(supra* §§ 250-251). The

---

428 See French Court of Cassation, First Civil Chamber, Cassation Appeal No. A 17-25.851, *Bolivarian Republic of Venezuela v. Serafín García Armas and Karina García Gruber,* February 13, 2019 **(Annexo RLA-6)** 1350. 17.

429 *Serafín García Armas and Karina García Gruber v. Republic of Venezuela* (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2)** §§ 154-158.

430 *Serafín García Armas and Karina García Gruber v. Republic of Venezuela* (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2)** §§ 159-165.

431 *Serafín García Armas and Karina García Gruber v. Republic of Venezuela* (PCA Case No. 2013-3), Decision on Jurisdiction, December 15, 2014 **(Annex CLA-2)** §§ 199-200.

*The ordinary meaning* referred to by the VCLT is not necessarily the literal meaning, but the meaning that results from the understanding of the terms in the light of the elements that Article 31 requires consideration, including the rules and principles of international law.

295. If, after considering these elements, it turns out that the wording of the terms adequately reflects the agreement of the Contracting Parties, then it is necessary to stick to the semantic element. However, this conclusion must be reached after, and not before, considering all the elements of interpretation of Article 31 of the VCLT *(supra* § 250).

296. With regard to the treatment of dual nationals in investment agreements, an inclusion in all events would be extraneous, both at the time of conclusion of the BIT and now *(supra* § 269). Therefore, it cannot be concluded, based on the text of Article I.1.a) alone, that it defines *per se* the agreement of the Contracting Parties, as assumed by the court in the *Serafín García Armas case.*

297. This judgment is supported by various awards that have consistently considered international law to be relevant to the interpretation of investment treaties[432].

298. This is the case of the award in *Manuel García Armas v. Venezuela*[433], which, recognizing that the definition of *investor in* the BIT does not exclude double nationals, considered various elements of international law and practices of the Contracting Parties to conclude that the inclusion of double nationals in all events was not a reasonable conclusion with respect to the BIT.

*(iii) Conclusion*

299. The Arbitral Tribunal considers that the literal definition of *investor* in Article I.1(a) of the BIT does not include or exclude all national doubles events. In the Court's view, the silence of the Treaty cannot be interpreted in one way or the other, based only on the text of Article I.1(a) of the BIT.

---

432 Incidentally, this has also been recognized in the field of investment arbitration, where international law has been invoked as an element of interpretation. Thus, e.g., *Islamic Republic of Iran v. United States of America,* IUSCT Case No. A/18, Decision, 6 April 1984 **(Annex RLA-15)** p. 25; *Enrique Heemsen and Jorge Heemsen v. Bolivarian Republic of Venezuela* (PCA Case No. 2017-18), Award of Jurisdiction, October 29, 2019 **(Attachment CLA-101)** §§ 420-438; *Victor Pey Casado and Fundación Presidente Allende v. Republic of Chile* (ICSID Case No. ARB/98/2), Award, May 8, 2008 **(Annex CLA-1)** § 414, regarding the relevant moment for compliance with the nationality requirement.

433 *Manuel García Armas et al. v. Bolivarian Republic of Venezuela* (PCA Case No. 2016-08), Award on Jurisdiction, December 13, 2019 **(Annex CLA-102).**





### 3. Context of the BIT

300. In the previous section, it was concluded that the text of the BIT does not per *se answer* the question regarding the treatment of dual nationals. In this section, the context of the Treaty will be discussed to complete the

y to test that conclusion.

301. With respect to the context of the BIT, the Parties discuss three distinct issues: (i) the substantive protections of the Treaty, in particular the National Treatment Treaty; (ii) the dispute resolution clause;

y (iii) the Treaty of Friendship.

***(A) Substantive protections of the BIT and, in particular, the National Treatment Standard***

*(i) Summary of the discussion*

302. The Respondent submits that Articles II.1, III.1, IV, V.1 and XI.1 of the Treaty also conflict the expressions *of one Contracting Party* and *the other Contracting Party,* thus confirming the total exclusion of dual nationals. In addition, it points out that the protection of dual nationals would be incompatible with the National Treatment Standard, since it would be absurd for Venezuela to commit to treating as nationals persons who already have Venezuelan nationality.

303. The Applicant, on the other hand, submits that the definition of *investor* does not exclude dual nationals, so that the reiteration of the expressions *of one Contracting Party* and *the other Contracting Party* in other provisions of the Treaty would not alter that conclusion. In this regard, it points out that the Standard of National Treatment has effect with respect to dual nationals, since it seeks to prevent them from being discriminated against because they have a second nationality. It adds, in the alternative, that even if this standard were not applicable to dual nationals, this would not mean that it would be excluded from the scope of protection of the Treaty.

*(ii) Analysis*

304. As discussed *(supra* § 258), the Court considers that the mere contrast of the expressions *of one Contracting Party* and *the other Contracting Party* in the definition of *investor* does not necessarily have the capacity to exclude dual nationals. Its use in other provisions of the same Treaty does not alter this conclusion. The different articles of the BIT must be interpreted harmoniously with each other, so that it can be assumed that this term does not exclude dual nationals in the various situations in which it is used.

305. With respect to the National Treatment Standard, the Court agrees with the Respondent that it seems counterintuitive to apply it to dual nationals who already have the nationality of the State





receiving the investment. However, the Court considers that the explanation given by the Applicant is reasonable. Indeed, it is possible for a State to differentiate between citizens who have only their nationality and those who, in addition, have another, discriminating against the latter. In that case, the National Treatment Standard contained in the BIT provides relevant protection for a dual national.

306. While this is a relatively unlikely hypothesis, the Court considers that the National Treatment Standard is compatible with the protection of dual nationals. However, from this circumstance alone it is not possible to determine conclusively whether such protection operates to all events or whether it is subject to any limit or condition.

307. In view of the foregoing, the Court considers it unnecessary to rule on the Applicant's alternative argument in this matter.

*(iii) Conclusion*

308. The Arbitral Tribunal considers that the substantive protections of the BIT, in particular the National Treatment protection, do not change the conclusion reached in paragraph 299 *above.*

***(B) BIT Dispute Settlement Mechanism***

*(i) Summary of the discussion*

309. The Respondent alleges that the choice of the ICSID system as the primary dispute settlement forum under the BIT would show the total exclusion of dual nationals from its scope of protection. In fact, the ICSID Convention does not allow the State of nationality of the investor to be sued, so that dual nationals could not make use of the mechanism provided for in Article XI.2 of the Treaty. Since it would not be possible for the Treaty to encompass two distinct concepts of *investor,* one for substantive protections and the other for dispute resolution, dual nationals must be understood as excluded. It further adds that access to a tribunal constituted under the UNCITRAL Rules if the ICSID system *"is not available"* does not refer to dual nationality cases.

310. The Applicant points out that the jurisdictional requirements of the BIT are distinct and independent from those of the ICSID Convention, and that the latter cannot be understood by reference to the former. It adds that the Treaty does not establish ICSID as the only alternative for dispute settlement, but *rather "offers a menu of forums."* Thus, the Treaty would allow recourse to UNCITRAL arbitration when *ICSID was not available*. In the Claimant's view, one of the reasons why ICSID might not be available is precisely the dual nationality of the investor.





*(ii) Analysis*

311. Article XI, in paragraphs 2 and 3, provides:

> *2. If the dispute cannot be resolved in this way* [amicable agreement] *within a period of six months,* [...] *It will be submitted to the choice of the investor:*
>
> *(a) To the competent courts of the Contracting Party in whose territory the investment was made, or*
>
> *(b) The International Centre for Settlement of Investment Disputes (ICSID) established by the Convention for the Settlement of Investment Disputes between States and Nationals of Other States, open to be signed at Washington on 18 March 1965, when each State party to the present Agreement has acceded to it. In the event that one of the Contracting Parties has not acceded to the above-mentioned Convention, the Additional Facility for the Administration of Conciliation, Arbitration and Fact-Finding Procedures shall be invoked by the Secretariat of the ICSID.*
>
> *3. If, for any reason, the arbitral bodies referred to in point 2 (b) of this article are not available, or if both parties so agree, the dispute shall be submitted to an ad hoc arbitration tribunal established in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law.*

312. Article 25(2)(a) of the ICSID Convention provides:

> *(2) "Nationals of another Contracting State" means:*
>
> *(a) any natural person who has, on the date on which the parties consented to submit the dispute to conciliation or arbitration and on the date on which the application under Article 28 (3) or Article 36 (3) was registered, the nationality of a Contracting State other than the State party to the dispute; but in no case shall it cover persons who, on either date, also had the nationality of the State party to the dispute;*

313. It is clear from the above-mentioned articles that Mr. Fraiz, like any other dual national, could not have recourse to ICSID arbitration to sue one of the States of which he is a national, because that Convention excludes investors with dual nationality, without exception. 314. It is clear that, if a treaty

designates ICSID as the *sole forum* for the settlement of disputes, it must be understood that dual nationals are not protected by that treaty, since there is an express exclusion in the ICSID Convention in this regard[434]. In such a case, the exclusion results from the submission of both contracting parties exclusively to the ICSID Convention.

315. However, the above reasoning is applicable only if ICSID is the *only* forum available to the potential claimant. In contrast, if a treaty offers different dispute settlement mechanisms, it makes little sense to incorporate the jurisdictional requirements of one of them into the treaty's general definitions. In such a case, it is most reasonable to understand that the conditions set out in the treaty are independent of those required by each particular forum. Of course, in order to sue before a forum, the jurisdictional requirements of that mechanism must be complied with, as well as those established in the treaty. However, it does not seem reasonable that if the treaty establishes a multiplicity of forums, the particular requirements of each should be communicated or extended to the others.

316. Accordingly, the Arbitral Tribunal must determine whether, in the case of the BIT, the conditions of access to ICSID are deemed to be incorporated into the Treaty, as the Respondent claims, or whether, on the contrary, the multiplicity of forums means that the particular requirements of ICSID are not transferred to the Treaty, as the Claimant alleges.

317. First, it is clear from a reading of Article XI alone that ICSID is not the exclusive dispute settlement mechanism of the BIT. This also refers to the national courts of the host State of the investment and, in the event that ICSID is not available, to an ad hoc arbitration tribunal established under the UNCITRAL Rules. Thus, the relevant question is whether ICSID constitutes the *"first and foremost dispute resolution forum"* and whether that circumstance is sufficient to incorporate its jurisdictional limitations into the concept of *investor* in the BIT, as Venezuela argues.

318. The Defendant's argument in this matter is based on two assumptions. First, there would be a hierarchy between the various forums included in the BIT. The investor would have the option to choose between

[434] As indicated in *Dawood Rawat v. Republic of Mauritius* (PCA Case No. 2016-20), Award on Jurisdiction, 6 April 2018 **(Annex CLA-4/RLA-54)** § 179, if a treaty establishes ICSID as the only alternative, even if it says nothing about dual nationals, the contracting parties must be understood to *be "implicitly, but necessarily, excluded* [...] *dual nationals from the scope of application of the BIT"*. In the same sense, the courts of the Enrique *Heemsen and Jorge Heemsen cases ruled*

*v. Bolivarian Republic of Venezuela* (PCA Case No. 2017-18), Award of Jurisdiction, October 29, 2019 **(Annex CLA-101)** §§ 411-419 and *Manuel Garcia Armas et al. v. Bolivarian Republic of Venezuela* (PCA Case No. 2016-08), Award on Jurisdiction, December 13, 2019 **(Annex CLA-102)** §§ 705-723.





local courts and international arbitration. If it opts for the latter, the main forum would be ICSID, with UNCITRAL arbitration remaining as a secondary mechanism in case the former is not available. Second, the Respondent submits that the reasons why ICSID might not be available only refer to reasons specifically related to ICSID, such as its dissolution, the denunciation of the ICSID Convention or similar circumstances, but in no case to considerations relating to the characteristics of the investor.

319. The Arbitral Tribunal disagrees with both premises, for the following reasons:

a) Indeed, Article XI of the BIT states that if the ICSID system is available, either in an arbitration under the ICSID Convention or through the Additional Facility, the Parties must resort to it. At the same time, however, it indicates that the investor may submit the dispute to ad hoc arbitration if the ICSID system *"for any reason"* is not available. In the Court's view, this exception, by reason of its breadth, cannot constitute a strict relationship of subordination between the courts. As will be seen, the hypotheses under which ad hoc arbitration can be resorted to are so many that this mechanism cannot be classified as secondary.

b) The BIT does not limit the grounds for unavailability of the ICSID system to circumstances intrinsic to it. The ordinary meaning of the term *"any reason"* is broad enough that any reasons why ICSID might not be available are valid for recourse to UNCITRAL arbitration. In the Court's view, the Respondent does not sufficiently take charge of the phrase *"for any reason"*. Thus, it is more accurate to interpret this expression as a criterion for delimiting the cases in which one forum or another must be resorted to, than as a criterion for the subordination of the UNCITRAL forum to the ICSID forum.

c) For the same reasons, the Court disagrees with the conclusion reached in the *Manuel García Armas case,* since it does not explain why the expression *"any ground"* used in the Treaty should be limited to *"certain grounds"* of an intrinsic nature to the ICSID system[435].

[435] *Manuel Garcia Armas et al. v. Bolivarian Republic of Venezuela* (PCA Case No. 2016-08), Award on Jurisdiction, December 13, 2019 **(Annex CLA-102)** §§ 705-720.





320. Thus, Mr. Fraiz's Venezuelan nationality may be a reason that makes the ICSID system unavailable in his respect. Indeed, as the tribunal in *Nova Scotia v. Venezuela noted,* if the Claimant had attempted to initiate arbitration under Additional Facility[436], *"there is no reasonable prospect that the Secretary-General would approve the arbitration agreement and then register the request for arbitration, and do so without delay."*[437], precisely because of his dual nationality. Alternatively, then, this unavailability allows Mr. Fraiz to initiate ad hoc arbitration under the UNCITRAL Rules, in accordance with the provisions of Article XI.3 of the BIT.

*(iii) Conclusion*

321. The Arbitral Tribunal considers that the dispute settlement mechanism of Article XI of the BIT does not modify the conclusion set out in paragraph 299 *above,* that the Treaty does not include or exclude all events involving dual nationals.

***(C) Treaty of Friendship***

*(i) Summary of the discussion*

322. The Respondent submits that the Treaty of Friendship is part of the relevant context of the BIT, as it would have served as the basis for its signing. It points out that the Treaty of Friendship would enshrine the legal equality of States as an essential principle in relations between Spain and Venezuela. In the Respondent's view, allowing a person to sue in an international forum against one of the States of which he or she is a national would mean giving greater value to one nationality over the other, in violation of that principle.

323. The Applicant denies that the Treaty of Amity is part of the relevant context of the BIT. In any event, nothing in that agreement would refer to the concept of *investor* and the protection of dual nationals.

*(ii) Analysis*

324. The Arbitral Tribunal considers that the Treaty of Friendship is not part of the context of the BIT. In fact, this agreement cannot be subsumed in any of the hypotheses of Article 31.2 of the

[436] After Venezuela's complaint, arbitration under the ICSID Convention ceased to be a possible alternative.

[437] *Nova Scotia Power Incorporated v. Bolivarian Republic of Venezuela* (UNCITRAL), Award on Jurisdiction, April 22, 2010, § 102.





CVDT. It is not an *"agreement relating to the treaty which has been concluded between all the parties in connection with the conclusion of the treaty",* nor is it an *"instrument formulated by one or more parties in connection with the conclusion of the treaty and accepted by the others as an instrument relating to the treaty"*. The Treaty of Friendship predates the BIT by several years, so it cannot be argued that it was concluded *"on the occasion of the conclusion"* of an agreement that did not exist at the time. Moreover, neither instrument refers to the other, even implicitly.

325. Even if the Treaty of Friendship could be considered to be part of the context of the BIT, nothing in its content is relevant to the interpretation of the BIT. The Treaty of Friendship is, by its nature, particularly broad, and does not provide any useful element for the understanding of the term *investor* under the BIT.

326. Finally, as will be seen *(Section 5 below* ), the Court differs from Venezuela's interpretation of the principle of equality of States.

*(iii) Conclusion*

327. The Arbitral Tribunal considers that the Treaty of Amity is irrelevant to the interpretation of the BIT in general and the concept of *investor* in particular.

**4. Object and purpose of the BIT**

*(i) Summary of the discussion*

328. The Respondent submits that the objective of investment treaties is to promote the transnational flow of capital, not to protect investments by nationals in the territory of their own State. Therefore, the intention of each Contracting Party in signing the BIT would have been to encourage foreign investment from the other Party. In this sense, the protection of dual nationals would be incompatible with the object and purpose of the BIT, as reflected in its preamble.

329. The Applicant points out that the protection of dual nationals extends the scope of the BIT, thus safeguarding the increase in investment. That would be the object and purpose of the BIT: to promote investments in Venezuela and Spain. In its view, the BIT does not contain any requirement regarding the origin of the funds invested and no additional condition can be added to the investment by reference to the object and purpose of the Treaty. It adds that the promotion of investment would not be the only purpose of the Treaty, but that it would also seek to strengthen the historical ties between the signatory countries. Given the large Spanish immigration in Venezuela, it is natural that the BIT also protects dual nationals.

*(ii) Analysis*

330. On the basis of Article 31.1 of the VCLT, the ordinary meaning of the terms of the Treaty must be determined in the light of its object and purpose.

331. Although the object and purpose of a treaty is a relevant element of interpretation, its determination from the preamble must be viewed with caution, because this is, in general, a statement too broad to infer a precise and operative rule of interpretation of a specific concept, such as the protection of dual nationals. In this case, if the Contracting Parties had wished to agree on a particular rule on the matter, the reasonable thing to do would have been an express agreement, instead of entrusting it to an exercise of deduction on the basis of general considerations contained in the preamble. The conclusion of this Court that the BIT does not contain an express rule on dual nationals cannot be modified on the basis of general considerations about the object and purpose of the Treaty.

332. In the view of the Arbitral Tribunal, rather than giving a specific interpretation to the respective treaty, the function of the object and purpose as an element of interpretation, in the context of a general preamble such as that preceding the BIT, is to verify whether any readings of the treaty text are compatible with the presumed intention of the contracting parties.

333. Taking into account the foregoing considerations, the Arbitral Tribunal shall analyse the interpretations advocated by the Parties in order to determine whether they are compatible with the object and purpose of the BIT.

334. The Respondent points out that the object and purpose of the BIT is to encourage and protect Spanish investment in Venezuela and Venezuelan investment in Spain, which would be incompatible with the protection of investors with dual nationality *(supra* § 328).

335. In this regard, the Court takes into account the following:

a) The text of the BIT does not contain an exclusion of all events of dual nationals and it is not possible to introduce such a rule by reference to the object and purpose of the Treaty alone, for the reasons indicated in the preceding paragraphs.

b) Indeed, the object and purpose of the BIT is to promote Spanish investment in Venezuela, but nothing in its text or in its preamble allows it to be maintained that it is limited to investments by *exclusively* Spaniards, because the Treaty is silent on the matter.





c) Nor would a total exclusion of dual nationals from the scope of protection of the Treaty be incompatible with its object and purpose.

336. For its part, the Applicant notes that the full inclusion of dual nationals would further the BIT's objective of protecting and promoting investment. For these purposes, it is based on the decision of the Paris Court of Appeals which, in reviewing the *Serafín García Armas award,* stated: "[t]he *object and purpose of the treaty, which, according to the preamble, are 'to create favourable conditions for investments made by investors of each of the contracting parties in the territory of the other', they would only be partially satisfied if the investments of the binationals were discarded"*[438].

337. In the view of the Arbitral Tribunal, the protection of dual nationals is not inconsistent with the object and purpose of the BIT. Indeed, the status of national of one Contracting Party investing in the other, which is precisely what the BIT seeks to protect, is not lost by the fact that he also possesses the nationality of the State receiving the investment. Therefore, in principle, the investment of a Venezuelan-Spanish can also be classified as a Spanish investment.

338. However, the Arbitral Tribunal differs from the Claimant's view. The precise scope of protection for dual nationals cannot be inferred from the object and purpose of the BIT. Whether such protection is for all events or is subject to limitations is a question that the text of the Treaty does not answer and that cannot be replaced by general considerations in the preamble. Given the generality of the object and purpose as an element of interpretation, this cannot be used to extract from it a precise rule on the matter. On the other hand, a partial satisfaction of the object and purpose is not in itself problematic, since the function of this element is to verify whether the possible readings of the text are compatible with what the Contracting Parties agreed. In this case, unlimited protection of dual nationals seems compatible with the object and purpose of the BIT, but, as already stated, it is not the only possible interpretation.

*(iii) Conclusion*

339. The Arbitral Tribunal considers that the interpretations of the Parties are not in themselves incompatible with the object and purpose of the BIT. However, it is not possible to deduce from this element a precise rule that would allow the protection of dual nationals by the BIT to be defined.

438 Reply, § 108, referring to *Republic of Venezuela v. Serafín García Armas and Karina García Gruber,* Judgment of the Paris Court of Appeal, April 25, 2017 **(Annex CLA-3)** p. 6.





**5. Principles of international law**

340. Following the rule of Article 31(3)(c) of the VCLT, the relevant rules of international law must be taken into account in the relationship between the Contracting Parties.

***(A) General considerations***

341. Article 31(3)(c) of the VCLT is prescriptive and obliges the Court to interpret the Treaty in the light of any rules of international law that are relevant to the relations between the Contracting Parties. Unlike the recourse to *travaux préparatoires* provided for in article 32, which is optional, the application of the relevant rules of international law is a mandatory step in the interpretative process. This mandatory nature of Article 31.3 indicates that the reference to the relevant rules of international law has the role not only of confirming the will of the contracting parties, but also of ensuring that such interpretation is in conformity with those rules[439].

342. The Respondent submits that, for the purposes of interpreting the BIT in accordance with Article 31(3)(c) of the VCLT, the general rules of international law, binding between Venezuela and Spain, are applicable. There is no doubt that the relevant rules of international law referred to in Article 31.3 include customary international law. The question is whether there are rules of customary international law that are relevant to this case and, if so, what they are.

343. The Tribunal agrees with the Respondent that rules of international law which have been taken up and developed in the field of diplomatic protection are relevant to the interpretation of the BIT on the issue in dispute. Investment protection based on bilateral treaties is undoubtedly different from that granted by diplomatic protection. In particular, in the context of a bilateral treaty, the investor had the right to take direct action against the host State, whereas in the field of diplomatic protection, it was the investor's State of nationality that acted. However, it is relevant that both legal systems pursue the same objective and that the jurisdiction of the court is determined in both cases by the same connecting link, that is, nationality. It is also important that, to a large extent, treaty-based investment protection has replaced (though not replaced) diplomatic protection. In this sense, the jurist James Crawford argued that

439 Campbell McLachlan, *The Principle of Systemic Integration and Article 31(3)(c) of the Vienna Convention,* International and Comparative Law Quarterly, Vol. 54, No 2, 2005, pp. 279-319 **(Anexo RLA-71).**





*"bilateral investment treaties in some sense institutionalize and reinforce (rather than replace) the system of diplomatic protection"*[440].

344. There is no doubt that in international law there are rules that allow, in certain circumstances, a national to act against his own State. This is the case, for example, in the context of treaties relating to the protection of human rights. The rules on the protection of human rights and those on the protection of investments could be considered to have at least partly similar objectives. However, the Court considers that the relevant rules for interpreting the BIT in the matter of dual nationals are not those of human rights, but the general rules of international law contained in the field of diplomatic protection. Indeed, as stated, the latter system essentially shares the same purpose as the rules of protection developed in investment treaties, and is therefore closer to the BIT for the purposes of determining the relevant rules of international law for interpreting it. In addition, unlike the rules for the protection of human rights, both statutes usually use nationality as a connecting criterion to determine the competence *ratione personae* of the respective court.

345. As will be explained below, in the presence of a treaty containing specific rules for resolving a given issue, recourse to the general rules of international law as an interpretative tool would not be relevant. In the present case, however, the BIT does not contain specific rules to resolve the question of whether a dual national who is a national of the respondent State can act against that State. It is therefore necessary to refer to the relevant rules of international law in order to resolve this issue. In view of the fact that international law on the treatment of dual nationals has been specially taken up and developed in the context of diplomatic protection, and that the latter essentially shares the same purpose as investment treaties, it is appropriate to consider the rules applicable in this area as those relevant to interpreting the BIT in this matter.

346. This conclusion is consistent with the Draft Articles on Diplomatic Protection, which provides that the Articles do not apply to the extent that they are inconsistent with the clauses of a treaty (article 17). Thus, if the treaty regulates a particular issue, it must prevail. On the other hand, in the absence of a solution given by the treaty, the rules of international law, which have been codified in the Draft, apply.

440 James Crawford, *The ILC's Articles on Responsibility of States in Internationally Wrongful Acts: A Retrospect,* American Journal of International Law, Vol. 96, No 4, 2002, pp. 887-888.

347. On the basis of the foregoing, the tribunal will analyze the various arguments presented by the parties on the applicable international law.

***(B) The BIT as* lex specialis *between Contracting Parties***

*(i) Summary of the discussion*

348. The Respondent points out that the Treaty does not constitute *lex specialis* between the Contracting Parties and that it does not exclude the application of international law. On the contrary, Article XI(4)(b) of the BIT expressly states that, in an arbitration constituted under the Treaty, the rules and principles of international law must apply. In addition, Article 31(3)(c) of the VCLT provides that in interpreting a treaty, *"any relevant rule of international law applicable in the relations between the parties" must be taken into account.*

349. The Applicant submits, on the contrary, that the Treaty is *lex specialis* and that the express agreements of the Contracting Parties cannot be modified by reference to general rules of international law, because that would be tantamount to reconstructing the Treaty rather than interpreting it. In the same vein, it argues that Article XI.4(b) of the BIT would apply only to the merits of the dispute

y not to jurisdictional issues.

*(ii) Analysis*

350. Generally speaking, the Court understands the BIT to be *lex specialis* between the Contracting Parties. It is an agreement in force between Spain and Venezuela, and its rules apply to any dispute arising under its wing. The Treaty is the starting point of this Court for its analysis and is applicable law to this case. The relevant question on the issue under discussion is another: whether the Treaty constitutes a self-contained regime, which excludes the general rules of international law or whether, on the contrary, it requires them to be interpreted.

351. A number of arbitral tribunals have been confronted with this problem, in particular with regard to the protection of dual nationals. Thus, the court in the *Pey Casado case* pointed out:

> *The APPI does not expressly address the question of whether or not dual Spanish-Chilean nationals are covered by its scope of application. In the view of the Court of Arbitration, it would not be justified (on the basis of purported rules of customary international law) to add a requirement of implementation that does not reflect either its letter or its spirit*[441].





352. For its part, the Bahgat court held as follows:

> *Some academic writing indicates that where an underlying BIT does not clarify whether dual nationals might bring claims, principles of international law on effective nationality might be considered by a tribunal in order to determine its jurisdiction based on the dominant nationality of the claimant-investor. However, any developments in international law must yield to the lex specialis of the investment treaty* [...] [442]
>
> *On the basis of the considerations above (paragraphs 228 to 230), the Tribunal comes to the conclusion that general international law principles concerning the consequences of dual nationality in respect of jurisdiction ratione personae do not trump the explicit language of the BITs, according to the Tribunal's finding as set out above at paragraph 227*[443].

353. Also relevant is the statement made by the court in the *Pugachev case,* which held:

> *Moreover, the Tribunal notes that, contrary to the ICSID Convention, which expressly excludes dual nationals in its Article 25, the UNCITRAL Rules do not contain any such restriction. The issue of dual nationality should be resolved considering the Treaty, as it is the lex specialis between the Parties* [...] [444]
>
> *For the reasons set out above, the Tribunal concludes that dual nationals are not excluded from the Treaty's scope of protection. Even if Claimant held the nationality of France and the nationality of Russia, it does not disqualify him as an investor under the Treaty*[445].

441 *Victor Pey Casado and Fundación Presidente Allende v. Republic of Chile* (ICSID Case No. ARB/98/2), Award, May 8, 2008 **(Annex CLA-1)** § 415.

442 *Mohamed Abdel Raouf Bahgat v. Arab Republic of Egypt* Jurisdiction, 30 November 2017 **(Annex CLA-168)** (PCA Case No. 2012-07), Decision on § 231.

443 *Mohamed Abdel Raouf Bahgat v. Arab Republic of Egypt* Jurisdiction, 30 November 2017 **(Annex CLA-168)** (PCA Case No. 2012-07), Decision on § 232.

444 *Sergei Viktorovich Pugachev v. Russian Federation* (UNCITRAL), Award on Jurisdiction, June 18, 2020 **(Annex CLA-173)** § 384.





354. The Tribunal does not disagree with the findings of the awards in the *Pey Casado, Bahgat* and *Pugachev* cases that, if a tribunal concludes that the contracting parties to a BIT agree on a specific rule on the treatment of dual nationals, it must apply that rule without reference to the general rules of international law, because that rule takes precedence over general rules.

355. However, the fact that a treaty is *lex specialis* in the matters it regulates does not mean that it should not be interpreted in respect of those parts that are obscure, ambiguous or whose scope is difficult to determine. This interpretative task does not involve modifying the treaty or adding to it clauses that the contracting parties did not wish to include, but rather determining the meaning of a clause that needs to be interpreted in harmony with international law.

356. Consistently, if this Court were to conclude that the BIT contains a rule on the treatment of dual nationals, it would apply it without any inconvenience, whatever it might be, without the need to have recourse to the general rules of international law. In fact, all the principles invoked by the Defendant, which will be analysed in the following sections, do not have the character of *jus cogens,* and are therefore perfectly available to the Contracting Parties.

357. As noted *above (supra* §§ 255-272), this Court considers that the BIT does not contain a rule on dual nationals, which makes it necessary to interpret the term *national* used to define a natural person investor in the light of the relevant rules of international law. In other words, in view of the Treaty's silence on dual nationals, the Tribunal must have recourse to international law, as mandated by Article 31 of the VCLT.

358. To the extent that the BIT does not contain a special rule on dual nationals, it cannot be said to constitute a self-contained regime. Investment treaties create particular rules that take precedence over the general and supplementary rules of international law, but with respect to matters in which they do not rule, as this Court considers to be the case with respect to dual nationals, the principles of international law are relevant in determining their scope. In the opinion of the Tribunal, this is the meaning to be given to the *Diallo* case of the International Court of Justice, which was particularly disputed by the Parties[446].

445 *Sergei Viktorovich Pugachev v. Russian Federation* (UNCITRAL), Award on Jurisdiction, June 18, 2020 **(Annex CLA-173)** § 388.





359. Finally, the Court does not share the distinction sought by the Applicant that international law would apply only to matters of substance and not to questions of jurisdiction. Recourse to the relevant rules of international law under Article 31(3) of the VCLT is a matter distinct from the scope of Article XI(4)(b) of the BIT. The reference in Article 31.3 of the VCLT to the relevant rules of international law applies to the interpretation of all clauses of the BIT, whether of a substantive or procedural nature.

360. In addition, in matters of foreign investment protection, international law regulates both jurisdictional and substantive issues. In the absence of an agreement between the Contracting Parties, there are no reasons to justify excluding international law for one or the other subject.

361. The Complainant seeks to introduce an exception to Article XI.4(b) which is not supported by the BIT. In effect, the aforementioned article states that "arbitration *shall be based on:* [...] *b) The rules and principles of International Law".* The Court does not see any basis for limiting this rule only to matters of substance, excluding those of jurisdiction.

362. The Applicant's position is also based on the cases *of Abaclat v. Argentina* and *Ambiente Ufficcio v. Argentina.* In the opinion of the Court, these cases are not relevant to this dispute, nor sufficient to support the alleged distinction. In both, the respective tribunals noted that Article 8(7) of the treaty between Argentina and Italy, equivalent to Article XI.4 of the BIT, was not relevant for analysing the validity of consent to arbitration, nor that of the powers granted by the claimants. It is clear that these are different situations. In *Abaclat* and *Ambiente Ufficcio*, the relevant question concerned the law applicable to acts in which the consent of the plaintiffs was recorded. In contrast, in the present case, the issue concerns the law applicable to the definition of *investors* contained in the BIT. In addition, in the two cases referred to, it was intended to exclude the application of the domestic law of the State receiving the investment in favor of international law. Thus, the conclusions of the courts of *Abaclat* and *Ambiente Ufficcio* are not applicable to the issue at issue here.

*(iii) Conclusion*

363. The Arbitral Tribunal considers that the BIT constitutes, in general terms, *lex specialis* between the Contracting Parties. However, that does not mean that the BIT is a self-contained, isolated system

446 Reply, § 167; Reply, §§ 163 and 164; Rejoinder, §§ 85 and 107.

of international law, so as to prevent its interpretation in accordance with the VCLT in those matters that it does not regulate, such as the case of the treatment of double nationals.

***(C) Principle of equality of States***

*(i) Summary of the discussion*

364. The Respondent submits that the principle of equality of States would have been recognized by the Contracting Parties in the preamble to the Treaty. To allow a person to sue the State of his nationality, invoking a second nationality, would be contrary to this principle, since it would imply making the nationality of one Contracting Party prevail over the other.

365. The Applicant submits that the protection of dual nationals does not infringe the principle of equality. On the contrary, denying Mr. Fraiz's ability to sue Venezuela would imply annulling his Spanish nationality, making Venezuelan prevail. It adds that there is no problem with a national suing his own State, if the latter consents to it.

*(ii) Analysis*

366. As a preliminary matter, the Court notes a certain ambiguity in the Defendant's argument. In some parts of his briefs, he appears to argue that the protection of dual nationals would be absolutely prohibited by international law, and that the Contracting Parties could not have agreed on a definition of investors that included such persons. For example, the Respondent asserts that "[t]he *principle of equality of States prohibits a dual national from suing either of the two States of which he holds nationality before an international arbitral tribunal"*[447], that "[t]he *admission of an international action by a dual national would not only be contrary to international law as has been held by specialized doctrine"*[448], and that "[i] *n effect, both the principle of equality of States and the principle of non-responsibility prohibit a national from bringing an action in an international forum against his or her own State"*[449].

367. The Court disagrees with these statements for two reasons:

a) International law does not absolutely prohibit a person from suing his or her own State in an international forum. As will be discussed *(infra* §§ 373-378), there is no

[447] Memorial, § 125.

[448] Memorial, §127.

[449] Memorial, §123.





such a rule in the protection of investments, nor in general international law. In this sense, the systems for the protection of human rights, of which Spain and Venezuela are part, are paradigmatic.

b) Even if a rule such as the one alleged by Venezuela existed, there is nothing to indicate that it is not available to the Contracting Parties. As noted *above (supra* § 356), except in matters of *jus cogens,* Contracting Parties may depart from the general rules of international law.

368. In addition, the Court considers that the principle of equality of States, as described by the Respondent, is not relevant to the resolution of this dispute.

369. In itself, the principle of equality does not contain a specific solution to the question of dual nationality. The Court understands that its relevance has been given in a mediate way, as a justification or foundation for the principle of non-liability[450]. Given that, under contemporary international law, the latter principle has been displaced by that of effective and dominant nationality *(infra* §§ 373-378), the rule of legal equality of States is not incompatible with the protection of dual nationals.

*(iii) Conclusion*

370. The Arbitral Tribunal considers that the principle of legal equality is not relevant to the resolution of the present dispute.

***(D) Principle of non-liability***

*(i) Summary of the discussion*

371. The Respondent asserts that the principle of non-responsibility is enshrined in Article 4 of the Convention on Nationality, by virtue of which disputes between a State and its nationals must be settled in the domestic sphere, so that no person can sue his or her own State before an international forum. Thus, a dual national could not sue, in an international court, a State whose nationality he holds.

[450] In this regard, *Florence Strusky Mergé,* Italian-American Conciliation Commission, Decision No. 55, Compilation of Arbitral Awards, Vol. XIV, Award, June 10, 1955 **(Annex RLA-83)** p. 247.





372. The Applicant submits that the principle of non-liability is confined to the scope of diplomatic protection. In any case, he adds, this principle would be superseded in current international law. In his view, there was no rule prohibiting a person from suing his own State, if the State consented to do so.

*(ii) Analysis*

373. In the opinion of the Arbitral Tribunal, the Respondent's argument in this matter involves analysing three issues. First, whether the principle of non-responsibility continues to be in force in international law. Secondly, if so, whether its application is restricted to diplomatic protection. Thirdly, if its scope extends beyond diplomatic protection, whether that principle has any implications for the present case.

374. As regards the validity of the principle, the Arbitral Tribunal takes particular note of the explanations in the award in the case of *Hermanos Heemsen v. Venezuela*[451]. In its beginnings, the rule of non-responsibility was formulated in the context of diplomatic protection, as can be seen from Article 4 of the Convention on Nationality: *"A state may not afford diplomatic protection to one of its nationals against a state whose nationality such person also possesses."* Although the States parties to this instrument are few, it has been understood that it adequately reflects the customary law of the time[452].

375. Without prejudice to the foregoing, the rule of non-liability has also been applied in statutes other than diplomatic protection. By way of example, it was precisely the solution adopted by the ICSID Convention, to which both Spain and Venezuela adhered.

376. However, with the evolution of international law since the *Nottebohm* case of the International Court of Justice, the principle of non-responsibility has been progressively displaced by that of effective and dominant nationality, as shown by the decisions in the *Mergé cases,* of the

[451] *Enrique Heemsen and Jorge Heemsen v. Bolivarian Republic of Venezuela* (PCA Case No. 2017-18), Award of Jurisdiction, October 29, 2019 **(Annex CLA-101)** §§ 423-443. The parties discussed at length the relevance of this award to the present dispute. The Applicant points out that the tribunal's analysis of the principles of international law is an *obiter dicta and* would therefore have no great value. While it is true that the paragraphs outlined do not represent the central part of that award, the Tribunal does consider that they adequately set out the current state of international law in this area. As indicated *(supra* § 273), for the purposes of this analysis, the argumentative force of an award is more relevant than its binding value.

[452] *Manuel García Armas et al. v. Bolivarian Republic of Venezuela* (PCA Case No. 2016-08), Award on Jurisdiction, December 13, 2019 **(Annex CLA-102)** §§ 660-669.





the Italian-United States Conciliation Commission[453], the Iran-United States Claims Tribunal[454] and *Manuel García Armas*[455], among others[456]. In the opinion of this Arbitral Tribunal, the jurisprudence of the Iran-United States Claims Tribunal is of particular relevance in this case, given the important similarities between the Algeria Agreements, which gave rise to that body, and investment protection, in that nationals of one contracting party have the right to act directly against the other contracting party. In other words, as the same court pointed out, the system established by the Algerian Agreements *"was not a typical exercise of diplomatic protection"*[457] and is close to the system of investment protection established by bilateral treaties such as the BIT.

377. Another true reflection of this development is the Draft Articles on Diplomatic Protection, which provide: "[a] *State of nationality may not exercise diplomatic protection in respect of a person against another State of which that person is also a national, unless the nationality of the former State is predominant both on the date on which the injury occurred and on the date of the official presentation of the claim"* (Article 7)[458].

378. The legal authorities cited above show that the principle of non-liability has lost relevance in the context of contemporary international law on dual nationals, and is therefore not relevant to the resolution of the question raised here[459]. Therefore, the Court considers it unnecessary to refer to the other aspects identified in § 373 *above.*

[453] *Florence Strusky Mergé,* Italian-American Conciliation Commission, Decision No. 55, Compilation of Arbitral Awards, Vol. XIV, Award, June 10, 1955 **(Annex RLA-83)** pp. 246-247.

[454] *Islamic Republic of Iran v. United States of America,* IUSCT Case No. A/18, Decision, 6 April 1984 **(Annex RLA-15).**

[455] *Manuel García Armas et al. v. Bolivarian Republic of Venezuela* (PCA Case No. 2016-08), Award on Jurisdiction, December 13, 2019 **(Annex CLA-102)** § 675.

[456] *See* the cases referred to in this regard in the Draft Articles on Diplomatic Protection of the United Nations International Law Commission with its commentaries (excerpt), 2006 **(Annex CLA-158 bis)** p. 50, art. 7.

[457] *Nasser Esphahanian v. Bank Tejarat,* IUSCT Case No. 157, Final Decision, March 29, 1983, § 43.

[458] Draft Articles on Diplomatic Protection of the United Nations International Law Commission with its commentaries (excerpt), 2006 **(Annex CLA-158 bis)** p. 49, art. 7.

[459] The Arbitral Tribunal notes that this declaration does not prejudge the validity of the principle of non-liability in cases of single nationality. This hypothesis exceeds the scope of this dispute, so it is unnecessary to refer to it.

*(iii) Conclusion*

379. The Arbitral Tribunal considers that the principle of non-liability is also irrelevant to the resolution of the present dispute.

***(E) Principle of effective and dominant nationality***[460]

*(i) Summary of the discussion*

380. The Respondent points out that the principle of effective and dominant nationality constitutes the supplementary rule of international law for cases of dual nationality. Thus, a dual national could only sue the State of his non-dominant nationality.

381. The Applicant maintains that this principle has been widely criticized, denying that it is the supplementary rule. In any event, he submits that this principle would only be applicable in cases of diplomatic protection, but not when the investor sues directly under the auspices of a bilateral investment treaty.

*(ii) Analysis*

382. As a preliminary matter, the Arbitral Tribunal considers it appropriate to distinguish two different hypotheses of claims brought by dual nationals. A first case includes cases in which a person who has more than one nationality invokes one of them to sue a third State of which he is not a national. In these cases, investment tribunals have consistently chosen not to examine the claimant's links with the State of which he or she is a national. It is sufficient that it is not fraudulent for the nationality requirement to be understood to have been satisfied, without the need to apply the principle of effective and dominant nationality. This has been the solution adopted, for example, in the

460 The Court is aware that this principle has been the subject of a terminological discussion. In the *Nottebohm case,* the International Court of Justice referred to him by the terms *effective and dominant nationality.* Other courts, however, such as the Italian-American Conciliation Commission in the *Mergé case,* have used the term *nationality predominantly.* So does the Draft Articles on Diplomatic Protection (art. 7). Although this second terminology could be considered more appropriate, as it better reflects the balancing exercise that must be carried out between the two opposing nationalities, the Court considers it unnecessary to address this dispute, for two fundamental reasons. First, both parties referred to this rule of international law by the expression *effective and dominant nationality.* Second, this award concludes that Mr. Fraiz's alleged links with Spain are insufficient to grant him protection under the BIT, regardless of the wording of this principle of international law.





*Saba Fakes v. Turkey*[461], *Oostergetel v. Slovakia*[462], *Eudoro A. Olguín v. Republic of Paraguay*[463], *Tza Yap Shum v. Peru*[464] and *Mr. Franck Charles Arif v. Republic of Moldova*[465]. Something similar has happened when, due to the renunciation or loss of the nationality of the receiving State, only one of the nationalities has remained in force [466].

383. Mr. Fraiz's situation is not as described in the preceding paragraph. In this case, the Claimant is invoking one of his nationalities to bring an international action against the State of his other nationality. This assumption is different and requires a more thorough analysis.

384. For these purposes, the Arbitral Tribunal will first analyze the validity of the principle of effective and dominant nationality. It will then review whether this principle is applicable in cases other than diplomatic protection.

385. As noted *above § §* 376-377, at least for the purposes of diplomatic protection, the rule of effective and dominant nationality has displaced the principle of non-liability in respect of dual nationals suing one of their States. In the Tribunal's view, effective and dominant nationality is the rule of customary international law in force in matters of dual nationals, so that the term *national* in Article I.1(a) of the BIT has to be interpreted in accordance with this principle[467].

386. In this arbitration, the Claimant has raised a number of criticisms of the appropriateness of this principle in the context of the BIT. In particular, it points out that the rule of effective and dominant nationality: (i) is

461 *Saba Fakes v. Republic of Turkey* (ICSID Case No. ARB/07/20), Award, July 14, 2010 **(Annex CLA-66)** § 64.

462 *Jan Oostergetel and Theodora Laurentius v. Slovak Republic* (UNCITRAL), Decision on Jurisdiction, 30 April 2010 **(Annex CLA-65)** § 130.

463 *Eudoro A. Olguín v. Republic of Paraguay* (ICSID Case No. ARB/98/5), Award, July 26, 2001, § 61.

464 *Tza Yap Shum v. Republic of Peru* (ICSID Case No. ARB/07/6), Decision on Jurisdiction and Competence, June 19, 2009 **(Annex CLA-171)** §§ 52 et seq.

465 *Mr. Franck Charles Arif v. Republic of Moldova* (ICSID Case No. ARB/11/23), Award, 8 April 2013, §§. 352 et seq.

466 See, e.g., *Ioan Micula et al. v. Romania* (ICSID Case No. ARB/05/20), Decision on Jurisdiction and Admissibility, 24 September 2008, §§ 98 et seq.; *Waguih Elie George Siag and Clorinda Vecchi v. Arab Republic of Egypt* (ICSID Case No. ARB/05/15), Decision on Jurisdiction, 11 April 2007. In the same vein, C. Schreuer, *The ICSID Convention: A Commentary,* 2nd ed. (2009), pp. 265-267.

467 This is clear from the commentaries to article 7 of the Draft Articles on Diplomatic Protection of the United Nations International Law Commission with its commentaries (excerpt), 2006 **(Annex CLA-158 bis)** pp. 49-53, art. 7. In the same vein, *Enrique Heemsen and Jorge Heemsen v. Bolivarian Republic of Venezuela* (PCA Case No. 2017-18), Award of Jurisdiction of October 29, 2019 **(Annex RLA-4)** §§ 428-433.





Uncertain; (ii) it is subject to subjective assessments by the court; and (iii) it may be incompatible with the practice of countries to grant their nationality without the need for a genuine bond.

387. The Court is aware that the rule of effective and dominant nationality may present some difficulties in its application in practice. However, the Applicant has not alleged, nor has this Court been able to identify, a rule of international law other than that of effective and dominant nationality that is relevant for the purposes of Article 31 of the VCLT. In any case, this Court is convinced that this hypothetical rule is not the protection of all national doubles events. As has been explained *(supra* § 270), there is no State practice, not even incipient, of protection with this scope.

388. Once the validity of the principle of effective and dominant nationality has been established, it is necessary to analyse its scope of application, that is, whether it is restricted to diplomatic protection, as the Applicant alleges, or whether it has general application, as the Respondent alleges.

389. As a starting point, it should be noted that, although the principles of international law relating to dual nationality have undergone significant development in the field of diplomatic protection, they are not limited to it. This is confirmed by the 1930 Nationality Convention, which used these principles for purposes that go beyond diplomatic protection *(supra* § 263).

390. Moreover, these principles persist even in the current context of international protection of foreign investment. This is shown, above all, by the ICSID Convention, one of the most relevant instruments of the current regime in this area, whose Article 25(2)(a) includes the principle of non-liability without nuance.

391. Similarly, State practice indicates that the principle of effective and dominant nationality, which constitutes a nuanced rule of the principle of non-responsibility, remains relevant in the adoption of investment treaties. In fact, in those cases in which the contracting parties to an investment treaty have expressly regulated the situation of dual nationals, the solutions adopted have been[468]: (i) their total exclusion, as is the case with the Italy-Venezuela BIT[469], the Canada-Venezuela BIT-

468 This sample does not include cases where the contracting parties have defined investor status on the basis of residence or other similar criteria. Strictly speaking, in these cases the nationality of the investor is irrelevant, so there are no dual nationality conflicts.

469 Additional Protocol to the Agreement between the Italian Republic and the Republic of Venezuela on the Promotion and Protection of Investments, June 1990 **(Annex C-166),** clause 1(a).





Venezuela[470], the Iran-Venezuela BIT[471] or the Spain-Uruguay[BIT 472], or (ii) the application of the principle of effective or dominant nationality, as is the case with the Colombia-Spain BIT, the Uruguay-Armenia BIT, the Argentina-Ecuador BIT, the Czech Republic-Albania BIT and the DR-CAFTA[473].

392. The Complainant argued, on the basis of, inter alia, the Commission's Draft Articles on Diplomatic Protection[474], that the principle of effective and dominant nationality applies only in the context of diplomatic protection, and that, in view of the differences between that mechanism and the current system of investment protection, it could not be applied by analogy in the latter[475]. In the opinion of the Arbitral Tribunal, the background information referred to in the preceding paragraphs proves precisely the opposite: the principle of effective and dominant nationality, as reflected and developed in the field of diplomatic protection, constitutes a relevant rule of international law for the interpretation of the BIT and does not present a substantive incompatibility with the investment protection system, both at the time of the BIT and today.

393. For the sake of completeness, the Court considers that the applicant's argument is based on an incorrect assumption. Of course, the rules clearly agreed upon by the parties to an investment treaty take precedence over the general solutions of international law. That was the meaning of articles 16 and 17 of the Draft Articles on Diplomatic Protection. However, the evolution that investment protection mechanisms may have undergone does not imply the loss of validity of the substantive principles that govern the matter, particularly with respect to matters that have not been directly resolved in the relevant treaty. As the Court noted in *§* 263 above, dual nationality raises legal issues that persist in an analogous manner in both diplomatic protection and foreign investment arbitration, with the principle of effective and dominant nationality being applicable in both systems.

470 Agreement between the Government of the Republic of Venezuela and the Government of Canada for the Promotion and Protection of Investments, July 1, 1996 **(Annex C-195)** art. I.g.

471 Agreement on the Reciprocal Promotion and Protection of Investments between the Government of the Bolivarian Republic of Venezuela and the Government of the Islamic Republic of Iran, 11 March 2005 **(Annex C-224)** art.1.2.a).

472 Agreement for the Promotion and Reciprocal Protection of Investments between the Kingdom of Spain and the Oriental Republic of Uruguay, 7 April 1992 **(Annex C-176)** art I.3.c).

473 Free Trade Agreement between the Dominican Republic, Central America and the United States of America (DR-CAFTA), August 5, 2004 **(Annex C-338),** art. 10.28.

474 Draft Articles on Diplomatic Protection of the United Nations International Law Commission with its commentaries (excerpt), 2006 **(Annex CLA-158).**

475 Transcript, Day 2, 380:8-22.

394. The applicant also relies on the cases *of Saba Fakes v. Turkey*[476], *Bahgat v. Egypt*[477], *Pey Casado v. Chile*[478], *KT Asia v. Kazakhstan*[479], *ADC v. Hungary*[480] and *Rompetrol v. Romania*[481]. Notwithstanding the fact that some of these precedents refer to the nationality of legal persons[482], the Court considers that they point more to the speciality of investment treaties than to the particular nature of the principle of effective and dominant nationality. In these cases, the courts concluded that the question of nationality was regulated by the respective treaties and therefore there was no need to rule on the principles of international law. The Arbitral Tribunal reiterates that, in general terms, it does not disagree with this approach[483]. The difference with this case lies in the result of the textual and contextual interpretation of the Treaty.

395. Although there is consensus that the principle of effective and dominant nationality has undergone significant development in the field of diplomatic protection, there is nothing in the precedents cited by the Parties to indicate that the principle applies *exclusively* to situations relating to diplomatic protection. Indeed, when the courts should have analysed the matter in greater detail, they have reached a conclusion similar to that expressed in *§* § 388-392 above, namely that the principle of effective and dominant nationality is not restricted to the scope of diplomatic protection, but has general application in international law.

396. In this context, the Iran-United States Claims Tribunal in the *A/18* case held, recognizing that this was not a case of diplomatic protection[484], that: "[t]here *is a considerable*

476 *Saba Fakes v. Republic of Turkey* (ICSID Case No. ARB/07/20), Award, 14 July 2010 **(Annex CLA-66)** § 69.

477 *Mohamed Abdel Raouf Bahgat v. Arab Republic of Egypt* (PCA Case No. 2012-07), Decision on Jurisdiction, November 30, 2017 **(Annex CLA-168)** § 231.

478 *Victor Pey Casado and Fundación Presidente Allende v. Republic of Chile* (ICSID Case No. ARB/98/2), Award, May 8, 2008 **(Annex CLA-1)** § 415.

479 *KT Asia Investment Group B.V. v. Republic of Kazakhstan* (ICSID Case No. ARB/09/8), Award, October 17, 2013 **(Annex RLA-29)** §§ 125-129.

480 *ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary* (ICSID Case No. ARB/03/16), Award, October 2, 2006 **(Annex CLA-44)** § 359.

481 *The Rompetrol Group N.V. v. Romania* (ICSID Case No. ARB/06/3), Decision on Objections to Jurisdiction and Admissibility, April 18, 2008 **(Annex CLA-124)** § 85.

482 For example, KT Asia Investment Group B.V. v. Republic of Kazakhstan (ICSID Case No. ARB/09/8), Award, October 17, 2013 **(Annex RLA-29),** ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary (ICSID Case No. ARB/03/16), Award, October 2, 2006 **(Annex CLA-44).**

483 This is without prejudice to the cautionary measures that this Court has made with respect to the reasoning made by the *Bahgat* and *Pey courts (supra* §§ 276-275).

484 This was expressly pointed out by the court, which indicated that most of the disputes that were called a be resolved involved conflicts between private parties and States, rather than disputes between States: *Republic*





*body of law and legal literature, analysed herein, which leads the Tribunal to the conclusion that the applicable rule of international law is that of dominant and effective nationality"*[485].

397. For the sake of completeness, the Court understands that the principle of effective and dominant nationality is consistent with the natural meaning, context, object and purpose of an investment treaty, such as, in the relevant part, to give assurance to investors who have their headquarters of business in one country, that they will be subject to an international jurisdiction that protects their investments in another country. In other words, although those criteria in Article 31 of the VCLT do not in themselves define the scope of the concept of *investor* in the BIT *(supra* §§ 249 and 250), they acquire meaning in the light of the more general provision that in cases of dual nationality, the principle of effective and dominant nationality is relevant, in the absence of a special rule, to determine the subjects who are protected.

*(iii) Conclusion*

398. In view of the decisions of *Sections* 2, 3 and 4 above and considering the provisions of Article 31 of the VCLT, the Arbitral Tribunal concludes that the principle of effective and dominant nationality is a relevant rule of international law applicable to the interpretation of the term *investor* in Article I(1)(a) of the BIT when the investor is a dual national bringing arbitration against one of the States of which he is a national.

### 6. Conclusion on the interpretation of the concept of *investor* in the BIT

399. In the preceding sections *(supra* 2, 3, 4), the Arbitral Tribunal has concluded that Article I.1(a) of the BIT does not contain a special rule governing the treatment of dual nationals as investors. The Court has also pointed out that the principle of effective and dominant nationality, as a relevant rule of international law, is applicable to the present case *(supra* Section 5(E)).

400. It follows from the foregoing that the BIT, interpreted in accordance with the various elements provided for in Article 31 of the VCLT, including the relevant rules of international law, partially protects investors with dual nationality. Specifically, the Court considers that a dual national may invoke the protection of the BIT, to the extent that he invokes his effective and dominant nationality, in order to sue the State of his non-dominant nationality.

*Islamic Law of Iran v. United States of America,* IUSCT Case No. A/18, Decision, 6 April 1984 **(Annex RLA-15),** p. 18; similar statement in *Nasser Esphahanian v. Bank Tejarat,* IUSCT Case No. 157, Final Decision, 29 March 1983, § 43.

485 *Islamic Republic of Iran v. United States of America,* IUSCT Case No. A/18, Decision, 6 April 1984 **(Annex RLA-15)** pp. 16 and 17.





## B. COMPLEMENTARY MEANS OF INTERPRETATION

401. Article 32 of the VCLT refers to complementary means of interpreting a treaty, stating the following:

> *32. Complementary means of interpretation. Supplementary means of interpretation, in particular the travaux préparatoires of the treaty and the circumstances of its conclusion, may be used to confirm the meaning resulting from the application of article 31, or to determine the meaning where the interpretation given in accordance with article 31:*
>
> *a) leaves the meaning ambiguous or obscure; or*
>
> *b) leads to a manifestly absurd or unreasonable result.*

402. In accordance with the interpretative exercise carried out in the preceding sections, the Arbitral Tribunal considers that the elements mentioned in Article 31 of the VCLT make it possible to give a clear and determined meaning to the concept of *investor* contained in the BIT, which is consistent with the principle of effective and dominant nationality in force in international law.

403. In circumstances where such a result is not ambiguous or obscure, nor manifestly absurd or unreasonable, the Court considers it unnecessary to have recourse to the additional means provided for in Article 32. The optional nature of this appeal is clear from the very wording of the transcribed rule, which indicates that the respective court *"may"* resort to the complementary means of interpretation in the hypotheses indicated therein.

404. Consequently, in view of the conclusion reached in chapter A of this award, the Tribunal will not rule on the complementary means of interpretation invoked or disputed by the Parties. The following chapter will analyse Mr. Fraiz's specific situation under Article I(1)(a) of the BIT, in the light of the interpretation made by this Tribunal.

## C. MR. FRAIZ 'S SITUATION UNDER ARTICLE I.1(A) OF THE BIT

*(i) Summary of the discussion*

405. The Respondent points out that Mr. Fraiz's effective and dominant nationality has always been Venezuelan. In particular, it states that the Plaintiff was born in Venezuela, is the son of naturalized Venezuelan parents, and spent his entire family and business life in Venezuela. He only acquired Spanish nationality at the age of 38, after which he continued to act as a Venezuelan citizen. It adds that





Mr. Fraiz's Spanish nationality and his links with that country would be a mere fiction. Thus, for example, when he emigrated from Venezuela he took up residence in Miami, not in Spain.

406. The Applicant asserts that his links with Spain are real. He claims that his parents never renounced their Spanish nationality and that Spain always considered them Spanish. He adds that he has official Spanish documentation and that he is authorized to exercise political rights in that country. He also points out that he has legal residence in Spain and that a large part of his family lives there.

*(ii) Analysis*

407. Various courts have ruled on the criteria necessary for the practical application of the principle of effective and dominant nationality. For example, the Iran-United States Claims Tribunal in case *A/18* stated: "[i]n *determining the dominant and effective nationality, the Tribunal will consider all relevant factors, including habitual residence, center of interests, family ties, participation in public life and other evidence of attachment"*[486].

408. En similar sentido, el tribunal del caso *Mergé* sostuvo: "[i]n *order to establish the prevalence of the United States nationality in individual cases, habitual residence can be one of the criteria of evaluation, but not the only one. The conduct of the individual in his economic, social, political, civic and family life, as well the closer and more effective bond with one of the two States must also be considered"*[487].

409. La cuestión también fue abordada, en semejantes términos, por la Corte Internacional de Justicia en el caso *Nottebohm:* "[d]ifferent *factors are taken into consideration, and their importance will vary from one case to the next: the habitual residence of the individual concerned is an important factor, but there are other factors such as the centre of his interests, his family ties, his participation in public life, attachment shown by him for a given country and inculcated in his children, etc."*[488].

410. Following these precedents, the Arbitral Tribunal will jointly apply the aforementioned criteria, based on the information available in the file, for the purpose of determining the effective and dominant nationality of Mr. Fraiz.

486 *Islamic Republic of Iran v. United States of America,* IUSCT Case No. A/18, Decision, 6 April 1984 **(Annex RLA-15)** p. 25.

487 *Florence Strusky Mergé,* Italian-American Conciliation Commission, Decision No. 55, Compilation of Arbitral Awards, Vol. XIV, Award, June 10, 1955 **(Annex RLA-83)** p. 247.

488 *Nottebohm Case (Liechtenstein v. Guatemala),* Judgment, 1955 ICJ Reports, April 6, 1955 **(Annex RLA-17)** p. 22.

411. As a preliminary matter, the Court notes that the Applicant does not rightly assert that his Spanish nationality is dominant. In fact, in his writings he merely maintains that this nationality is not merely formal, and that his links with Spain are real[489].

412. The Court agrees with the Applicant on this point. There is no evidence that Mr. Fraiz's Spanish nationality is merely *formal* or *paper*. He acquired it in 2003, because he was the son of Spanish citizens [490]. Nor is there any indication of fraud or that such nationality was acquired solely to obtain an advantage in the context of this dispute. The Court does not doubt, therefore, that Mr. Fraiz's Spanish nationality is real and that it can be validly exercised in accordance with the legislation of that country.

413. In accordance with the foregoing, the question to be analyzed is whether, in the light of the principle of effective and dominant nationality, Mr. Fraiz's Spanish nationality can be classified as preponderant over his Venezuelan nationality, so that it can be invoked against Venezuela for the purposes of obtaining the protection of the BIT.

414. In accordance with the criteria referred to above *(supra* §§ 407-409), the Arbitral Tribunal considers that the answer to this question is negative, for the following reasons:

a) Mr. Fraiz was born, studied, married, and had children in Venezuela[491].

b) Mr. Fraiz developed his business life in Venezuela. All of the investments that have been alleged in this arbitration were made in Venezuela. In contrast, the Tribunal has no evidence of relevant investments made by Mr. Fraiz in Spain.

---

489 Memorandum of Claim, §§ 132 et seq.; Reply, § 14.

490 This is stated in the entry of March 15, 2004 made on Mr. Fraiz's birth certificate, granted before the Spanish Consulate on May 3, 1978 (Birth Certificate of Fernando Fraiz Trapote before the Spanish Consulate, May 3, 1978 **(Annex C-3)** entry of March 15, 2004, p. 2).

491 Most of these facts are recognized in Mr. Fraiz's own May 18, 2020 statement, filed in this arbitration **(Exhibit CWS-1).** Mr. Fraiz's birth in Venezuela is also recorded on his birth certificate **(Exhibit C-3)** and on his birth certificate of September 22, 2016 **(Exhibit C-138);** the fact that Mr. Fraiz had children in Venezuela is recorded in the birth certificate of his daughter Alejandra Fraiz González, dated March 29, 1993 **(Appendix R-13).**





c) Mr. Fraiz resided in Venezuela from birth until 2014. Once he left Venezuela, he settled in the city of Miami, United States[492]. The Plaintiff did not prove that he had resided permanently in Spain, at any time in his life.

d) In view of the apparent success of his investments, Mr. Fraiz actively participated in Venezuelan public life[493]. There is no evidence of similar participation in Spanish society.

e) At the outset of the present dispute, Mr. Fraiz presented himself to the Government of Venezuela as a Venezuelan businessman, without mentioning his dual nationality. Although it is true that in those communications he did not expressly deny his status as a Spaniard, nor did he say that he was *exclusively* Venezuelan, with them he sought to obtain preferential treatment precisely because he was a Venezuelan national.

f) Mr. Fraiz's parents were born in Spain and emigrated to Venezuela before Mr. Fraiz's birth[495]. In addition, part of Mr. Fraiz's family currently lives in Spain and has some properties there[496]. However, these links with Spain do not directly concern Mr. Fraiz (but members of his family) and are insufficient to counteract the circumstances described in the preceding letters.

---

492 Witness statement of Fernando Fraiz Trapote **(Annex CWS-1)** p. 1.

493 This is clear from various press releases that publicly show Mr. Fraiz as a well-known Venezuelan businessman **(Annexes R-8, R-9, R-10** and **R-11).** On the other hand, Mr. Fraiz has also been authorized to exercise political rights in Venezuela, as follows from his registration in the electoral registry of Venezuela (Electoral Registry of the Voter Fernando Fraiz Trapote, Court as of July 29, 2020, National Electoral Council of the Bolivarian Republic of Venezuela, July 29, 2020 **(Annex R-14);** Electoral registration of the voter Fernando Fraiz Trapote, Court as of July 31, 2019, National Electoral Council of the Bolivarian Republic of Venezuela **(Annex R-7)).**

494 Letter from Fernando Fraiz Trapote to Nicolás Maduro, January 17, 2014 **(Exhibit C-107).**

495 Witness statement of Fernando Fraiz Trapote **(Annex CWS-1)** p. 1.

496 This is stated in the registry information issued by the Property Registrar Mr. Reynaldo Vázquez de la Puerta, of the Property Registry of Pozuelo de Alarcón No. 1. See Nota Simple of the Property Registry of Pozuelo de Alarcón No. 1 on the property C/ Portugal 1, portal 2°, bajo C. 28224 Pozuelo de Alarcón, June 10, 2020 **(Annex R-6)** p. 2.





*(iii) Conclusion*

415. From the available evidence, the Arbitral Tribunal concludes that Mr. Fraiz's effective and dominant nationality is Venezuelan, and therefore he is not protected by the BIT for the purposes of suing Venezuela. Mr. Fraiz's links with Spain are insufficient to reverse this conclusion[497].

**D. VENEZUELA'S SUBSIDIARY ARGUMENT**

416. As noted in the explanatory section *(supra* Section V.D), the Respondent argues, in the alternative, that the Arbitral Tribunal lacks jurisdiction *ratione personae* because Mr. Fraiz Trapote would have been exclusively Venezuelan at the time of making his alleged investments. In his view, Article I.1(a) of the BIT would require compliance with the condition of nationality – that is, being a national of the non-host country of the investment – at the time of making the investment in the territory of the host country, a requirement that, in Mr. Fraiz's case, would not be met.

417. According to the qualification given by Venezuela itself, this argument has been formulated in a subsidiary manner, that is, in the event that the Court rejects the main argument on which it bases its *Objection Ratione Personae*[498].

418. In Section VI.C of this award, the Tribunal has concluded that Mr. Fraiz, in view of his effective and dominant nationality, is not protected by the BIT for the purposes of suing Venezuela, which means accepting the main argument of the *Objection Ratione Personae.* For this reason, the Court considers it unnecessary to analyze the alternative argument.

---

497 As noted in *footnote* 460 above, the Tribunal finds that Mr. Fraiz's ties with Spain are insufficient for the purposes of granting him investor protection under the BIT, regardless of the formulation of the rule of international law applicable to dual nationals.

498 Memorial, § 174.





**And. COASTS**

**1. Plaintiff's Cost Statement**

419. In its Statement of Costs, the Claimant claims:

a) USD 500,000.00 for advance on fees and costs of the Arbitral Tribunal y the CPA, including USD 250,000.00 corresponding to Respondent's portion[499];

b) EUR 3,000.00 for the non-refundable administrative fee for the Secretary-General of the PCA to act as appointing authority[500];

c) USD 1,727,218.87 for total costs (fees and expenses) of international lawyers (Freshfields and Dechamps International Law) for the jurisdictional phase of this[501] arbitration; and

d) USD 8,202.00 for professional fees of the jurisdictional phase of its Venezuelan lawyers, the firm D'Empaire[502].

**2. Defendant's Statement of Costs**

420. In its Statement of Costs, the Respondent claims the amount of USD 3,832,215.00 for fees and expenses of the law firm De Jesús y De Jesús[503].

**3. Decision on costs**

421. According to article 40.1 of the UNCITRAL Rules, *"in principle, the costs of the arbitration shall be borne by the unsuccessful party".* However, the same provision empowers the Arbitral Tribunal to apportionment such costs between the Parties if it decides that it is reasonable to do so in view of the fact that it is reasonable to do so.

---

499 Plaintiff's Statement of Costs, § 15(a)(i). On January 18, 2022, the Arbitral Tribunal requested that the Parties make an additional deposit of USD 200,000.00, which was paid in full by the Claimant, bringing its total effective contribution to the advance of costs to USD 700,000.00 (of which USD 350,000.00 corresponds to the Respondent's portion).

500 Plaintiff's Statement of Costs, § 15(a)(i).

501 Plaintiff's Statement of Costs, § 15(a)(ii).

502 Plaintiff's Statement on Costs, § 15(a)(iii).

503 Defendant's Statement of Costs, § 13(i).

taking into account the circumstances of the case. The Tribunal may also, if it deems it appropriate, apportionment among the Parties the costs of representation and assistance of counsel, as indicated in article 40.2 of the UNCITRAL Rules.

422. Although the Arbitral Tribunal has rightly disagreed with the legal position of the Claimant, it recognizes that the complexity of the arguments and precedents invoked by the Parties constitutes a special circumstance that gives rise to the fact that, without prejudice to the decision on jurisdiction adopted in this award, the Tribunal is in favour of not ordering Mr. Fraiz to pay costs. This means that (i) each Party shall pay its costs for attorneys' fees and expenses (i.e., the costs and expenses incurred by each Party in defending itself in arbitration), while (ii) the common costs shall be divided between them in halves (i.e., the fees and expenses of the arbitrators, the fees of the PCA Secretary General and the PCA, and any other costs that may apply under article 38 of the UNCITRAL Rules). This decision includes the costs associated with the incidents processed during the course of the arbitration.

423. The share of the costs of the arbitration to be shared between the Parties is set out below, as set out in paragraph 422 *above.*

424. *Costs of the Tribunal:* According to Article 38(a) of the UNCITRAL Rules, "[t]he *arbitral tribunal's fees* [shall] be indicated *separately for each arbitrator and* [shall] be fixed by *the tribunal itself in accordance with Article 39."* In turn, Article 39 of the UNCITRAL Rules provides: "[t]he *arbitral tribunal's fees shall be of a reasonable amount, taking into account the amount in dispute, the complexity of the subject matter, the time spent by the arbitrators and any other relevant circumstances of the case."*

425. In accordance with the above-mentioned provisions and section 12 of the Articles of Incorporation, the fees and expenses of the Tribunal are as follows:

a) Dr. Enrique Barros Bourie: USD 265.500,00 (honorarios);

b) Mr. Alexis Mourre: USD 134,550.00 (fees); and

c) Prof. Raúl E. Vinuesa: USD 131,700.00 (fees).

426. *Nominating Authority Costs:* The non-refundable administrative fee for the Secretary-General of the PCA, who was designated as the appointing authority by agreement of the Parties, to act as the appointing authority, amounts to EUR 3,000.00.





427. *Other costs:* The fees of the CPA, which was designated as the administering institution by agreement of the Parties, amount to USD 79,027.20.

428. Other expenses of the Tribunal, including stenography, printing, telecommunications, bank and courier charges, amount to USD 14,071.07.

429. *Unspent Balance:* The Complainant has made advance payments to the PCA in the amount of USD 700,000.00 to cover the fees and expenses of the Tribunal and the cost of registration services. Of this amount, USD 350,000.00 corresponds to an advance on the portion of the deposit corresponding to the Respondent. The costs paid with the deposit funds total USD 624,794.27. The unused balance on the deposit is USD 75,205.73. Pursuant to section 11.4 of the Articles of Incorporation, the Tribunal orders the PCA to return the unused balance of the deposit to the Applicant (i.e. USD 75,205.73), subject to paragraph 431 *below.*

430. In accordance with rule 41.5 of the UNCITRAL Rules, the PCA shall provide the Parties with a statement of accounts of the deposits received upon rendering this award.

431. In view of the fact that, by decision of the Respondent, the deposits to cover the costs of the arbitration have been borne exclusively by Claimant[504], the decision in paragraph 422 (ii) above implies that the Respondent must reimburse the Claimant for 50 per cent of those costs (i.e. USD 312,397.14). To this amount must be added 50 percent of the USD 3,493.50,505 paid by the Complainant as a non-refundable fee for the action of the appointing authority *(i.e.,* USD 1,746.75), which in total amounts to USD 314,143.89. Although the Plaintiff requested that the amounts awarded for costs be paid *"plus interest,"*[506] the Court will reject that request, considering that the Plaintiff did not justify the admissibility of interest or provide the necessary elements to determine it. The Court will order the Respondent to pay USD 314,143.89 to the Claimant.

504 Act of Incorporation, § 11.5.

505 Equivalent to EUR 3,000 at the exchange rate applicable on the day on which the Claimant made the payment of this administrative fee (see letter from the Claimant to the PCA of 1 March 2019, Exhibit E).

506 Reply, § 231; Plaintiff's Statement of Costs, § 15(b).





## VII. DECISION OF THE ARBITRAL TRIBUNAL

432. For the reasons set forth in this award, the Arbitral Tribunal, by the unanimity of its members, resolves the following:

a) The main argument is accepted as the *Objection Ratione Personae* raised by the Demanded.

b) As a consequence of the foregoing, it is declared that the Court lacks jurisdiction and jurisdiction to hear and resolve the claims of the Plaintiff.

c) The treatment of the alternative argument of the *Objection Ratione is declared unofficial Personae* raised by the Defendant.

d) It is declared that each Party shall pay the portion of the costs corresponding to its costs of representation and legal assistance. The remaining portion of the costs of the arbitration, meanwhile, shall be distributed among the Parties in halves, in the terms set forth in paragraphs 422 to 431. As a consequence of the foregoing, the Defendant must pay the Plaintiff USD 314,143.89.

e) Any other request by the Parties that has not been expressly addressed by the Tribunal in this paragraph is rejected.





Sede del arbitraje: La Haya, Países Bajos

Fecha: **31 de enero de 2022**

El Tribunal Arbitral

Sr. Alexis Mourre

Prof. Raúl Vinuesa

Dr. Enrique Barros Bourie
(Árbitro presidente)